1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF MICHIGAN
2                         SOUTHERN DIVISION

3       _____

4    UNITED STATES OF AMERICA,

5                         Plaintiff,
                                         DOCKET NO. 1:19-mj-24
6    vs.

7
     MUSE ABDIKADIR MUSE,
8    MOHAMED SALAT HAJI, and
     MOHAMUD ABDIKADIR MUSE,
9
                         Defendants.
10   _____/

11

12           TRANSCRIPT OF DETENTION HEARINGS (DAY 1)

13          BEFORE MAGISTRATE JUDGE PHILLIP J. GREEN

14                    GRAND RAPIDS, MICHIGAN

15                      January 25, 2019

16

17   Court Reporter:        Glenda Trexler
                            Official Court Reporter
18                          United States District Court
                            685 Federal Building
19                          110 Michigan Street, N.W.
                            Grand Rapids, Michigan 49503
20

21   Proceedings reported by stenotype, transcript produced by

22   computer-aided transcription.

23

24

25

1   A P P E A R A N C E S:

2   FOR THE GOVERNMENT:

3       MR. CLAY M. WEST
        UNITED STATES ATTORNEY'S OFFICE
4       330 Ionia Avenue, N.W.
        P.O. Box 208
5       Grand Rapids, Michigan 49501-0208
        Phone:  (616) 456-2404
6       Email: Clay.M.West@usdoj.gov

7       MR. CHRISTOPHER M. O'CONNOR
        UNITED STATES ATTORNEY'S OFFICE
8       330 Ionia Avenue, N.W.
        P.O. Box 208
9       Grand Rapids, Michigan 49501-0208
        Phone:  (616) 456-2404
10      Email:  Christopher.m.o'connor@usdoj.gov

11  FOR THE DEFENDANT MUSE ABDIKADIR MUSE:

12      MS. SHARON A. TUREK
        FEDERAL PUBLIC DEFENDERS OFFICE
13      50 Louis Street, N.W., Suite 300
        Grand Rapids, Michigan 49503-2633
14      Phone:  (616) 742-7420
        Email:  sharon_turek@fd.org

15

16  FOR THE DEFENDANT MOHAMED SALAT HAJI:

17      MS. MARY CHARTIER
        CHARTIER & NYAMFUKUDZA, PLC
18      1905 Abbot Road, Suite 1
        East Lansing, Michigan 48823
19      Phone:  (517) 885-3305
        Email: mary@cndefenders.com

20

21  FOR THE DEFENDANT MOHAMUD ABDIKADIR MUSE:

22      MR. RICHARD E. ZAMBON
        RICHARD E. ZAMBON, PLLC
23      202 Waters Building
        161 Ottawa Avenue, N.W.
24      Grand Rapids, Michigan 49503
        Phone: (616) 456-7831
25      Email: rick@zambonlaw.com

```
 1                              Grand Rapids, Michigan

 2                              January 25, 2019

 3                              2:01 p.m.

 4                   P R O C E E D I N G S

 5          THE COURT:  Good afternoon.  Please be seated.  We are

 6   here in the matter of the United States versus

 7   Muse Abdikadir Muse, Mohamed Salat Haji, and

 8   Mohamud Abdikadir Muse, case number 19-mj-24.  This is the date

 9   and time set for a hearing on the government's motion for

10   detention.

11          Could I have appearance of counsel, please.

12          MR. WEST:  Good afternoon, Your Honor, Clay West and

13   Chris O'Connor for the United States.  Also at counsel table is

14   Special Agent Paul Dunham with the FBI.

15          THE COURT:  All right.  Good afternoon to all three of

16   you.

17          MS. CHARTIER:  Good afternoon, Your Honor,

18   Mary Chartier on behalf of Mohamed Haji who is seated to my

19   right.  I would ask the Court if Mr. Haji may be uncuffed in

20   case he would like to take some notes during the proceeding.

21          THE COURT:  No.

22          MS. CHARTIER:  Thank you, Your Honor.

23          THE COURT:  You're welcome.

24          MS. TUREK:  Good afternoon, Your Honor, Sharon Turek

25   on behalf of Mr. Muse Muse.
```

1          *THE COURT:*  All right.  Good afternoon, Ms. Turek.

2          And am I mispronouncing his name?  Is it Muse?

3     Muse Muse?

4          *DEFENDANT MUSE MUSE:*  Yeah.

5          *THE COURT:*  All right.  I apologize.  Thank you.

6          *MR. ZAMBON:*  And good afternoon, Your Honor,

7     Richard Zambon appearing on behalf of the defendant

8     Mohamud Muse, and I would also make the same request to uncuff

9     Mr. Muse.

10          *THE COURT:*  It is respectfully denied.  I defer to the

11     Marshal Service.  They have a policy on this matter, and I'm

12     not going to deviate from that policy.  I don't think there's

13     sufficient basis for purposes of this hearing.  For a trial,

14     then it will be a different matter.

15          *(Ms. Turek's cell phone went off)*

16          *MS. TUREK:*  I'm sorry, Your Honor.

17          *THE COURT:*  Oh.  Normally we confiscate those phones,

18     Ms. Turek, but I've had my phone go off in here, so I'm going

19     to cut you some slack.

20          *MS. TUREK:*  I'm turning it off, Your Honor.

21          *THE COURT:*  All right.  Mr. West, I received along

22     with defense counsel an email yesterday from you indicating

23     that the government intends to object to any question that

24     would elicit classified information.

25          I want to address that at the outset because your

1    email suggested that the agent would determine when classified

2    information was being elicited and choose when not to answer.

3    We don't normally handle things that way in terms of an

4    objection.  I'm not trying to prevent the government from

5    objecting, nor do I want to interfere with national security,

6    but I think we have to have some bases for the Court to

7    ascertain whether it's being properly asserted.  So I'm a

8    little uncomfortable with proceeding if the intention is simply

9    that the agent would choose as he determined what to provide

10   and what not to provide.

11        Is there a way that we can proceed that would allow

12   the government to preserve as privileged classified information

13   but also give the Court and defense counsel some opportunity to

14   determine whether it's being appropriately asserted?

15        MR. WEST:  Absolutely, Your Honor.  And I'll note at

16   the outset the government certainly does not intend to use that

17   assertion to cut off a cross or even a vigorous

18   cross-examination of any matters put out in direct examination.

19        I'm happy to sit down with the Court and cocounsel and

20   discuss the issue if it even arises.  It may not arise.  But

21   it's a scenario where the government counsel will certainly

22   object where it's obvious.  There are some scenarios where it

23   may not be initially obvious to government counsel.

24        THE COURT:  Okay.

25        MR. WEST:  And that was the impetus of the

1    communication that was presented.

2            THE COURT:  Well, we would normally discuss it here on

3    the record to the extent that's possible.  Well, we'll just --

4    we'll have to see how it goes.  I guess I was a little

5    surprised by that because I've reviewed the search warrant

6    applications and the Criminal Complaint.  I'm assuming there

7    was no classified information in those documents.

8            MR. WEST:  That is correct, Your Honor, and certainly

9    the government is prepared both in direct and cross-examination

10   to go through those materials at length and in depth.

11           THE COURT:  All right.  Very well.  The other question

12   I have for you, is the government relying upon the statutory

13   rebuttable presumption?

14           MR. WEST:  It is, Your Honor.

15           THE COURT:  All right.  So we need to do a prelim.

16           MR. WEST:  Just a moment, Your Honor.

17           Your Honor, on that note I would just respectfully

18   represent that the government's position is that the finding of

19   probable cause in the Complaint upon signing of the Complaint

20   is sufficient in terms of the rebuttable presumption itself.

21           THE COURT:  I disagree.

22           MR. WEST:  Okay.

23           THE COURT:  If the government wants to rely upon the

24   statutory rebuttable presumption, I interpret the statute as

25   requiring me to make a finding here in court following a

1    preliminary hearing that there is probable cause.  So I don't

2    know that it's going to matter at the end of the day.  I

3    suspect that the testimony that's coming in is going to be

4    fairly extensive.  But I just wanted to clarify that.

5              MR. WEST:  Understood, Your Honor.  And may I consult

6    again before we --

7              THE COURT:  Yes.  Please do.

8              MR. WEST:  Your Honor, the government's position is in

9    the event that a full preliminary examination is necessary, the

10   government would drop the rebuttable presumption in that

11   scenario.

12             THE COURT:  I'm sorry, I didn't hear what you said.

13             MR. WEST:  The government would drop its request for

14   the rebuttable presumption in that scenario and defer the full

15   preliminary exam to a later date as initially noted by the

16   Court's scheduling order.

17             THE COURT:  Okay.

18             MS. CHARTIER:  Your Honor, if I just may.  Do we have

19   a date for that preliminary hearing?  I didn't see one in the

20   minutes.

21             THE COURT:  We don't yet.  Certainly it has to be

22   within 14 days of their initial appearance.  We can certainly

23   discuss that at some point if counsel wishes.

24             MS. CHARTIER:  Thank you, Your Honor.

25             MR. ZAMBON:  Your Honor, so the government's email

1    that they sent regarding classified information is not going to

2    be heard?  Or they are withdrawing that it sounds like --

3         *THE COURT:*  No.

4         *MR. ZAMBON:*  -- because we're only going to be in the

5    detention hearing now?

6         *THE COURT:*  Well, no.  Here is what I understand,

7    Mr. Zambon.  And Mr. West can correct me if I'm wrong.  There

8    were two separate issues.  One, the issue of the potential of

9    classified information being responsive to a question raised

10   here today.  The way we're going to handle that is on a

11   case-by-case basis.  Questions will be asked, and if there's an

12   objection or if the agent believes that a full answer would

13   require the disclosure of classified information, we'll address

14   it on a case-by-case basis.

15        The second issue is whether the government enjoys a

16   statutory rebuttable presumption.  And under Title 18,

17   United States Code § 3142(e)(3)(C), the government would enjoy

18   such a presumption upon a judicial finding of probable cause.

19   Now, the government's position, as I understand it, is my

20   signing of the Criminal Complaint was a finding of probable

21   cause.  And the government is right, at least to some extent.

22   My interpretation of that statutory provision requires a

23   preliminary hearing and a finding after the opportunity for

24   cross-examination at a preliminary hearing.  And I -- my

25   interpretation is based upon case law that does provide that --

1    because the government has argued in other cases, not

2    necessarily in this district, that the government can obtain

3    the statutory presumption by introducing evidence of uncharged

4    offenses that establish probable cause of an offense that is

5    not charged but would otherwise have a rebuttable presumption.

6    The Court said no, that's not sufficient.  So my interpretation

7    is, right or wrong, is that it has to be a charged offense,

8    there has to be a preliminary hearing or an indictment to

9    trigger the rebuttable presumption.  So the government has

10   elected not to rely upon the statutory rebuttable presumption.

11        *MR. ZAMBON:*  Thank you, Your Honor.  And I appreciate

12   that and I understand that.  My concern is -- and maybe this is

13   premature, that we won't even reach this -- but if the

14   government is going to claim some classified -- some objection

15   to our questioning based on classified information, there is a

16   procedure to be followed that is set out in the Classified

17   Information Procedures Act, and I don't know how we're going to

18   do that on a case-by-case basis.

19        *THE COURT:*  Well, CIPA -- CIPA, I think, is intended

20   more for trial.  It may be that in this case CIPA will have to

21   be employed.  I don't know that we need to address the

22   provisions of CIPA for purposes of a detention hearing.

23        But what is at issue, Mr. Zambon, and will be very

24   much on the front of my mind, is due process.  Now, what we

25   can't have is a situation where the government declines to

1    provide evidence the extent of which would deny your client

2    due process.  I don't know whether that will happen or not.

3    I've reviewed several search warrant applications and the

4    Criminal Complaint, none of which had classified information.

5    So, frankly, I was a little surprised when I saw the email

6    about classified information.  I'm not sure how or why

7    classified information would come into play here.  But we'll

8    have to see.  And if the government asserts classified

9    information, you know, if it declines to provide that

10   information, then I'll just have to look at the totality of the

11   situation to determine whether your client's due process rights

12   have been protected.

13          MR. ZAMBON:  Thank you, Your Honor.  I appreciate

14   that.

15          THE COURT:  All right.  Are we ready to begin?

16          MR. O'CONNOR:  Yes, Your Honor.

17          THE COURT:  All right.  Go ahead.

18          MR. O'CONNOR:  Your Honor, the government calls

19   FBI Special Agent Paul Dunham.

20                          PAUL DUNHAM

21                  *(The oath was administered)*

22          MR. O'CONNOR:  May I proceed, Your Honor?

23          THE COURT:  Yes.

24

25

*DIRECT EXAMINATION OF PAUL DUNHAM*                              11

1                              DIRECT EXAMINATION

2      *BY MR. O'CONNOR:*

3      *Q.*  Good afternoon, sir.

4      *A.*  Good afternoon.

5      *Q.*  Will you please introduce yourself to the Court.

6      *A.*  My name is Paul Dunham, D-U-N-H-A-M.  I'm a special agent

7      with the FBI assigned to the FBI's office in East Lansing,

8      Michigan.

9      *Q.*  How long have you been employed with the FBI?

10     *A.*  A little over 14 years.

11     *Q.*  And in what position?

12     *A.*  For about nine and a half years I was a forensic accountant

13     and for just shy of five years a special agent.

14     *Q.*  As an analyst and now a special agent with the FBI, have

15     you received training and experience with investigation -- with

16     investigations of counterterrorism matters?

17     *A.*  I have.

18     *Q.*  And through your training and experience are you generally

19     familiar with certain Arabic words and phrases as they relate

20     to extremist and terrorism offenses?

21     *A.*  I am.

22     *Q.*  Have you personally been involved in the investigation of

23     Muse Muse, Mohamud Muse, and Mohamed Haji in this case?

24     *A.*  I have.

25     *Q.*  Have you also learned information from other FBI agents and

1    personnel that were involved in this investigation?

2    A.  Yes, I have.

3    Q.  All right.  Agent Dunham, I would like you to please turn

4    to Exhibit 1 in the book in front of you.

5         MR. O'CONNOR:  A copy has been provided to all counsel

6    and the Court, Your Honor.

7         THE COURT:  Okay.  Thank you, Mr. O'Connor.

8    Q.  (BY MR. O'CONNOR)  Agent Dunham, is this a

9    Criminal Complaint and Affidavit charging the defendants in

10   this case with Title 18, U.S. Code § 2339B, conspiring to

11   provide material support or resources to a designated foreign

12   terrorist organization, namely ISIS?

13   A.  Yes, it is.

14   Q.  Now, looking at the Affidavit that follows the

15   Criminal Complaint page, did you assist with the drafting of

16   the allegations that appear in the Affidavit supporting the

17   charge against the defendants here today?

18   A.  Yes, I did.

19   Q.  To the best of your knowledge and belief, was this

20   Affidavit in Exhibit 1 true and correct in all material

21   respects on July 21st, 2019, when it was sworn by another FBI

22   agent in the investigation?

23   A.  Yes, it was, with the exception of one part.  There was an

24   edit or correction in paragraph 42.  So it starts with "On or

25   about January 8th and 9th of 2019," and in the next slot after

1  the comma is the lowercase word "Muse," and that should reflect

2  two capital letters "MM" intending to represent Muse Muse.

3  *Q.*  I see.  So that's a typographical error.  It should be "MM"

4  not Muse --

5  *A.*  That's correct.

6  *Q.*  -- in the first sentence?

7     Okay.  Other than that correction was this Affidavit true

8  and correct in all material respects on January 21st, 2019?

9  *A.*  Yes, it was.

10  *Q.*  And does it remain true and correct in all material

11  respects today to the best of your knowledge and belief?

12  *A.*  Yes, it does.

13          *MR. O'CONNOR:*  Your Honor, the government moves

14  Exhibit 1 into evidence.

15          *THE COURT:*  Any objection, Ms. Chartier?

16          *MS. CHARTIER:*  No, Your Honor.

17          *THE COURT:*  Okay.  Ms. Turek?

18          *MS. TUREK:*  No, Your Honor.

19          *THE COURT:*  Mr. Zambon?

20          *MR. ZAMBON:*  None, Your Honor.

21          *THE COURT:*  It is received.

22  *Q.*  *(BY MR. O'CONNOR)*  Agent Dunham, we're going to ask you a

23  lot of questions here today about events that occurred prior to

24  January 21st, 2019, but I want to start on that date.

25     Were you actively involved in the investigation on that

*DIRECT EXAMINATION OF PAUL DUNHAM*                                    14

1   date?

2   A.  Yes, I was.

3   Q.  And for some context to the exhibits that we'll go through

4   in a moment, on that date did the defendants Muse Muse,

5   Mohamud Muse, and Mohamed Haji all travel together by vehicle

6   from Lansing, Michigan, to the Gerald R. Ford International

7   Airport?

8   A.  Yes, they did.

9   Q.  And did all three individuals enter the airport that day?

10  A.  They did.

11  Q.  Was anyone in that group of three individuals intending to

12  fly out of the airport?

13  A.  Yes.

14  Q.  And who was that?

15  A.  Muse Muse.

16  Q.  What was his ultimate destination that day?

17  A.  Mogadishu, Somalia.

18  Q.  And did Muse Muse obtain his boarding pass from the ticket

19  counter of the airline who was flying out of the Grand Rapids

20  airport?

21  A.  Yes, he did.

22  Q.  After obtaining that boarding pass did he proceed to the

23  TSA security checkpoint and attempt to enter the sterile area

24  of the Grand Rapids airport?

25  A.  Yes, he did.

1  *Q.* At that point was Muse Muse arrested by FBI agents?

2  *A.* He was.

3  *Q.* With respect to the other two individuals, Mohamud Muse and

4  Mohamed Haji, did they remain in the airport as Defendant

5  Muse Muse attempted to enter the secure sterile area of the

6  airport?

7  *A.* Yes, they did.

8  *Q.* And what happened to those two individuals?

9  *A.* They were both arrested near the TSA area by FBI agents and

10  officers.

11  *Q.* After the three defendants were arrested at the airport,

12  were they transported to the FBI's office here in Grand Rapids?

13  *A.* Yes, they were.

14  *Q.* And did the FBI seek to interview each defendant?

15  *A.* Yes, we did.

16  *Q.* Were you personally involved in any of those interviews?

17  *A.* I was.

18  *Q.* Which interview were you involved in?

19  *A.* The interview of Mohamed Haji.

20  *Q.* Let me ask you about the first defendant, Muse Muse.  Did

21  you receive information from other agents concerning that

22  interview?

23  *A.* I did.

24  *Q.* Prior to his interview by FBI agents in the office, was he

25  read his Miranda rights?

1   *A.*  He was.

2   *Q.*  And did he agree to speak to FBI agents at that time?

3   *A.*  He did.

4   *Q.*  Was he confronted with Facebook communications that he made

5   to codefendants and others including a person he believed was

6   an ISIS Somali fighter about his desire to travel to Somalia to

7   join ISIS?

8   *A.*  Yes.

9   *Q.*  Generally speaking, Agent Dunham, did Muse Muse give an

10  indication as to the statements that he made that he was

11  confronted with?

12  *A.*  Um, in general he described the fact that he had been

13  communicating with an ISIS fighter that he believed was in

14  Somalia and that he was intending to travel to Somalia to join

15  ISIS there.

16  *Q.*  At any point during the interview did Muse Muse give an

17  impression that the statements that he made prior to his arrest

18  were not genuine?

19  *A.*  No, he did not.

20  *Q.*  Did he reaffirm his beliefs as expressed in those

21  communications?

22  *A.*  He did.

23       *THE COURT:*  Mr. O'Connor, I'm sorry to interrupt.  For

24  my benefit, in the Criminal Complaint continuation there are

25  three undercover employees, UCE-1, UCE-2, and UCE-3.  Is the

1    employee who pretended to be the Somali fighter UCE-2?

2              *MR. O'CONNOR:*  That's correct.

3              *THE COURT:*  All right.  Thank you.

4              *THE WITNESS:*  Yeah, Undercover Employee 2.

5              *THE COURT:*  I'm sorry.  Yes.  Go ahead, please.

6              *MR. O'CONNOR:*  Thank you, Your Honor.

7    *Q.   (BY MR. O'CONNOR)*  Agent Dunham, did Muse Muse agree to

8    sign a handwritten statement at some point during his interview

9    with the FBI that day?

10   *A.*  Yes, he did.

11   *Q.*  I turn your attention to Government Exhibit 2 in the book

12   in front of you, please.

13   *A.*  I'm there.

14   *Q.*  What is this?

15   *A.*  This is a handwritten statement that was made by

16   Special Agent Southard, and it reflects Muse Muse's statement

17   on that day, and as laid out on page 2 it says from Muse Muse's

18   perspective "I have asked Special Agent Southard of the FBI to

19   help me write this statement because I do not write well with a

20   pen."

21             *MR. O'CONNOR:*  The government moves Exhibit 2 into

22   evidence.

23             *THE COURT:*  Ms. Turek?

24             *MS. TUREK:*  No objection, Your Honor.

25             *THE COURT:*  Ms. Chartier?

1           *MS. CHARTIER:*  No objection, Your Honor.

2           *THE COURT:*  Mr. Zambon.

3           *MR. ZAMBON:*  Your Honor, if I may just -- Agent, can

4    you tell me who wrote this?

5           *THE WITNESS:*  This was Special Agent Southard.

6           *MR. ZAMBON:*  And it's in his handwriting?

7           *THE WITNESS:*  It is.

8           *MR. ZAMBON:*  Was the interview taped?

9           *THE WITNESS:*  It was video and audio recorded.

10          *MR. ZAMBON:*  And so there is an audio and video of

11   this statement being written out?

12          *THE WITNESS:*  It should be reflected in there.  I have

13   not seen it.  But, yes, it should be reflected on there.

14          *MR. ZAMBON:*  And you can say that the -- that this

15   exhibit is a true and accurate representation of what was on

16   the audio and video?

17          *THE WITNESS:*  It is.

18          *MR. ZAMBON:*  Thank you, Your Honor.  I have no

19   objection.

20          *THE COURT:*  All right.  Exhibit 2 is received.

21   *Q.   (BY MR. O'CONNOR)*  Agent Dunham, let's take a closer look

22   at the contents within Government Exhibit 2.  First of all, did

23   the defendant Muse Muse sign this handwritten statement on

24   January 21st, '19, 2019?

25   *A.*  Yes, he did.

1    *Q.*  That appears on page 2?

2    *A.*  That's correct.

3    *Q.*  The contents of the handwritten statement, in the first

4    paragraph does this document indicate that Muse Muse has

5    indicated he lives in Lansing, Michigan, but was born in a

6    Somali refugee camp in Kenya?

7    *A.*  That's correct.

8    *Q.*  All right.  I'll direct your attention to the second

9    paragraph of Exhibit 2.  Did Muse Muse indicate in this

10   statement when he began researching ISIS or what is otherwise

11   referred to as dawla, D-A-W-L-A?

12   *A.*  Yes.  He advised that when he was in high school he began

13   that exercise.

14   *Q.*  And did he indicate that at some point he began talking to

15   an ISIS recruiter, someone he believed to be an ISIS recruiter?

16   *A.*  Yes.

17   *Q.*  All right.  I would like you to read into the record the

18   sentence that follows, begins on the fourth line of paragraph 2

19   starting with "I."

20   *A.*  "I wanted to join ISIS in Somalia so I wouldn't have to do

21   an attack in the United States."

22   *Q.*  Does this handwritten statement also acknowledge that

23   Muse Muse understood that ISIS was a terrorist organization

24   according to the U.S. government?

25   *A.*  Yes, it does.

*DIRECT EXAMINATION OF PAUL DUNHAM*                    20

1   *Q.*  And did he indicate his belief that ISIS does not kill,

2   injure, maim, or kidnap innocent people?

3   *A.*  Yes, he did.

4   *Q.*  And I'd like you to read the final paragraph on page 1 of

5   Exhibit 2 into the record, please.

6   *A.*  "I was arrested today at the airport.  I was going to join

7   ISIS or live in Somalia."

8   *Q.*  Turning now to Defendant Haji.  Did he agree to be

9   interviewed by the FBI on Monday?

10  *A.*  Yes, he did.

11  *Q.*  Was he read his Miranda rights?

12  *A.*  He was.

13  *Q.*  And did he agree -- at that point did he speak with FBI

14  agents?

15  *A.*  He did.

16  *Q.*  Did Mr. Haji confirm that he was the person communicating

17  with the others using a Facebook account by the name of

18  Ebrahim Mohamed Salat?

19  *A.*  Yes, he did.

20  *Q.*  Referenced in the Affidavit as FB Account Haji?

21  *A.*  He did.

22  *Q.*  What's a kunya name?

23  *A.*  A kunya name is an ISIS adaptation of an Arabic word for

24  your ISIS fighter name.  So you're not using your true name,

25  you're using an ISIS fighter name that you select.

1    **THE COURT:**  Can you tell me that term again?  I didn't

2    quite catch it.

3    **MR. O'CONNOR:**  Kunya, Your Honor.  It's spelled

4    K-U-N-Y-A.

5    **THE COURT:**  All right.  Thank you.

6    *Q.*   *(BY MR. O'CONNOR)*  In this case, Agent, did any of the

7    defendants create a kunya alias and create Facebook accounts

8    using those kunya names?

9    *A.*  All three defendants selected an ISIS kunya name and had

10   corresponding Facebook accounts.

11   *Q.*  Do you recall off the top of your head the names of the

12   kunya fighter names they had assigned to themselves?

13   *A.*  I do.

14   *Q.*  What are those?  What are they?

15   *A.*  For Muse Muse it was Ali al-Muhajir.  For Mohamed Haji it

16   was Salamujahid al-Muhajir, and for Mohamud Muse it was

17   Abu Usama al-Muhajir.

18   *Q.*  And are those the aliases that appear on the cover page of

19   the Criminal Complaint as a/k/a's next to the defendants'

20   true names?

21   *A.*  They are.

22   *Q.*  And did Mr. Haji confirm with you that he was using a

23   kunya-named Facebook account during portions of this agreement

24   to assist with the travel of Muse Muse?

25   *A.*  He did.

 1   *Q.*  Generally speaking, Agent, did Mr. Haji adopt the

 2   communications in those Facebook accounts when he was

 3   confronted with them during his interview?

 4   *A.*  Yes.

 5   *Q.*  Did he also admit to the actions that he is alleged to have

 6   taken that's documented in those Facebook communications?

 7   *A.*  Yes, he did.

 8   *Q.*  Did he tell you anything else concerning his statements and

 9   actions?

10   *A.*  No.  He basically described that the statements were all

11   his and that the parties that he was sending stuff back and

12   forth to were who he thought they were.  That he didn't tell

13   the parties he was working with any differently.  However, he

14   did say that in his heart he didn't mean to do any of this.

15   *Q.*  Did you ask -- did you ask Mr. Haji if he had ever

16   communicated to anybody that sentiment?

17   *A.*  Yes, I did, and, no, he did not.

18   *Q.*  So he did not tell Muse Muse that?

19   *A.*  Not the latter part, that he didn't mean it and that he

20   didn't intend to do what he was doing.

21   *Q.*  He didn't tell that to Mohamud Muse?

22   *A.*  He did not.

23   *Q.*  Were FBI agents able to interview Mohamud Muse on Monday?

24   *A.*  They were not.

25   *Q.*  All right.  Let's turn to some examples.  There are

1    numerous summaries of Facebook communications that appear in

2    the Affidavit.  I would like to review some of those as well as

3    look at some actual exhibits of communications.

4        We'll start with the Complaint Affidavit on paragraph 12 on

5    page 3.  If you could turn to that, please.

6        Did the FBI obtain Facebook communications in this

7    investigation?

8    *A.*  Yes, we did.

9    *Q.*  And generally speaking, how did you do that?

10   *A.*  We used federal criminal search warrants.

11   *Q.*  Once you obtained those Facebook communications through the

12   search warrants, did you and others review them?

13   *A.*  Yes, we did.

14   *Q.*  And the summaries of the Facebook communications in this

15   Affidavit, is that based on a review of those Facebook

16   communications obtained through the search warrants?

17   *A.*  Yes, they are.

18   *Q.*  I would point your attention to paragraph 12.  In your

19   review of Facebook communications, is it true that

20   Defendant Haji and Defendant Mohamud Muse discussed ISIS videos

21   and did they make comments about ISIS videos that they had been

22   watching?

23   *A.*  Yes, they did.

24   *Q.*  And generally speaking, what did they say about that?

25   *A.*  So as reflected in the Criminal Complaint on or about

*DIRECT EXAMINATION OF PAUL DUNHAM*                    24

1  January 19th Mohamed Haji and Mohamud Muse were talking about

2  ISIS videos.  Haji wrote that he liked how ISIS burned people,

3  end quote.

4       MR. ZAMBON:  Your Honor, I object to this.  This is

5  far outside the date of the Complaint.  Where he's talking

6  about September of 2017.  And the Complaint is specific between

7  certain dates, October of 2018 and January of 2019.  I don't

8  see the relevancy to this.

9       THE COURT:  I get your point, Mr. Zambon, but this is

10  a detention hearing.  I assume the government is introducing it

11  because the government believes it's evidence that goes to

12  their state of mind as to whether they may be dangerous.

13       MR. O'CONNOR:  That's correct, Your Honor.

14       THE COURT:  Is that right, Mr. O'Connor?

15       MR. O'CONNOR:  That's correct, Your Honor.

16       THE COURT:  And, of course, I take all evidence into

17  consideration and give it the weight it's due, Mr. Zambon.

18       MR. ZAMBON:  Thank you, Your Honor.

19       THE COURT:  Go ahead, Mr. O'Connor.

20  Q.   (BY MR. O'CONNOR)  Were you finished?

21  A.   No.  So in that vein Mohamed Haji wrote to Mohamud Muse

22  that he liked how ISIS burned people and "I love it, man."

23  Q.   Was there also a reference to watching somebody put fuel on

24  somebody, watching somebody burning?

25  A.   There was.  The next day on January 20th, 2017,

1    Mohamed Haji wrote to Mohamud Muse "Ha" -- quote -- "Ha, ha, he

2    put that guy who was threaten, he put fuel on that dude while

3    he -- while his burning.  That was funny, dude."

4    *Q.*  Do you have an understanding of approximately when the FBI

5    inserted undercover FBI employees to start communicating with

6    the defendants?  Was this before or after January of 2017?

7    *A.*  After January of 2017.

8    *Q.*  So these comments that we see here, this is prior to any

9    involvement by the FBI communicating with the defendants?

10   *A.*  That's correct.

11   *Q.*  I would like you to turn to Exhibit 3 in your exhibit book,

12   please.  What is Exhibit 3?

13   *A.*  Exhibit 3 is a record produced by Facebook pursuant to a

14   criminal search warrant on Mohamud A. Muse of the account,

15   Facebook account Mohamud A. Muse.

16   *Q.*  Whose communications are depicted in Government Exhibit 3?

17   *A.*  These are communications between Mohamud Muse and

18   Mohamed Haji.

19   *Q.*  Now, if we look at the author lines of these

20   communications, it refers to a Mohamud A. Muse and an

21   Ebrahim Mohamed Salat.  Is that, the Salat name, the alias

22   Facebook account that Mr. Haji admitted to using?

23   *A.*  Yes, it is.

24   *Q.*  And what's significant about the conversation that appears

25   in Exhibit 3?

*DIRECT EXAMINATION OF PAUL DUNHAM*                    26

1    *A.*  So this was in June of 2017, and it's an apparent

2    conversation between Mohamud Muse and Mohamed Haji.  It starts

3    with "Yeah, what's up with dawla?"  Which is what Mohamed Haji

4    said.  And as the conversation continues on --

5    *Q.*  Let me stop you right there.  Again, what is dawla?

6    *A.*  So dawla is the Arabic name for ISIS.  So much like

7    professions and industries have jargon, dawla in the world of

8    terrorism means ISIS.

9    *Q.*  Okay.  Please continue.

10           *THE COURT:*  Is the government going to introduce this?

11           *MR. O'CONNOR:*  Yes, Your Honor.

12           *THE COURT:*  All right.  Any objection, Ms. Turek?

13           *MS. TUREK:*  No, Your Honor.

14           *THE COURT:*  Ms. Chartier?

15           *MS. CHARTIER:*  Is this -- I do have a question.  Is

16    this the complete communication between Mr. Muse and Mr. Haji?

17           *THE WITNESS:*  No, it is not.

18           *MS. CHARTIER:*  Then I do have an objection with just

19    the portion.  We don't have the context of the full

20    conversation.

21           *THE COURT:*  All right.  The objection is overruled.

22    I'll take it into consideration.

23           Mr. Zambon, any objection?

24           *MR. ZAMBON:*  I would just join Ms. Chartier's

25    objection, Your Honor.

1          *THE COURT:*  The objection is joined.  It is also

2    overruled.  It is received.

3          Go ahead, Mr. O'Connor.

4          *MR. O'CONNOR:*  Thank you.

5    *Q.*  *(BY MR. O'CONNOR)*  Agent Dunham, can you continue to

6    describe the communications that are highlighted on Government

7    Exhibit 3.

8    *A.*  Yes.  So again Mohamed Haji was asking "What's up with

9    dawla?"  Mohamud Muse replied, "I know anything new, bro, but

10   Imma speak other mujahid soon."  So "mujahid" is an Arabic word

11   for one who engages in jihad.  "Jihad" is an Arabic word for

12   basically fighting against the enemies of Islam.

13         So Mohamed Haji then replies, "I pray Allah gives

14   mujahideen," that's the plural of "mujahid," so a group of

15   fighters, "the victory.  And we are next to step on the battle

16   filed."  I think he intended to mean "field."  So "We are next

17   to step on the battlefield."

18   *Q.*  If I could turn your attention back to Exhibit 1, the

19   Complaint Affidavit at paragraph 10.  Going in chronological

20   order.

21         Did you find communications between Mohamud Muse and an FBI

22   undercover employee in about June 21st of 2017 where

23   Mohamud Muse made statements to that employee about what his

24   plans were?

25   *A.*  Yes.

*DIRECT EXAMINATION OF PAUL DUNHAM*                    28

1    *Q.*  Tell us about that.

2    *A.*  So Mohamud Muse was talking to someone that he thought was

3    an ISIS recruiter in the Iraq and Syria area --

4         *(Recess taken from 2:34 p.m. to 2:45 p.m.)*

5         *(There was a malfunction with the audio recording equipment*

6    *and the proceedings were stopped and the problem was corrected*

7    *and the proceedings continued as follows:*

8         *THE COURT:*  Please be seated.  I suppose this may have

9    been a metaphor for what we've been going through here in the

10   last few weeks.

11        All right.  Go ahead, Mr. O'Connor.

12        *MR. O'CONNOR:*  Thank you, Your Honor.

13   *Q.*  *(BY MR. O'CONNOR)*  Agent, we were talking about

14   Government's Exhibit 1, paragraph 10, on page 2, and I believe

15   the question I asked you was did Mohamud Muse indicate to an

16   online undercover employee with the FBI what his plans were?

17   *A.*  Yes, he did.

18   *Q.*  And what were those plans?

19   *A.*  He said that he wanted to join ISIS in Syria.  That he was

20   saving his money to make his way there.  That he had a valid

21   U.S. passport for travel.  That he wanted firearms training.

22   He wanted explosives training.  And that he planned to die with

23   a gun in his hand fighting for the Islamic State.

24   *Q.*  I'd like you to flip to Government Exhibit 4, please.  What

25   is Exhibit 4?

1    *A.*   Exhibit 4 is a record from Facebook that was produced

2    pursuant to a criminal search warrant for Muse Muse's Facebook

3    account.

4             *MR. O'CONNOR:*  The government moves Exhibit 4 into

5    evidence.

6             *THE COURT:*  Ms. Turek?

7             *MS. TUREK:*  Your Honor, I do have one question.

8             *THE COURT:*  Go ahead.

9             *MS. TUREK:*  Do we have any idea when -- the date on

10   top of the photo, what does that relate to?  Or not the date,

11   but is there a date relating to this photo?

12            *THE WITNESS:*  There is.  So if you go to -- the way

13   Facebook produces records, the records are produced most recent

14   to oldest, and as you're looking at the pages, unfortunately,

15   you have to start at the bottom and work your way up.  So if

16   you flip to page -- at the top it's labeled "432."  There's a

17   highlighted section for November 1st, 2017.  The type and URL

18   information in the bottom right is the digital description of

19   that photo.  And then this is the photo that was attached in

20   the communication.

21            *MS. TUREK:*  No objection, Your Honor.

22            *THE COURT:*  So this photo was sent on November 1st of

23   2017?

24            *THE WITNESS:*  That's correct.

25            *THE COURT:*  All right.  Thank you.

1            Ms. Chartier?

2            MS. CHARTIER:  Your Honor, I just would like to state

3    a standing objection to items coming in without the full

4    record.  I believe they are being admitted without context.  I

5    thought it might be easier for me to just make that objection

6    for all of the documents coming in and then you can probably

7    overrule me just once.

8            THE COURT:  Well, I appreciate that, Ms. Chartier, as

9    always.  There is the possibility that that objection might be

10   sustained depending upon the circumstance.  You know, the Rules

11   of Evidence are not as strictly applied in the detention

12   hearing.  At trial it would be a different situation.  So it is

13   still my discretion as to what to allow and what not to allow.

14   So, again, I would suggest you go ahead and make your objection

15   because it might be sustained.

16           MS. CHARTIER:  Great.  I'm happy to do that.

17           THE COURT:  I wouldn't hold my breath, but, you know,

18   you can catch me on a -- to be reasonable every once in a

19   while.

20           MS. CHARTIER:  Thank you, Your Honor.

21           THE COURT:  Mr. Zambon.

22           MR. ZAMBON:  I have no objection, Your Honor.

23           THE COURT:  All right.  It's received.

24   Q.   (BY MR. O'CONNOR)  So for the record, Agent Dunham, when

25   was this picture sent by Muse Muse?

1  A.  November 1st, 2017.

2  Q.  And who did he send it to?

3  A.  This picture was sent from Muse Muse to Mohamed Haji.

4  Q.  And was there a conversation associated with the sending of

5  this picture?

6  A.  Yes, there was.

7  Q.  And before we go to that conversation, can you describe for

8  the record what the picture depicts on the first page of

9  Government Exhibit 4.

10  A.  Yes.  So this appears to be a picture of the Home Depot

11  truck attack in Tribeca, New York, on Halloween, which was

12  October 31st of 2017.  So this was a scenario where an

13  individual drove a vehicle down a pathway and struck and killed

14  a number of individuals.

15  Q.  And on the bottom of that picture does it say "At least

16  eight people dead"?

17  A.  It does.

18  Q.  And that occurred -- that event occurred the day before

19  this picture was sent by Muse Muse to Mohamed Haji?

20  A.  It did.

21  Q.  And were there conversations associated with the sending of

22  this picture?

23  A.  There were.

24  Q.  Explain those to us.

25  A.  So in response to the picture, Mohamed Haji wrote "Real

1   civil war," to which Muse Muse replied "If this do not wake up

2   the people, nothing will."  And Mohamed Haji replied, "Yeah,

3   I'm ready.  Inshallah."  "Inshallah" is an Arabic term that's

4   very common and basically means God willing.  It's a normal

5   customary-type thing that's said in the spoken word and

6   written.

7        After saying "Yeah, I'm ready.  Inshallah," Mohamed Haji

8   says "This is a call for hijra."

9   *Q.*  And what is hijra?

10  *A.*  In the -- so "hijra" again is an Arabic word.  In the

11  context of extremism, hijra is basically the ISIS-used word to

12  define a foreign fighter's travel from their country of origin,

13  so let's say they live in the United States, in order to travel

14  to terrorist-held lands abroad to join as a fighter for that

15  particular group.

16       Mohamed Haji goes on to say "We can't live here.  I'm

17  trying to plan for hijra now."  To which Muse Muse replies,

18  "You have spoken the truth.  Just wait on the opportunity.  It

19  will present itself if we are truthful.  But no right.  It's

20  going to require some type of sacrifice."

21  *Q.*  Turning to Government's Exhibit 5, please.  What is this

22  record?

23  *A.*  This is a record produced by Facebook pursuant to a

24  criminal search warrant for Muse Muse's Facebook account.

25  *Q.*  And the conversations that appear on Government Exhibit 5,

1  when did those occur?

2  A.   This was in February of 2018.

3         MR. O'CONNOR:  The government moves Exhibit 5 into

4  evidence.

5         THE COURT:  Ms. Turek.

6         MS. TUREK:  No objection, Your Honor.

7         THE COURT:  Ms. Chartier.

8         MS. CHARTIER:  Objection, not the complete record.

9         THE COURT:  All right.  Mr. Zambon.

10        MR. ZAMBON:  I'm with Ms. Chartier.

11        THE COURT:  All right.  The objections are overruled.

12 It is received.

13 Q.   (BY MR. O'CONNOR)  Agent Dunham, what did you find of

14 significance in Government Exhibit 5?

15 A.   So here Muse Muse is communicating with Mohamed Haji, and

16 Muse Muse says "Little by little, bro, and soon we'll be in

17 dawla."  Again, "dawla" being ISIS.  And after a series of just

18 one-word exchanges back and forth, Mohamed Haji says "Out of

19 here.  Hijra."

20 Q.   And that's on page 2 of the exhibit, the "out of here" and

21 "hijra"?

22 A.   It is.

23 Q.   Exhibit 6, please.  What is Government Exhibit 6?

24 A.   So Government Exhibit 6 again is records produced by

25 Facebook pursuant to a criminal search warrant for Muse Muse's

1  Facebook account.

2  *Q.*  And this portion of Muse -- I'm sorry, whose account is

3  this?

4  *A.*  This was a Facebook search warrant for Muse Muse's

5  Facebook account.

6  *Q.*  And this section of the conversations of the account, what

7  is the time period that's covered here?

8  *A.*  March of 2018.

9      *MR. O'CONNOR:*  The government moves Exhibit 6 into

10  evidence.

11      *THE COURT:*  Ms. Turek?

12      *MS. TUREK:*  No objection, Your Honor.

13      *THE COURT:*  Ms. Chartier?

14      *MS. CHARTIER:*  Lack of complete record objection.

15  Thank you.

16      *THE COURT:*  Mr. Zambon?

17      *MR. ZAMBON:*  Your Honor, I don't see the relevancy of

18  this at all.

19      *THE COURT:*  I think that will be established in a

20  moment.

21      It is received over objection.

22  *Q.*   *(BY MR. O'CONNOR)*  Agent Dunham, what is the photograph

23  that appeared in the Facebook records that you obtained from

24  this part of the account?

25  *A.*  So this is a picture of what appears to be a slaughtered

 1  goat that was sent by Mohamed Haji on March 28th of 2018 to

 2  Muse Muse.

 3  *Q.*  And did you find any conversations around the same time

 4  period that this photograph was sent?

 5  *A.*  Yes.  There was a slight delay from the time period when

 6  Mohamed Haji sent it and when Muse Muse received it.  Once

 7  Muse Muse received it they started an exchange conversation to

 8  which Mohamed Haji said, "Yeah, next time I want to catch

 9  kuffar and do my jihad training on them.  That will be in

10  dawla." So "kuffar" is the Arabic word for nonbeliever.

11  *Q.*  Government Exhibit 7, please.  What is this document?

12  *A.*  This is a record produced by Facebook pursuant to a search

13  warrant for Mohamed Haji's Facebook account.

14  *Q.*  And what is the time period covered for the communications

15  that appear in Exhibit 7?

16  *A.*  I'm sorry, it wasn't -- it wasn't Mohamed Haji's

17  Facebook account, it was Mohamed -- I'm sorry -- Muse Muse's

18  Facebook account.  And the time period is April of 2018.

19          *MR. O'CONNOR:*  Okay.  The government moves Exhibit 7

20  into evidence.

21          *THE COURT:*  Ms. Turek?

22          *MS. TUREK:*  May I have a moment, Your Honor?

23          *THE COURT:*  You may.

24          *MS. TUREK:*  No objection, Your Honor.

25          *THE COURT:*  Ms. Chartier?

1          *MS. CHARTIER:*  I object on the basis of not having the

2    complete record.

3          *THE COURT:*  Okay.  Mr. Zambon?

4          *MR. ZAMBON:*  Same objection, Your Honor.

5          *THE COURT:*  All right.  The objections are overruled.

6    It is received.

7    *Q.   (BY MR. O'CONNOR)*  Agent, what did you find of

8    significance to your investigation in Government Exhibit 7?

9    *A.*  So, again, this is a Facebook message exchange between

10   Muse Muse and Mohamed Haji where Muse Muse writes "Dawla has a

11   new video."  He describes it a little bit as being humiliating

12   for certain types of people.  "It will heal -- it will heal

13   much in your watching it, bro.  The Islamic State is

14   dawlat al baqiyah."  "Baqiyah" is an Arabic word that means

15   enduring or everlasting, and it's somewhat of a slogan tag that

16   ISIS has adopted that they can never be defeated.

17        So in response to that Mohamed Haji says "I'm at work right

18   now.  I'll enjoy it later."

19        And then later in the next day, April 29th, 2018,

20   Mohamed Haji replies, "I saw them dawla videos and are very

21   hot.  We need more of those.  Very aggressive and makes you

22   want to be with them in getting victory."  Which Muse Muse

23   replies, "You're absolutely right.  Seeing those heads getting

24   cut off heals the heart and makes me want to be with them more.

25   May Allah make a steadfast upon this until we are in the ranks

1    of the khalifa and until we die."  "Khalifa" is the Arabic word

2    for caliphate which is also associated with ISIS.

3    *Q.*  And I believe you may have misspoke, so I want to make sure

4    the record is clear.

5    *A.*  Sure.

6    *Q.*  In that conversation, the communication from Mr. Haji where

7    he says "We need more of those.  Very aggressive and makes you

8    want to be in them in getting victory."

9    *A.*  Yes, you're correct.  If I didn't say that, that's correct.

10   *Q.*  Government Exhibit 8, please.  What is this document?

11   *A.*  This is a record produced by Facebook pursuant to a search

12   warrant for Muse Muse's Facebook account.

13   *Q.*  And what time period is covered by this excerpt from the

14   Facebook messages?

15   *A.*  May of 2018.

16          *MR. O'CONNOR:*  The government moves Exhibit 8 into

17   evidence.

18          *THE COURT:*  Ms. Turek.

19          *MS. TUREK:*  May I have a moment to read it,

20   Your Honor?

21          *THE COURT:*  You certainly may.

22          *MS. TUREK:*  No objection, Your Honor.

23          *THE COURT:*  All right.  Ms. Chartier.

24          *MS. CHARTIER:*  Objection.  Lack of complete record.

25   And I don't see the relevance in reading through this.

1              THE COURT:  Help me understand that.

2              MS. CHARTIER:  Sure.  So this just -- I'm reading just

3    one highlighted portion, and it's just two gentlemen

4    communicating without any reference at all to what the

5    allegations are here or what their potential state of mind

6    might have been.

7              THE COURT:  Well, that would go to the weight of the

8    evidence certainly, and you're free to cross-examine the agent,

9    as I know you will.

10             MS. CHARTIER:  I will.  Thank you.

11             THE COURT:  All right.  Thank you.

12             Mr. Zambon.

13             MR. ZAMBON:  Same objection, Your Honor.

14             THE COURT:  All right.  The objections are overruled.

15   It is received.

16   Q.   (BY MR. O'CONNOR)  Agent Dunham, directing your attention

17   to the top of Government Exhibit 8, will you please explain for

18   us the relevancy of that highlighted portion of the

19   communication.

20   A.   Yes.  So this was a Facebook written exchange between

21   Muse Muse and Mohamed Haji where Mohamed Haji wrote "And today

22   it was just a little look of Allah to show you what I went

23   through for four years now.  It's clear with them.  I don't

24   have nothing else but my own family, man, and you as a real

25   brother.  May Allah keep us on this.  As for me, I want that

1  shahid inshallah by Allah."  "Shahid" is the Arabic word for

2  martyr.

3  *Q.*  Government Exhibit 9.  What is this document?

4  *A.*  This is a Facebook record that was produced pursuant to a

5  criminal search warrant for Mohamed Haji's Facebook account.

6  *Q.*  And what period of time is covered by this excerpt from the

7  Facebook messages?

8  *A.*  July of 2018.

9         *MR. O'CONNOR:*  The government moves Exhibit 9 into

10  evidence.

11         *THE COURT:*  Ms. Turek.

12         *MS. TUREK:*  Objection, Your Honor.  I don't see the

13  relevance in this photo.

14         *THE COURT:*  All right.  Help me understand that,

15  Mr. O'Connor.

16         *MR. O'CONNOR:*  The agent can explain the relevance, I

17  believe, Your Honor.

18         *THE COURT:*  All right.  Ms. Chartier.

19         *MS. CHARTIER:*  Same objection.  Lack of a complete

20  record, Your Honor.

21         *THE COURT:*  Okay.

22         *MR. ZAMBON:*  Same here, Your Honor.

23         *THE COURT:*  Okay.  The objections as to lack of

24  complete record are overruled.  Ms. Turek's relevancy objection

25  is being held in abeyance.  I'll give the agent an opportunity

1    to explain the relevance.

2         Go ahead, Mr. O'Connor.

3         *MR. O'CONNOR:*  Thank you, Your Honor.

4    *Q.  (BY MR. O'CONNOR)*  Agent Dunham, what is the relevance of

5    your pulling out this photograph that appears on page 1 of

6    Exhibit 9?

7    *A.*  So, again, this was a Facebook message.  This was sent from

8    Muse Muse to Mohamed Haji, and as the picture describes it says

9    "The martyrdom of Abu Bakr al-Baghdadi's son in an anti-Syrian

10   operation against the Syrian Army in eastern Homs in Syria."

11        In response to this picture, Mohamed Haji said, "Kuffar.  I

12   want to kill one inshallah one day."  He goes on to say "My

13   days are coming.  I want a lot of this kuffar dead."

14        Muse Muse replies, "Same here, akhi."  "Akhi" is the Arabic

15   word for brother.  Muse Muse goes on to say "May Allah make a

16   way for us."  Mohamed Haji replies, "We can't love this PPL,"

17   possibly standing for people.  "Is haram, nasty haram."

18   "Haram" is the Arabic word for forbidden.

19        Mohamed Haji goes on to say "We can't have love for

20   kuffar."  Again "kuffar" being nonbelievers.

21        Mohamed Haji goes on to say "I wish Allah could bless me

22   with a thousand kids for dawla."  Again, ISIS.  "Wallahi,"

23   which means I swear to Allah, "I will want them in there

24   inshallah wallahi.  When it comes to the truth, I will never

25   deny it that that's the only state we have."  Meaning or likely

*DIRECT EXAMINATION OF PAUL DUNHAM*                    41

1    meaning the Islamic State.

2            THE COURT:  All right.  The relevance has been

3    established.  It is received unconditionally.

4    Q.  (BY MR. O'CONNOR)  Government Exhibit 10, please.  What is

5    this document?

6    A.  This is a record produced by Facebook pursuant to a

7    criminal search warrant for Mohamed Haji's Facebook account.

8    Q.  And what are the time periods covered in this excerpt from

9    Facebook?

10   A.  August of 2018.

11           MR. O'CONNOR:  And the government moves Exhibit 10

12   into evidence.

13           THE COURT:  Okay.  Ms. Turek.

14           MS. TUREK:  No objection, Your Honor.

15           THE COURT:  Ms. Chartier.

16           MS. CHARTIER:  Lack of complete record.

17           THE COURT:  Got it.  Mr. Zambon.

18           MR. ZAMBON:  Same, Your Honor.

19           THE COURT:  Okay.  The objections are overruled.  It's

20   received.

21   Q.  (BY MR. O'CONNOR)  There was communications on August 17th

22   of 2018 between Muse Muse and Mohamed Haji?

23   A.  That's correct.

24   Q.  And what is the most significant communication that appears

25   in this record?

*DIRECT EXAMINATION OF PAUL DUNHAM*                    42

1   *A.*  Where Muse Muse sends a written exchange to Mohamed Haji

2   and Muse Muse says "Hijra" -- again this is the idea of a

3   foreign fighter traveling from their country of origin to a

4   terrorist outland and joining the fight -- "Hijra is the only

5   think" likely meaning "thing," "Hijra is the only think that

6   can save us unless we do an istishhad operation on these

7   kuffar."

8       "Istishhad" is the Arabic word for martyrdom.  And "kuffar"

9   is the word for nonbelievers.  So if I read it differently,

10  Hijra is the only thing that can save us unless we do a

11  martyrdom operation on these nonbelievers.

12  *Q.*  Turn to Government Exhibit 11, please.  What is this

13  document?

14  *A.*  This is a record produced by Facebook pursuant to a search

15  warrant for Muse Muse's Facebook account.

16  *Q.*  And what is the date of the communications that appear in

17  Government Exhibit 11?

18  *A.*  August 31st, 2018.

19          *MR. O'CONNOR:*  The government moves Government

20  Exhibit 11 into evidence.

21          *THE COURT:*  Ms. Turek?

22          *MS. TUREK:*  No objection, Your Honor.

23          *THE COURT:*  Okay.  Ms. Chartier?

24          *MS. CHARTIER:*  Objection, lack of a complete record.

25          *THE COURT:*  Okay.  Mr. Zambon.

1            MR. ZAMBON:  I join.

2            THE COURT:  Okay.  The objection is overruled.  It is

3    received.

4    Q.   (BY MR. O'CONNOR)  Agent Dunham, what was significant in

5    Government Exhibit 11?

6    A.   So this is an exchange between Muse Muse and Mohamed Haji,

7    and it surrounds a time period that we believe that Muse Muse

8    obtained his driver's license.  And so Mohamed Haji says

9    "Mash'Allah," which is the Arabic phrase or word for basically

10   like it was God's will.  It was an important event.  To which

11   Muse Muse replies, "Yes, I'm a driver now."  To which

12   Mohamed Haji says "That's good.  So you can drive the

13   stashahadi car, right?"  "Stashahadi" is the Arabic word for

14   martyr.  Martyrdom.  To which Muse Muse replies, "Yes."

15   Mohamed Haji then says "On this kuffar I'm ready to meet

16   Allah."  Muse Muse replies, "Bro, I've been thinking about

17   getting a rifle and something."  He goes on to say "I'm

18   starting to entertain these thoughts."  Mohamed Haji says

19   "Easy, inshallah, let's just go to dawla together and do our

20   things there.  Here is just only us.  So the bigger the

21   better."

22        The conversation continues where Muse Muse says "Bro, all

23   I'm seeing is going to Somalia right now.  And I want to tell

24   you more, but I was listening to an ex-Pentagon guy say how the

25   kuffar have an extremist list, so be careful on Facebook, dawla

1  Bro.  The more Islamic you are, the more likely they are

2  watching you."

3      Mohamed Haji replies, "Yes, they are.  They are tightening

4  the web up, sheikh faisal."  Mohamed Haji goes on to say "They

5  read all of our stuff."  Mohamed Haji goes on to say "They even

6  track us."  Muse Muse replies, "I'm not surprised.  I would be

7  pissed if I tried to Somalia and they put me on the no-fly

8  list."  Muse Muse then says "Then it would be jihad on their

9  land."  And again "jihad" is the Arabic word for basically

10 fighting against the enemies of Islam.

11     Mohamed Haji replies, "Inshallah.  Slowly, move slowly,

12 brother.  Do open yourself up to the kuffar to know your

13 plans."  Again "kuffar" is nonbelievers.  Mohamed Haji then

14 corrects himself and says "I mean don't open yourself up for

15 al-kuffar to know."

16     Muse Muse replies, "They will never know, inshallah."

17 Mohamed Haji then says "They will just know a car passed by for

18 an istishhad operation."  Again, "istishhad" being the Arabic

19 word for martyrdom.

20     Mohamed Haji goes on to say "That's how I want to do them

21 soon.  If there was one in here."  Mohamed Haji then says "They

22 will know the Jundallah don't play."  "Jundallah" is the Arabic

23 word for soldiers of Allah.

24     Mohamed Haji closes with "I just want to dispatch them to

25 the hellfire."

*DIRECT EXAMINATION OF PAUL DUNHAM*                              45

1   *Q.*  Do you have an understanding of what the hellfire is?

2   *A.*  I have a very general understanding.  In Islam there are a

3   number of layers to hell itself, and hellfire is one of those

4   layers.

5   *Q.*  Government Exhibit 12, please.  What is this record?

6   *A.*  This is a record produced by Facebook pursuant to a search

7   warrant for Muse Muse's Facebook account.

8   *Q.*  And what time period is covered from this excerpt from the

9   Facebook records?

10  *A.*  November of 2018.

11       *MR. O'CONNOR:*  The government moves Exhibit 12 into

12  evidence.

13       *THE COURT:*  Ms. Turek?

14       *MS. TUREK:*  No objection, Your Honor.

15       *THE COURT:*  Okay.  Ms. Chartier.

16       *MS. CHARTIER:*  Objection, lack of a complete record.

17       *THE COURT:*  Okay.  Mr. Zambon.

18       *MR. ZAMBON:*  I join in, Your Honor.

19       *THE COURT:*  The objection is overruled.  It's

20  received.

21  *Q.*  *(BY MR. O'CONNOR)*  Agent Dunham, what did you find

22  concerning in these Facebook conversations?

23  *A.*  So now we're into the time period where Muse Muse is

24  communicating with FBI Undercover Employee 3 who was presented

25  as an ISIS fighter in Somalia.  And so Muse Muse says to the

1   ISIS fighter, "I'm ready to leave this land, but I'm going to

2   make another account so the munafiqun," which is basically a

3   plural for hypocrites in Arabic, "may connect anything to me.

4   My name on the new account will be Ali al-Muhajir."

5           THE COURT:  Did you say -- I'm sorry.  Did you say

6   Undercover Employee 3?

7           THE WITNESS:  Yes.  I'm sorry.  2.

8           THE COURT:  Okay.

9           THE WITNESS:  You're correct, Your Honor, 2.

10          THE COURT:  Because 3 is someone who was portraying

11  themselves as living here.

12          THE WITNESS:  That's correct.  You're correct.  Thank

13  you.  Undercover Employee 2.  Yeah, that's correct.

14          THE COURT:  Thank you.

15          MR. O'CONNOR:  Thank you for that clarification,

16  Your Honor.

17  Q.   (BY MR. O'CONNOR)  This reference to the new account,

18  Ali al-Muhajir, is that the kunya ISIS fighter name that you

19  talked about earlier that Muse Muse assigned to himself?

20  A.   Yes, it is.  We just need to continue on 12 here if we're

21  going to finish it.

22  Q.   Yes, please.  Go ahead.

23  A.   So Muse Muse goes on to say "I'm just learning from others.

24  I've come this far.  I'm not letting the kuffar," again

25  nonbelievers, "stop me now.  I never go to jail.  It's either

1  hijra or shahadah."  Again "hijra" is to travel and join ISIS,

2  "shahadah" is the Arabic word for death of a martyr.  So it's

3  either hijra or shahadah, death of a martyr.

4  *Q.*  Government Exhibit 13.  What is this record?

5  *A.*  This is an exchange between -- I'm sorry, this is a record

6  from Facebook that was produced pursuant to a criminal search

7  warrant.

8  *Q.*  And what time period is covered by the conversations in

9  Exhibit 13?

10  *A.*  November 2018.

11         *MR. O'CONNOR:*  The government moves Exhibit 13 into

12  evidence.

13         *THE COURT:*  All right.  Ms. Turek?

14         *MS. TUREK:*  No objection.

15         *THE COURT:*  Ms. Chartier?

16         *MS. CHARTIER:*  Objection, lack of a complete record.

17         *THE COURT:*  All right.  Mr. Zambon?

18         *MR. ZAMBON:*  I join in.

19         *THE COURT:*  The objection is overruled.  It is

20  received.

21  *Q.*  *(BY MR. O'CONNOR)*  Agent Dunham, did you find any relevant

22  communications in here concerning the defendants' plans?

23  *A.*  So again this is an exchange between Muse Muse and

24  Mohamed Haji where Muse Muse says "The kuffar don't know this

25  war will not end until we invade their land."

1    Mohamed Haji then goes on to say "We make sure and I make

2    sure my kids have this portion on killing kuffar for fun.  Take

3    them to the blazing fire."

4    *Q.*  Government Exhibit 14.  What is this record?

5    *A.*  This is a record produced by Facebook pursuant to a

6    criminal search warrant.

7    *Q.*  And whose records are depicted in Government Exhibit 14?

8    *A.*  So this is going to be the Facebook account of

9    Mohamed Haji.  The name of the Facebook profile was

10   Salamujahid al-Muhajir.

11   *Q.*  And was that a Facebook account that Mr. Haji opened after

12   he assigned himself a kunya fighter name?

13   *A.*  So that's the name that he selected.  According to Mr. Haji

14   in his interview, he advised that Muse Muse created the account

15   for him and then handed over the information that was necessary

16   to log in and use it.  So Mohamed Haji told us that he wrote

17   these communications.

18   *Q.*  What did you find relevant in Government Exhibit 14?  And

19   describe for the Court who the communications are with.

20   *A.*  So this is Mohamed Haji using his ISIS kunya

21   Facebook account, and he's communicating with FBI employee --

22   Undercover Employee Number 2 who was presented as an ISIS

23   fighter in Somalia.  And so Mohamed Haji wrotes -- wrote, "I'm

24   trying best, and I know it's not a place of us Muslims, but

25   there's too much spy and too much persecution of Muslims.  But

1    inshallah," again God willing, "hijra is the only way to go.

2    Is the only way out."

3        Mohamed Haji then goes on to write, "And I have family,

4    akhi.  I'm going to give them warnings.  Then I'll make my

5    hijra inshallah."

6    *Q.*  Government Exhibit 15.

7    *A.*  I don't know if we established a time period for that, but

8    that was November 25th of 2018.

9            *MR. O'CONNOR:*  And I'm not sure if I moved that into

10   evidence, Your Honor.  If not, I do at this time.

11           *THE COURT:*  I thought you did.

12           *MR. O'CONNOR:*  I thought I did too.

13           *THE COURT:*  The objections are recognized, overruled,

14   if they haven't already been.  It is received, if it wasn't

15   already.

16           *MR. O'CONNOR:*  All right.

17   *Q.   (BY MR. O'CONNOR)*  Turning now to Government Exhibit 15.

18   What do we see here?

19   *A.*  This is a record produced by Facebook pursuant to a

20   criminal search warrant.

21   *Q.*  And whose records are we looking at?

22   *A.*  So this is the Facebook account of the ISIS kunya name

23   Abu Usama, which was the name selected by Mohamud Muse.

24   *Q.*  And who is Mohamud Muse communicating with in this

25   Facebook, the Messenger excerpt?

1    A.   Mohamud Muse is communicating with FBI Undercover Employee

2    Number 2 who again was presented as an ISIS fighter and

3    recruiter in Somalia.

4    Q.   And what are the dates of these communications?

5    A.   This is December 12th of 2018.

6    Q.   What did you find of significance in this section of the

7    Facebook communications?

8    A.   So in this scenario the ISIS fighter persona was talking to

9    Mohamud Muse about who his group of -- the Arabic word is

10   "ikhwa," and it's adopted by ISIS to refer to kind of like your

11   local fighting brothers.  And so Mohamud Muse replies, "I only

12   know two people here in Michigan who support dawla with me."

13   Again, dawla being ISIS.  Mohamud Muse goes on to say, "Akhi,"

14   it's brother, "Ali al-Muhajir and my cousin."  Mohamud Muse

15   then says "I think he already gave bay'a to you."

16        We should probably stop and address bay'a real quick.

17   "Bay'a" is the Arabic word for making a pledge of allegiance or

18   an oath.  And so in this case by this point in time Muse Muse,

19   Mohamed Haji, and Mohamud Muse had all made bay'a, they had all

20   pledged their allegiance to ISIS in a video and audio recording

21   that was sent to the ISIS fighter persona.

22        So again, Mohamud Muse is saying "I think he already gave

23   bay'a to you."  And then he further clarifies, "His name is

24   Mohamed."

25   Q.   And who is the individual that transmitted the bay'a

1  videos, the pledges of allegiance to ISIS, to this person that

2  they believed was involved in the fight with ISIS?

3  *A.*  So they were all transferred by Muse Muse, the latter two,

4  on his ISIS kunya Facebook account in the name of

5  Ali al-Muhajir.

6      And in this -- this particular Facebook exchange continues.

7  After clarifying his name is Mohamed, there's some additional

8  clarification.

9  *Q.*  Okay.  And what is that?

10  *A.*  Mohamud Muse goes on to say "As far as I know, it's only us

11  three, akhi".  And then he says to the fighter, "Brother, I

12  just want Islam to win.  I want to kill kuffar."

13  *Q.*  And, again, those were the words of Mohamud Muse?

14  *A.*  That's correct, Mohamud Muse in his Facebook kunya account

15  Abu Usama.

16  *Q.*  If we could please turn back to Government Exhibit 1 and

17  paragraph 30 of the Affidavit which is on page 7, please.   7

18  and 8.

19      There's been some talk here about an individual referred to

20  as FBI UCE-3.  Was that a persona that was communicated to the

21  defendants during the course of the investigation?

22  *A.*  It was.

23  *Q.*  And in general what was that persona?

24  *A.*  So that was a persona that struck up a Facebook friendship

25  with Mohamed Haji, and that relationship evolved to where

1   Mohamed Haji was essentially recruiting that persona, this new

2   friend, to join ISIS.  And then eventually Mohamed Haji shared

3   that information with Muse Muse and the two worked together to

4   recruit who turned out to be Undercover Employee 3 for ISIS.

5   *Q.*  And so this was Defendant Haji who believed he was

6   recruiting an individual in Chicago, Illinois, who had

7   converted to Islam?

8   *A.*  That's correct.

9   *Q.*  And did you review communications on Facebook between

10  Mohamed Haji and this undercover FBI employee?

11  *A.*  I did.

12  *Q.*  And tell us the significance of a conversation that

13  occurred on December 14th, 2018, between Mr. Haji and the

14  person he was trying to recruit to join ISIS.

15       *MR. ZAMBON:*  Your Honor, I'm getting a little confused

16  by this.  Are we still referring to Exhibit 15, then?

17       *THE COURT:*  No, I believe we've moved to paragraph 30

18  of the Criminal Complaint.

19       *MR. ZAMBON:*  And we're done with that, so this is --

20       *THE COURT:*  As far as I know we're finished with it.

21  We'll see.  But we're now talking about something different as

22  I understand it.

23       Is that correct, Mr. O'Connor?

24       *MR. O'CONNOR:*  That's correct, Your Honor.

25       *MR. ZAMBON:*  That's why -- I thought so also.  Thank

*DIRECT EXAMINATION OF PAUL DUNHAM*                    53

1    you.

2              *THE WITNESS:*  Okay to proceed?

3              *THE COURT:*  Yes.

4              *THE WITNESS:*  So this was an event in Benton Harbor,

5    Michigan, where Mohamed Haji and Muse Muse met the undercover

6    employee, this person that they thought they were recruiting.

7    They basically spoke to him, coached him through the recording

8    of a video where they basically word-for-word walked him

9    through making his ISIS bay'a, his pledge of allegiance, as it

10   was recorded in a vehicle in the parking lot of a shopping

11   area.

12             And then during the course of their conversation

13   Muse Muse stated if he was unable to make hijra, he would take

14   a car and run down kuffar, again nonbelievers, like what

15   happened in France.  And then Haji and Muse Muse both echoed if

16   they were unable to make hijra, that Allah commanded them that

17   martyrdom is the only option.  So we basically have this theme

18   of hijra or death of a martyr.

19   *Q.*  Turning to the next page in Exhibit 1, paragraph 31.  Did

20   Mohamud Muse communicate with an FBI undercover employee

21   indicating what his travel plans were?

22   *A.*  Yes, Mohamud Muse did.

23   *Q.*  And what did Mohamud Muse tell FBI UCE-2 who he believed to

24   be an individual in Somalia?

25   *A.*  He wrote that his wife was pregnant and due to give birth

1    in March and that he would -- he basically wrote that he would

2    travel to Somalia to join ISIS soon after the birth of the

3    child.

4    *Q.*   Turning to Government Exhibit 16, please.   What is

5    Exhibit 16?

6    *A.*   16 is a record produced by Facebook pursuant to a criminal

7    search warrant.

8    *Q.*   And whose Facebook record was obtained through that warrant

9    that we're looking at here in this exhibit?

10   *A.*   So this is Mohamed Haji, his Facebook account and his ISIS

11   kunya name of Salamujahid al-Muhajir.

12   *Q.*   And what are the dates or what is the date of the

13   communications that appear in this Facebook excerpt?

14   *A.*   December 20th, 2018.

15   *Q.*   Did you find anything relevant in this conversation

16   concerning their plans?

17   *A.*   Yes.

18   *Q.*   Mr. Haji's plans, excuse me.

19   *A.*   Yes, I did.

20   *Q.*   And tell us -- go through that with us.

21   *A.*   So Mohamed Haji is talking to the ISIS fighter that he

22   believes to be in Somalia, and Mohamed Haji tells him "I need a

23   training, akhi.   Every skills of using a weapon."   There's a

24   little bit of an exchange about what type of weapon, rifle or

25   gun, to which Mohamed Haji replies, "Rifle."   And then

1   Mohamed Haji goes on to clarify, "Yes, I understand, but all I

2   say, all I have used a pistol, not an AKA."  Again, possibly

3   reference to an AKA, some type of assault rifle.

4         *MR. O'CONNOR:*  The government moves Exhibit 16 into

5   evidence.

6               *THE COURT:*  Okay.  Ms. Turek.

7         *MS. TUREK:*  No objection.

8         *THE COURT:*  Ms. Chartier?

9         *MS. CHARTIER:*  Objection, lack of the complete record.

10        *THE COURT:*  Okay.  Mr. Zambon.

11        *MR. ZAMBON:*  Same objection.

12        *THE COURT:*  The objection is overruled.  It's

13  received.

14  *Q.*  *(BY MR. O'CONNOR)*  During the course of this investigation

15  did each defendant here, Defendant Muse Muse, Mr. Haji, and

16  Mohamud Muse, pick up money that was wired to them that they

17  believed was money sent by the ISIS organization to assist

18  Muse Muse with his travel?

19  *A.*  Yes, they did.

20  *Q.*  And did that occur in early January of 2019?

21  *A.*  It did.

22  *Q.*  Let's turn to Exhibit 17.  What is this record?

23  *A.*  So this is a record that was printed by the FBI undercover

24  employees.  So basically they make periodic reports of the work

25  that they are doing and then they attach as a PDF basically a

*DIRECT EXAMINATION OF PAUL DUNHAM*                                    56

1   screen shot of the exchange they had with whoever the

2   individual is that they are assigned to investigate.

3   *Q.* So this is not actually a record from Facebook, but this

4   record is a summary of conversations that occurred between

5   these individuals through Facebook?

6   *A.* Yeah, I wouldn't say it's a summary. It's literally just a

7   screen shot, the screen capture of the exchange between the FBI

8   undercover employee and the individual being investigated.

9   *Q.* Okay. And who would be the individual that prepared, that

10  compiled this information and provided it to you? Would that

11  be --

12  *A.* The FBI undercover employee.

13  *Q.* All right. And there are two names listed on Government

14  Exhibit 17. Who are those two names?

15  *A.* Yep. So again with the same theme of the others that we

16  looked at. This is the same ISIS fighter persona, you know,

17  purported to be in Somalia exchanging a written conversation

18  with Mohamed Haji in his Salamujahid al-Muhajir

19  Facebook account.

20  *Q.* And, again, that Facebook account created by him was his --

21  in the name of his ISIS kunya name?

22  *A.* Again, although I'm -- Mohamed Haji told us that Muse Muse

23  created it but that he adopted it and used it in all the

24  communications he wrote.

25  *Q.* And the communications that appear in Government

1   Exhibit 17, when did they occur?

2   *A.*   These were in early January, January 7th of 2019.

3               *MR. O'CONNOR:*  The government moves Exhibit 17 into

4   evidence.

5               *THE COURT:*  I have a question before anyone else does.

6   Special Agent Dunham, help me understand it.  So first of all,

7   which of the undercover cooperating employees did this?  Was

8   this --

9               *THE WITNESS:*  UCE-2.  So the same ISIS fighter persona

10  in Somalia.

11              *THE COURT:*  All right.  And are you saying that

12  this -- that UCE-2 captured a screen shot and that's what's

13  reflected here?

14              *THE WITNESS:*  That's correct.  So they have --

15              *THE COURT:*  What was this screen shot taken from?

16              *THE WITNESS:*  From the assigned computer or machine

17  that they have to engage in these undercover activities.

18              *THE COURT:*  Okay.  And these were text messages or

19  emails?

20              *THE WITNESS:*  This is actually Facebook.  So this is a

21  written exchange on Facebook.

22              *MR. O'CONNOR:*  Maybe I can clarify, Your Honor.

23  *Q.*   *(BY MR. O'CONNOR)*  When the FBI undercover is

24  communicating with someone through Facebook, does their

25  computer have the ability to record the realtime conversations

1    that are occurring between the FBI undercover and the

2    individual who is using the Facebook messaging system?

3    *A.*  Yes, they can literally memorialize the written exchange

4    between the undercover employee and the party that they are

5    conversing with.

6    *Q.*  And is that what's reflected in Government Exhibit 17?

7    *A.*  That's what this is, correct.

8    *Q.*  I think there was some reference to screen shot.  That's

9    not literally correct; is that right?  This is not a -- someone

10   didn't take a picture of the screen.  This is a log of the

11   conversation that's occurring?

12   *A.*  It's basically like a tool, yes, that will pull that piece

13   of it over and capture it and put it into a PDF format.

14   *Q.*  Okay.

15            *THE COURT:*  I strongly suspect I'm the only person in

16   this room who has never used Facebook, so I have no idea what

17   you guys are talking about.

18            Ms. Turek.

19            *MS. TUREK:*  I would object.  This is not the Facebook

20   record.

21            *THE WITNESS:*  This is not a record produced by

22   Facebook, that's correct.

23            *MS. TUREK:*  I would object, Your Honor.

24            *THE COURT:*  Ms. Chartier?

25            *MS. CHARTIER:*  I join Ms. Turek's objection.  Not only

1  is this not a complete record, but this is not what Facebook

2  looks like at all.  And there are tools that will allow you to

3  print the screen or memorialize it as it looks like.  So --

4  this not only do we again not have a complete document, but

5  this doesn't even remotely look like what Facebook would look

6  like.  So I have concerns about the accuracy of what we're

7  receiving.

8          THE COURT:  Mr. Zambon.

9          MR. ZAMBON:  I agree with Ms. Chartier, Your Honor.

10  And I disagree with the Court because I don't have Facebook

11  either.  I've never used it.

12          THE COURT:  Okay.  Well, this is about the sixteenth

13  time today I've been wrong about something, Mr. Zambon.

14          All right.  The Rules of Evidence don't apply here,

15  and this is hearsay, and again the Rules of Evidence don't

16  apply.  I think this is a bridge too far for me.  I'm going to

17  exclude this.

18          The agent can testify to information he's received

19  from UCE-1, 2, or 3, but I'm not going to receive this

20  document.  I don't have enough understanding of the reliability

21  of it.

22          Go ahead, Mr. O'Connor.

23          MR. O'CONNOR:  Thank you, Your Honor.

24  Q.   (BY MR. O'CONNOR)  Did you receive information,

25  Special Agent Dunham, from the FBI undercover employees that on

1    January 7th of 2019 Defendant Haji had communicated to the

2    undercover that -- I'm sorry -- that Mohamud Muse communicated

3    to the undercover that Haji was his brother-in-law and that

4    they had talked and agreed to leave with each other?

5    A.   Yes, I did.

6    Q.   And did FBI Undercover 2 also communicate to you that on

7    about January 9th, 2019, Mohamud Muse told that undercover

8    employee that he, Mohamud Muse, might have to leave his wife

9    behind because she's scared and keeps flip flopping on him and

10   doesn't -- and that he didn't have time for that and Allah will

11   give him better?

12   A.   Yes, that's what was communicated by Mohamud Muse to

13   Undercover Employee 2.

14   Q.   And that was January 9 of 2019?

15   A.   That's correct.

16   Q.   Or thereabouts.  Turning to -- back to Government

17   Exhibit 1, please, at paragraph 45.  On page 10.

18        Did Defendant Muse Muse and Defendant Haji agree to meet

19   with FBI UCE-3, that individual they believed to be in Chicago

20   that they were trying to recruit to join ISIS with them?

21   A.   Yes, they did.

22   Q.   And where did they meet?

23   A.   They met at a WalMart store in Lansing.

24   Q.   And what was the purpose of that meeting?

25   A.   They were basically talking about and preparing for the

1    upcoming travel of Muse Muse with Undercover Employee 3, and

2    they were going to acquire any items that they might need for

3    that travel.

4    *Q.*   And during that trip did any of the individuals make a

5    purchase that day?

6    *A.*   So Muse Muse selected a pair of black combat-style boots

7    which Undercover Employee 3, the co-traveler, he thought he had

8    purchased for him at a retail price of approximately $20.

9    *Q.*   During this shopping trip at WalMart in Lansing on

10   January 15th of this year did Muse Muse and Mr. Haji talk to

11   the UCE-3 about their plans if they weren't able to leave and

12   join ISIS?

13   *A.*   Yes, they did.

14   *Q.*   What did they tell the undercover FBI individual?

15   *A.*   They basically told him if they were going to fail in their

16   attempt to join ISIS, they would conduct an attack or a

17   martyrdom operation.  During this exchange Muse Muse made

18   reference to a terrorism attack in Paris.

19        *MR. O'CONNOR:*  All right.  And for good housekeeping,

20   Your Honor, in case I have omitted anything, I believe I have

21   admitted or moved to admit all of the exhibits 1 through 16.  I

22   understand the Court is not allowing 17, 18, and 19.  To the

23   extent I missed any of those, I would move all of them into

24   evidence at this time.

25        *THE COURT:*  I only ruled on 17, not 18 or 19.  But

1  Exhibits 1 through 16 have been admitted.

2          *MR. O'CONNOR:*  May I have a moment, Your Honor?

3          *THE COURT:*  You may.

4          *MR. O'CONNOR:*  Thank you.

5          *THE COURT:*  Ms. Turek?

6          *MS. TUREK:*  Yes, Your Honor.

7          *THE COURT:*  Oh, you're getting ready.  We're giving

8  Mr. O'Connor a minute to see if he's finished.

9          *MR. O'CONNOR:*  Thank you, Your Honor.  No further

10  questions.

11          *THE COURT:*  All right.  Thank you.

12          Ms. Turek, you may cross.

13                          CROSS-EXAMINATION

14  *BY MS. TUREK:*

15  *Q.*  Good afternoon, Agent Dunham.

16  *A.*  Good afternoon.

17  *Q.*  My name is Sharon Turek, and I represent Muse Muse.  And in

18  the Complaint my client is referred to as MM?

19  *A.*  That's correct.

20  *Q.*  Okay.  And my client is -- do you know how old my client

21  is?

22  *A.*  He's 20 years old.

23  *Q.*  Okay.  And he just turned 20, correct?

24  *A.*  He did.

25  *Q.*  Just last week, I believe?

1    A.  January 14th of this year, I believe.

2    Q.  And his brother Mohamud Muse is 23?

3    A.  That's correct.

4    Q.  And his -- my client's brother-in-law Mohamed Haji is 26?

5    A.  That's correct.

6    Q.  Now, in the Complaint in paragraph 9 you indicate -- it's

7    indicated that sometime in April of 2016 that an account in the

8    name of -- Facebook account in the name of Mohamud Muse, my

9    client's brother, came to the attention of the FBI in April of

10   2016, correct?

11   A.  That's correct.

12   Q.  Okay.  How did it come to the attention of the FBI?

13   A.  Basically the FBI was conducting analysis regarding

14   Facebook accounts that had pro-ISIS, pro-martyrdom, pro-Jihad,

15   pro-violence type activity, and the Facebook account

16   Mohamud A. Muse came about.

17   Q.  Do you know how long that account had been in existence

18   before April of 2016?

19   A.  As we sit here right now I don't, but I know it goes back

20   prior to, you know, the beginning of 2016.  So it had been up

21   for a number of months at that point.

22   Q.  Okay.  And that's referred to as FB Account Muse Number 1?

23   A.  That's correct.

24   Q.  And then in paragraph 10 of the Complaint, around

25   June 21st, 2017, an undercover FBI employee, UCE-1,

1  communicates with Facebook account Muse Number 1?

2  A.  Correct.

3  Q.  Now, UCE-1, is that an FBI agent?

4  A.  So it's an FBI professional support employee who has

5  specialized training to do this type of work.

6  Q.  Have you met UCE-1?

7  A.  Yes, I have.

8  Q.  What -- are they salaried by the FBI, UCEs?

9  A.  They are direct employees of the FBI, yes.

10 Q.  Well, they receive a salary, but are they on the payroll of

11 the FBI so that they receive a check every two weeks or every

12 week?

13 A.  That's correct.  So they are duly appointed employees of

14 the federal government, specifically the FBI.

15 Q.  And in paragraph 10 it indicates that UCE posed as an ISIS

16 recruiter, correct?

17 A.  Correct.

18 Q.  What is meant by posing?

19 A.  It's not who they were in real life and they are in an

20 undercover capacity.  So they are presenting as something that

21 they personally are not.

22 Q.  In that they were presenting as someone who was recruiting

23 people to join ISIS, correct?

24 A.  Correct.

25 Q.  And did he -- did UCE-1 at that point tell Mohamud Muse

1    that he was a recruiter?

2    A.  He told him that he was a fighter in Syria.

3    Q.  Okay.  So he didn't tell him that he was recruiting him?

4    A.  There's a verbal exchange between them where he explains

5    the process of how you join ISIS and then asks him a series of

6    questions to bring that about.

7    Q.  Do you know the type of training that a UCE employee of the

8    FBI receives?

9    A.  I don't know the specific training other than they go

10   through a specialized program.

11   Q.  And then in July 2017, just one month after the FBI gets

12   involved, the Facebook account, FB Account Muse Number 1 is

13   suspended, correct?

14   A.  That's correct.

15   Q.  So the Facebook account was in existence at least 14 months

16   without being shut down by Facebook, correct?  Before the FBI

17   got involved.

18   A.  That's correct.

19   Q.  And then once the FBI gets involved, Facebook makes a

20   determination to suspend the account, correct?

21   A.  That I don't know.  I don't know why Facebook suspended the

22   account.

23   Q.  Well, the fact is that you know they did suspend the

24   account?

25   A.  I do because Facebook produced a record that they said they

1    suspended the account.

2    Q.  And all during the time before the FBI got involved

3    Facebook did not see a need to suspend the account, correct?

4    A.  I can't speak to that.  I don't know what Facebook does to

5    make determinations about suspension.

6    Q.  Well, I'm not asking you that.  I'm asking -- I'm asking

7    you to confirm that they did not suspend the account during

8    that time before the FBI.

9    A.  The account was active prior to them suspending it, that's

10   correct.

11   Q.  Thank you.  Now in paragraph 11 of the Complaint

12   Facebook Account Muse Number 2 came to the attention of the

13   FBI, correct?

14   A.  That's correct.

15   Q.  Do you know the exact date when that Facebook Account

16   Number 2 was created?

17   A.  I don't off the top of my head.  I think that's why it's on

18   or about early August of 2017.

19   Q.  And that was an account belonging to Mohamud Muse?

20   A.  Correct.

21   Q.  Between the time that Facebook Account Muse Number 1 was

22   shut down and the creation of a Facebook Account Muse Number 2

23   did the FBI UCEs have any contact with Mohamud Muse?

24   A.  They did not.

25   Q.  Do you know how that account became -- came to the

1   attention of the FBI?

2   A.   The original account was suspended, and so information

3   similar to what Mohamud Muse had posted on his first account

4   was essentially queried and similar basically posts to what

5   existed on his Mohamud A. Muse Facebook account appeared on the

6   Facebook account Abu Usama with a U.

7   Q.   Now, in paragraph number 12 of the Complaint you cite --

8   it's cited that the analysis of Facebook Account Number 1

9   identified communications between my client's brother and my

10  client's brother-in-law, correct?

11  A.   Yes.

12  Q.   But not my client?

13  A.   Not in that paragraph, no.

14  Q.   Okay.  And the Facebook Account Muse Number 2 was suspended

15  in October of 2017, correct?

16  A.   Yes, that's correct.

17  Q.   A search warrant authorized, was issued for

18  Facebook Account Muse Number 2 around February of 2018; is that

19  correct?

20  A.   Yes.

21  Q.   And did you obtain records pursuant to that search warrant?

22  A.   Yes, we did.

23  Q.   Now, the exhibits that were introduced today, those were

24  only a portion of the communications in those Facebook

25  accounts, correct?

*CROSS-EXAMINATION OF PAUL DUNHAM*                          68

1   A.  Communications in total or communications between certain

2   parties?

3   Q.  Communications in total.

4   A.  What we presented today, yes, were portions, correct.

5   Q.  Okay.  And would it also be true that they are portions of

6   communications between the three defendants here and anyone

7   from the FBI or just a portion of those communications?

8   A.  Correct.

9   Q.  So there are many more communications between my client and

10  the two codefendants and FBI employees?

11  A.  Correct.

12  Q.  Now, in paragraph 14 it mentions an FB Account MM.  Who was

13  that -- who -- that account MM, who did that refer to?

14  A.  Muse Muse.

15  Q.  And do you know when this was created?

16  A.  Do I know when the Facebook account was created?

17  Q.  Yes.

18  A.  Not off the top of my head, but I -- not off the top of my

19  head, but I know it goes back a number of years.  Well before

20  2018.

21  Q.  And am I correct that -- well, when did this account come

22  to the attention of the FBI?

23  A.  So it came to the attention of the FBI when we were going

24  through the analysis of the prior Facebook records that were

25  obtained.

1    *Q.*  Okay.  And when -- do you know when that was?

2    *A.*  It would have been when -- the records from the search

3    warrant that was executed in February of 2018.

4    *Q.*  Okay.  And your testimony is that it had been existing for

5    a number of years prior?

6    *A.*  Correct.

7    *Q.*  Okay.  And had that account ever come to the attention of

8    the FBI before that?

9    *A.*  So I guess I'll have to qualify with it's a big FBI, but to

10   my knowledge, no.

11   *Q.*  To your knowledge was it ever suspended?

12   *A.*  No.

13   *Q.*  Do you know if FBI UCE-1 ever communicated with my client

14   Muse Muse?

15   *A.*  FBI UCE-1 did not communicate with your client.

16   *Q.*  Now, in the same paragraph number 14 a screen capture is

17   sent on October 31st, 2017.  What screen -- would that be

18   Exhibit Number -- let me find it here -- Number 4?

19   *A.*  That's correct.

20   *Q.*  He sent a screen -- a photo of, but he did not make any

21   explicit threats, correct?

22   *A.*  No, he transmitted the picture and then the ensuing

23   conversation, ensuing written exchange happened.

24   *Q.*  But he didn't make any explicit threats, correct?

25   *A.*  No.

1   Q.   Okay.   Thank you.

2        Now, in the Complaint paragraph 15 there's more

3   communications between my client and Haji, and again my client

4   does not make any threats, correct?

5   A.   I guess can you define "threat" for me?

6   Q.   Well --

7   A.   So Mohamed Haji makes a number of statements about wanting

8   to kill kuffar and Muse Muse replies, "Same here, akhi."   Same

9   here, brother.

10  Q.   But my client didn't -- in his words he didn't make any

11  statements that he was going to harm anyone?

12  A.   Again, I don't know how to interpret that.   Mohamed Haji

13  made a statement and Muse Muse echoed it.

14  Q.   Well, Mr. Haji made a number of statements, and my client

15  made a very brief response, "Same here, brother."   Pretty

16  brief, glib response, isn't it?

17  A.   Again, I don't know how to interpret, you know, what he

18  meant.   The statements were made, and he said, "Same here,

19  akhi."

20  Q.   In the Complaint in paragraph 17 UCE Number 2 joins the

21  investigation, correct?

22  A.   Yes.

23  Q.   And at this point UCE-2 -- was UCE-2 aware of UCE-1?

24  A.   Yes.

25  Q.   Who was supervising -- at this point was this an

1    investigation would you say, an FBI investigation?

2    A.  This investigation was opened by me in December of 2016.

3    Q.  Okay.  So who was supervising the investigation then?

4    A.  So when you say supervising, can you define that for me?

5    Q.  Well, you have UCE-1.

6    A.  Uh-huh.

7    Q.  UCE-2.

8    A.  Uh-huh.

9    Q.  Did you have any agents or any other FBI employees working

10   on this at the time?

11   A.  Yes, I have an entire investigative team.

12   Q.  Okay.

13   A.  A number of people.

14   Q.  Okay.  And were you supervising?

15   A.  I'm not a supervisor, so I'm a line-level special agent.

16            MR. O'CONNOR:  Your Honor, at this point -- excuse

17   me -- at this point I'm going to object on relevance.  I don't

18   see how the supervision of agents goes to the issues today

19   which is risk of nonappearance or the danger to the community

20   by these defendants.

21            THE COURT:  I'm not sure either, but I'm going to give

22   Ms. Turek a little -- little room.

23            MS. TUREK:  Thank you, Your Honor.

24   Q.   (BY MS. TUREK)  So who was supervising this investigation

25   then?

1   *A.*  Again I'm asking you to clarify.  What do you mean by

2   supervising?

3   *Q.*  Well, who was making decisions -- let me ask it this way:

4   Was UCE-1 reporting to anyone?

5   *A.*  Yes, UCE-1 was reporting to a number of people.

6   *Q.*  Okay.  Who was he reporting to?

7   *A.*  I guess I don't -- I would have to describe the

8   organizational structure of the FBI --

9           *THE COURT:*  Special Agent Dunham, you were the agent

10  that opened the investigation, correct?

11          *THE WITNESS:*  So I'm considered internally as the lead

12  case agent.

13          *THE COURT:*  All right.  But you have somebody who

14  supervises you?

15          *THE WITNESS:*  Yes, and my team is -- so I'm in the FBI

16  Lansing office, so I have a direct supervisor in Lansing.  The

17  other people participating in this investigation were spread

18  throughout the state.  So they have separate supervisors too.

19  But we're not in silos, right?  We're communicating with one

20  another.

21          *THE COURT:*  Did you oversee the work of UCE-1, 2, or

22  3?

23          *THE WITNESS:*  I feel like "oversee" is a charged word

24  in the sense of like --

25          *THE COURT:*  Did they have to consult with you before

1   they took action?  Did they have any authority to act on their

2   own?

3               *THE WITNESS:*  Um, it's a partial exercise.  So some

4   things they had empowerment to do.  Other things they have to

5   reach out to the investigative team to share information and

6   talk about next steps.

7   *Q.   (BY MS. TUREK)*  So would it be fair to say UCE-1, 2, and

8   3, that they answer to an agent as opposed to some other

9   employee?

10  *A.*  Again, when you say answer to, I just don't know what that

11  means.

12  *Q.*  Report to.

13  *A.*  Report in terms of sharing information or report in terms

14  of . . .

15  *Q.*  Asking how -- well, let me ask it this way:  With the UCEs

16  that we're talking about here, 1, 2, and 3, were they told how

17  to -- what to do as their part in the investigation?

18  *A.*  And that's what I mean by it being a collaborative effort.

19  So you have people that are bringing subject matter expertise,

20  cultural expertise, language expertise.  So I would say it was

21  basically an exercise by committee, right?  We're looking at

22  the individual we're investigating, we're understanding who

23  that person is, and then talking about what the investigative

24  strategy is going to be.  I guess what I'm trying to tell you

25  is there's not an independent person that says yes or no and

1  it's final.  Most of what we do in this area is a collaborative

2  exercise.

3  Q.  Well --

4          THE COURT:  I think we've taken this as far as we're

5  going to go.

6          MS. TUREK:  I think so.  One more question,

7  Your Honor?

8          THE COURT:  All right.  Go ahead.

9  Q.  (BY MS. TUREK)  Did UCE-1 report to anyone?

10  A.  And, again, I don't want you to feel like I'm being cute.

11  Like I don't understand when you say "report."  Like written

12  reports are submitted and there's a supervisor that would

13  approve those.  Information is communicated to the

14  investigative team to understand what's happening in order to

15  plan the, you know, subsequent investigative steps.  So when

16  you say "report," I just feel like it has a number of, you

17  know, interpretations.

18  Q.  Well, what I mean by "report" in this instance is who would

19  they go to for advice on how to proceed in the investigation?

20  A.  Again, we would literally have a meeting amongst the

21  investigative team.  They would share whatever it is they were

22  talking to the individual being investigated about, share

23  whatever exchange they were having, you know, online in this

24  case, and then talk about what the next steps are.

25  Q.  Were you part of these meetings?

1   A.   Most of them, yes.

2   Q.   Now, in paragraph 17 it indicates that MM then wrote -- MM

3   being my client, correct?

4   A.   Correct.

5   Q.   "I plan in doing hijra to Somalia and joining those who are

6   establishing the Sharia of Allah."

7        Now, hijrah, the meaning of hijrah -- your meaning of

8   hijrah is what?

9   A.   So -- just so we keep the nomenclature consistent, so it's

10  hijra.

11  Q.   Hijra?

12  A.   Yep.  And in the context of extremism, so "hijra" is an

13  Arabic word.  But like I was describing earlier, much like

14  professions and industries that have jargon and words that have

15  ascribed meaning, "hijra" in the context of extremism is

16  basically the word that's used to describe a foreign fighter's

17  journey from their country of origin to a place controlled by a

18  terrorist organization in order to join and fight with that

19  group.  So ISIS has adopted the term "hijra" to describe people

20  it's recruiting and basically the path that they take to join.

21  Q.   But there's another meaning of hijra, correct?

22  A.   There would be a lay Arabic, yes.

23  Q.   And are you aware of that?

24  A.   I am not.

25  Q.   Were you aware that -- weren't you aware that it meant the

1    flight of Muhammad from Mecca to Medina?

2    *A.*   That is the Arabic word "hijra" and one interpretation of

3    it, yes.

4    *Q.*   Okay.  So you were aware of that interpretation of hijra?

5    *A.*   I've heard it described differently but similar, yes.

6    *Q.*   Okay.  So my client wasn't making any sort of threat there?

7    *A.*   Again, I guess you'd have to define "threat."

8    *Q.*   Well, I suppose it depends on whose definition you adopt.

9    But it could mean that he was referring to the flight of

10   Muhammad?

11   *A.*   It could mean, but in the context it doesn't make any sense

12   in October of 2018.

13   *Q.*   Well, he had -- well, let me ask about my client.  My

14   client -- he's 20 years old.  During the course of this

15   investigation have you checked him for any criminal history?

16   *A.*   Yes, I have.

17   *Q.*   And he has none, correct?

18   *A.*   He does not.

19   *Q.*   Okay.  Were you aware that he graduated from high school?

20   *A.*   I was.

21   *Q.*   Were you aware that he attended Lansing Community College

22   for a bit?

23   *A.*   It was my understanding that he was taking classes.

24   *Q.*   And that he was also at various times employed?

25   *A.*   Correct.

1   Q.   I would also note that it's only after FBI UCE-2 is

2   corresponding with my client Muse Muse that this trip came up,

3   correct?

4   A.   Trip in what sense?

5   Q.   Or this plan to join ISIS came up.  It was only when he was

6   corresponding with an FBI agent -- with an FBI employee?

7   A.   No, that's -- no, I would not agree with that.

8   Q.   Well, had -- where had he indicated that before he came

9   into contact with UCE Number 2?

10  A.   So in his prior communications with Mohamed Haji and to

11  some degree with Mohamud Muse he expressed views for pro-ISIS,

12  pro-violence, pro-martyrdom, pro-Jihad.  Specifically in the

13  context of dawla, ISIS.

14  Q.   But it was only after having contact with FBI UCE-2 that it

15  went further and that there was talk of taking a pledge to join

16  ISIS, correct?

17  A.   That's when the pledge came about, yes.

18  Q.   Okay.  Only after the FBI became involved, right?

19  A.   Are you saying the pledge was made after there was contact

20  between the FBI Undercover Employee 2 and Muse Muse?

21  Q.   Well, did FBI UCE Number 2, did he instruct my client or

22  any of the other codefendants on the fact that they had to take

23  a pledge?

24  A.   Muse Muse was making inquiries about how to join ISIS in

25  Somalia.

CROSS-EXAMINATION OF PAUL DUNHAM                    78

1    Q.  And FBI UCE-2 provided him with information --

2    A.  Right.

3    Q.  -- about that?

4    A.  Correct.

5    Q.  He provided him with an oath?

6    A.  He explained the process to him, correct.

7    Q.  He explained to my client what he would have to do,

8    correct?

9    A.  Correct.

10   Q.  He instructed my client on how to take the oath, correct?

11   A.  He provided your client with the pledge of allegiance.

12   Q.  Okay.  Prior to that my client knew nothing about that,

13   correct?

14   A.  I don't know.

15   Q.  Well, we know that -- well, strike that.

16       The fact is that it was only after the FBI became involved

17   and began encouraging my client and directing him that he took

18   an oath, correct?

19   A.  Again, I would take exception to the word "encouraging" and

20   other descriptors.  He asked what he had to do to join and was

21   given an explanation of how the process works.

22   Q.  And what was that -- what was the instruction?  What would

23   he -- do you know what UCE-2 told my client what he had to do?

24   A.  In general just explaining that you have to make a pledge

25   of allegiance to ISIS and you have to obtain something called

1    tazkiyah, which is basically like ISIS vetting.  Like somebody

2    can't just show up if they want to.  So there's certain

3    information they have to provide and they have to be vetted.

4    So basically the process was explained to Muse Muse by

5    Undercover Employee 2 of how that process works.

6    Q.  And so all of that information came from the FBI?

7    A.  Correct, UCE-2 shared that with Muse Muse.

8    Q.  Now, at some point the FBI UCE Number 2 corresponded with

9    Muse Muse about a passport?

10   A.  Correct.

11   Q.  And so at this point too I would note that my client is a

12   teenager during the time that this is going on last fall,

13   right?

14   A.  His age at the time was 19, that's correct.

15   Q.  And it's the FBI that also tells my client, this

16   19-year-old, that his oath was -- or his oath video was

17   accepted by ISIS, correct?

18   A.  That's correct.

19   Q.  So all along the line the FBI is paving the way for my

20   client to get more involved in this activity, correct?

21   A.  Help me better understand when you say "paving the way."

22   Q.  They are providing guidance and instruction on how to take

23   an oath, correct?

24   A.  Correct.

25   Q.  And they have provided information about other requirements

 1  that ISIS would have, correct?

 2  A.  So in the event of the passport, that wasn't raised by the

 3  undercover employee.  Muse Muse independently raised the issue

 4  that he didn't have a valid passport and that he needed to seek

 5  that.

 6  Q.  Okay.  So the FBI was aware that he would need a passport,

 7  correct?

 8  A.  Correct.

 9  Q.  Okay.  Now, the passport application, it's noted in

10  paragraph 31, the application was received by

11  the State Department on December 17th, 2018.  Was the FBI in

12  contact with the State Department about this?

13  A.  So based on the nature of this investigation, a number of

14  government agencies were aware of the names of the three

15  defendants.

16  Q.  And so was there any -- any effort by you, by the FBI, to

17  stop the State Department from issuing a passport?

18  A.  There was no effort by me or the FBI to stop it, no.

19  Q.  And would it be fair to say that the FBI wanted

20  the State Department to issue a passport?

21  A.  I mean, that would be up to the Department of State, right?

22  They would have to decide if the criteria were applicable.

23  They only make inquiries of us if there's reasons not to.

24  Q.  Well, had the FBI corresponded or provided

25  the State Department that my client was under investigation for

CROSS-EXAMINATION OF PAUL DUNHAM                    81

1   a terrorism crime?

2   A.  Well, again, we're not saying that he was guilty of

3   anything.  They were -- they were aware of the fact that the

4   FBI had an investigation, yes.

5   Q.  Okay.  So the State -- is it your understanding that the

6   State Department aware of such information would still issue a

7   passport without any further investigation?

8   A.  Right.  So the State Department had some type of flag or

9   hit when the passport application came in based on a matching

10  name.

11  Q.  Okay.  But they were aware of information that you provided

12  too, the FBI provided?

13  A.  Right.  They had a system that corresponded with our system

14  to flag that name.

15  Q.  Okay.

16  A.  When an application came in.

17  Q.  But yet a passport was issued to my client two days later

18  on December 19th?

19  A.  Correct.

20  Q.  And it's your testimony that the FBI didn't want

21  the State Department to issue a passport to my client?  The

22  fact is they wanted a passport issued.

23          THE COURT:  Is it -- I don't know that what they

24  wanted matters.  Are you asking did the FBI communicate with

25  the State Department to encourage the State Department to issue

1   the passport?

2        THE WITNESS:  So, again, without getting into --

3   because I don't know what the specific criteria are for the

4   Department of State to issue a passport.  What ends up

5   happening is myself as the case agent gets contact from the

6   Department of State and they make a specific inquiry of me

7   which is are there any wants or warrants, in this case for

8   Muse Muse.  And so I'm telling them that there are not any

9   wants or warrants.

10  Q.  But you also told them that they -- there was an

11  investigation ongoing, correct?

12  A.  I personally did not.  I didn't speak to any of those

13  folks.  It's entirely possible that, you know, at the larger

14  FBI function in Washington, D.C. that there were communications

15  between those parties, but I'm saying as like the case agent

16  what I'm inquired of from the Department of State personnel is

17  are there any wants or warrants, because I'm the person that's

18  responsible for the investigation.

19  Q.  Okay.  The fact is, though, that you did not -- knowing

20  that my client was under investigation, you did not contact

21  the State Department and say "Hey, don't issue this"?

22  A.  No, no.

23  Q.  Okay.

24  A.  Again, there were communications between the Department of

25  State and FBI probably at our headquarters function.

1   *Q.*  But you could have?

2   *A.*  Could have stopped it?

3   *Q.*  Yes.  You could have told the -- you could have told

4   the State Department not to issue the passport?

5   *A.*  Me personally or the FBI?

6   *Q.*  You or anyone else on this team, investigative team.

7   *A.*  Theoretically?

8   *Q.*  Yeah.  I think we're, you know, playing a little game here.

9   I mean --

10          *THE COURT:*  Do you have the authority to contact

11  the State Department and advise them not to issue a passport?

12          *THE WITNESS:*  I do not.  That's what I'm trying to get

13  at here.  Yes, there are communications between the FBI and the

14  Department of State, but like I in my individual special agent

15  capacity do not have the authority or ability to do that.

16  *Q.*   *(BY MS. TUREK)*  But you do -- okay.

17      Now, in paragraph number 24 it's indicated in the Complaint

18  that my client, as worded in the Complaint, broached the

19  subject of not having money to travel, correct?

20  *A.*  This was -- yeah, in reiterating his desire to travel, yes,

21  he raised the money issue.

22  *Q.*  He had no -- he didn't have the means to travel

23  internationally, correct?

24  *A.*  That's what he communicated to the undercover employee,

25  yes.  He did not have the rizq, which is an Arabic word for

1    like sufficient sustenance.  Basically like the finances.

2    Q.  And everything that you've investigated regarding my

3    client, have you come across facts that would indicate that he

4    did not have any monetary means on his own to travel

5    internationally?

6    A.  I guess I don't know how to answer that question when you

7    say he didn't have the monetary means.  As you pointed out

8    earlier --

9    Q.  Well, didn't have the money.

10   A.  Well, as you pointed out earlier, he was gainfully

11   employed.

12   Q.  Do you know where he was employed?

13   A.  A couple different places.

14   Q.  Do you know what his salary was?

15   A.  I have an idea, yes.

16   Q.  Okay.  What was his salary?

17   A.  Around minimum wage.

18   Q.  Okay.  And this plane ticket that he needed cost almost

19   $1,800, correct?

20   A.  Correct.

21   Q.  And he was indicating that he didn't have the money to

22   travel, correct?

23   A.  Correct.

24   Q.  So the FBI knew that?

25   A.  Again, based on his representations and things that were on

1    record.  So I reviewed his financial records and basically

2    whenever a payroll check hit, he withdrew it all in cash.

3    *Q.*  And the FBI provided my client money, correct?

4    *A.*  At his request, yes.

5    *Q.*  But it was the FBI who provided the means, the money for my

6    client to buy a ticket?

7    *A.*  And for factual accuracy, I'm saying that he asked for the

8    money, he specified the dollar amount, yes.

9    *Q.*  Now, the meeting that took place with UCE-3, the meeting

10   took place between UCE-3, my client, and Mr. Haji?

11   *A.*  Haji, correct.

12   *Q.*  Haji.  Was that recorded?

13   *A.*  Yes, it was.

14          *THE COURT:*  I'm sorry, Ms. Turek, I missed what --

15   what was recorded?

16          *MS. TUREK:*  Was the conversation.  The meeting that

17   they had.

18          *THE COURT:*  Between?

19          *MS. TUREK:*  Between my client, Mr. Haji, and UCE

20   Number 3.

21          *THE COURT:*  I've gotcha.  Thank you.

22   *Q.*  *(BY MS. TUREK)*  So there's a recording of that

23   conversation?

24   *A.*  There is.

25   *Q.*  Okay.  Now, at some point the FBI became aware that a

1    passport had in fact been issued to my client, correct?

2    A.   That's correct.

3    Q.   Okay.  And that passport disappeared, correct?

4    A.   I guess that's a way to characterize it, yes.

5    Q.   Well, what happened to that passport?

6    A.   Um, based on paperwork that Muse Muse submitted to the

7    Department of State or based upon interviews of parties that

8    know what happened to it?

9    Q.   Well, the passport -- that passport, the first passport

10   that was issued December 19th, the family took custody, my

11   client's family took that passport, correct?

12   A.   Yes, for certain reasons, yes.

13   Q.   Okay.  And the reasons were for concern for their son?

14   A.   That's my understanding, yes.

15   Q.   Their teenage son.

16   A.   Yes.

17   Q.   Now, when my client applied for a second passport, was the

18   FBI aware of that?

19   A.   Again I received the same notification from the Department

20   of State saying that a passport had been requested, and it was

21   explained that -- on the paperwork Muse Muse represented that

22   the prior passport that he received -- basically the way this

23   process works is you get your old passport back and you get

24   your new one.  So on the paperwork Muse Muse explained that he

25   inadvertently threw out the new passport thinking it was the

CROSS-EXAMINATION OF PAUL DUNHAM                           87

1    old passport.  So he was asking the Department of State for a

2    replacement of his recently issued new passport.

3    *Q.*  So at the time that this occurred had you known what had

4    happened to the first passport?

5    *A.*  So I think this is where we're going to tread into that

6    issue from before.

7              *THE COURT:*  You're saying that to answer that question

8    would disclose classified information?

9              *THE WITNESS:*  That's correct.

10             *THE COURT:*  Can you give me a general idea of why this

11   implicates classified -- is this methods and means of obtaining

12   information?

13             *THE WITNESS:*  That's correct.

14             *THE COURT:*  And this is information as to -- tell me

15   the question again.

16             *MS. TUREK:*  The question is whether the FBI knew that

17   the family had taken my client's first passport.

18             *THE COURT:*  And Special Agent Dunham testified that

19   yes.

20             *THE WITNESS:*  She's asking me about timing.

21             *MS. TUREK:*  But whether they knew at the time that my

22   client was seeking a second passport.

23             *THE COURT:*  Okay.

24             *THE WITNESS:*  And what I'm saying is I had that

25   knowledge, but why and how I have that --

1          THE COURT:  But you can't disclose how you had that

2   knowledge?

3          THE WITNESS:  Exactly.

4          THE COURT:  All right.

5          MS. TUREK:  That's okay, Your Honor.

6   Q.   (BY MS. TUREK)  I can ask this question:  So you were

7   aware that the family had concerns, right?

8   A.   Again, I'm right back in that same boat.

9   Q.   But you were aware that --

10         THE COURT:  Well, is answering the question about

11  whether you were aware, is that alone going to disclose

12  classified information?

13         THE WITNESS:  Think of it this way:  It's a timing

14  issue.  I now know that for different reasons, but she's asking

15  me about the timing of that.

16         THE COURT:  Okay.  So will you be able to answer the

17  question if the timing is at the time this occurred?

18         THE WITNESS:  That's the issue.

19         THE COURT:  Okay.

20         THE WITNESS:  That's the issue.

21  Q.   (BY MS. TUREK)  So you were aware that there was an issue

22  that the family had over this passport?

23         THE COURT:  You know, at this point I'm not sure how

24  relevant it is.  I mean, we know that he had a passport, the

25  family took the passport, the FBI was at some point aware of

CROSS-EXAMINATION OF PAUL DUNHAM                    89

1   that.  I'm not sure that that's of paramount importance or

2   relevance to what we have to deal with today.  But maybe you

3   can explain why that's important.

4         MS. TUREK:  Well, the relevance, in my opinion,

5   Your Honor, is that the FBI is doing everything in my opinion

6   it can to encourage and get my client and make a pathway for

7   him to get in deeper and deeper.

8         THE COURT:  Entrapment is not the issue here.  That's

9   not an issue that I'm going to be addressing.

10         MS. TUREK:  I understand that, Your Honor, but you are

11   going to be making a determination on bond.

12         THE COURT:  Yes, and I get that.  And certainly to the

13   extent your client has said or done something that suggests

14   that he may be a danger and it was at the encouragement of an

15   agent, then I'll take that into consideration.  But I don't

16   see -- it seems to me the passport, this other passport that

17   disappeared, we're getting pretty far afield.  The passport was

18   taken by the family, he reported to the State Department that

19   he lost it, they gave him a new passport.

20         MS. TUREK:  Well, I think I've made the point.  I

21   mean, the government knew --

22         THE COURT:  You did.  So let's move on.

23         MS. TUREK:  Okay.  Thank you.

24   Q.   (BY MS. TUREK)  Now I just have some questions based on

25   some of your earlier testimony.  Now, you had indicated that

1  you helped draft the Complaint, the Affidavit attached to the

2  Complaint, correct?

3  A.  That's correct.

4  Q.  Okay.  Who else was involved with drafting the Affidavit?

5  A.  Well, I'm not their agent, and obviously the process that

6  we go through with the U.S. Attorney's Office and prosecutors

7  in general.

8  Q.  Okay.  Now, when you arrested my client a few days back, he

9  didn't have any weapons on him, correct?

10  A.  No, he was through TSA security screening.

11  Q.  Okay.  Now, you also -- I'd ask you to -- refer you to

12  Exhibit -- Government Exhibit Number 2 which is the statement

13  that was written, written out by Special Agent Southand,

14  correct?

15  A.  Southard, correct.

16  Q.  Southern?

17  A.  Southard.

18  Q.  Southarn?

19          *THE COURT:*  How do you spell that?

20          *THE WITNESS:*  S-O-U-T-H-A-R-D.

21          *THE COURT:*  Thank you.

22          *MS. TUREK:*  Oh, Southard.  Okay.  I couldn't

23  understand the agent's handwriting, Your Honor.  Thank you.

24  Q.  *(BY MS. TUREK)*  And in fact this is a statement that was

25  written by the agent, correct?

1  A.  That's my understanding, correct.

2  Q.  Okay.  Is there a recording of this interview?

3  A.  There is.

4  Q.  How long was the interview?

5  A.  I'm just going to approximate.  Around four hours.

6  Q.  So this is what you got in four hours?

7  A.  The two interviews.  I was not part of that team.  But yes.

8  The two interviewers, yes.

9  Q.  Where did this interview take place?

10 A.  At the Law Building across the street here in Grand Rapids.

11 So basically it was U.S. Attorney's Office space in the same

12 building that's shared with a number of other federal agencies.

13 FBI, DEA, that type of thing.

14 Q.  Was it in the U.S. Attorney's Offices or was it on another

15 floor?

16 A.  No, it was in the U.S. Attorney's Office basically like in

17 interview rooms.

18 Q.  Okay.  And how many other people were in that interview

19 room when you were interviewing my teenage client?

20 A.  So, again, I didn't interview Muse Muse.  Two FBI special

21 agents interviewed Muse Muse.

22 Q.  Was anyone else in the room?

23 A.  No, just those two.

24 Q.  You were not present for that?

25 A.  I was not.

1   *Q.*  And this was recorded?

2   *A.*  It was.

3   *Q.*  Okay.  And referring to -- well, I'll strike that.

4       Now, of the FBI UCEs, was it just UCE-3 that had contact,

5   Facebook contact with my client?

6   *A.*  Was it just UCE-3?

7   *Q.*  Yes.

8   *A.*  No, UCE-2 had extensive contact.

9   *Q.*  Okay.  Now -- okay.  Now, UCE-3, was this individual posing

10  as someone who wanted to be recruited by ISIS?

11  *A.*  So for a second we have to talk a little bit about the

12  story of that.  That was an individual that became a Facebook

13  friend of Mohamed Haji and Mohamed Haji essentially came to a

14  point where he said, "I'd like to meet you in person and

15  introduce you to someone else," which was Muse Muse.

16  *Q.*  But was the reason that UCE-3 -- was UCE-3 pretending to be

17  someone who wanted to be recruited?

18  *A.*  No.  UCE-3 was communicating with Mohamed Haji to

19  understand who he is and what his intentions were.

20  *Q.*  But at some point did UCE-3 indicate that he wanted to be

21  recruited by ISIS?

22  *A.*  Mohamed Haji and UCE-3 talked about ISIS and then

23  Mohamed Haji proposed a meeting, a physical in-person meet.

24  *Q.*  Okay.  Now, all of these conversations between my client

25  and the UCEs were taking place over a fairly long period of

1  time, correct?

2  A.  Yes.

3  Q.  Several months?

4  A.  Yes, correct.

5  Q.  Now, Government Exhibit Number 7, which has been

6  introduced, at some point -- was it Muse Muse who indicated

7  that he was at work?

8  A.  No, it's Mohamed Haji.  So basically Muse Muse sent him a

9  video, an ISIS video, and Mohamed Haji was saying "Hey, I'm at

10  work right now.  I don't have time to look at it."

11  Q.  And so there was no sort of urgency there?

12  A.  I mean, it transpires over the course of a day.

13  Q.  Now, up until Government Exhibit 11 before August of 2018

14  my client didn't have his license, correct?

15  A.  That's my general understanding, right, that he didn't have

16  a State of Michigan operator's license.

17          MS. TUREK:  Okay.  Your Honor, I have no further

18  questions.

19          THE COURT:  All right.  Thank you, Ms. Turek.

20          Who's next?

21          MS. CHARTIER:  I am.

22          THE COURT:  All right.  Ms. Chartier.

23          MS. CHARTIER:  Thanks.  I have a lot of questions.

24          THE COURT:  I'm sorry?

25          MS. CHARTIER:  I said I have a lot of questions.

1      THE COURT:  That's so unlike you, Ms. Chartier.

2      MS. CHARTIER:  Thank you.  I thought the Court would

3  be surprised to hear that, so that's why I thought I should

4  tell you right away.

5      THE COURT:  Part of what I like about this job is

6  surprises.

7      MS. CHARTIER:  You would be surprised if I said I had

8  no questions.

9                      CROSS-EXAMINATION

10  BY MS. CHARTIER:

11  Q.  Agent Dunham, my name is Mary Chartier.  I represent

12  Mr. Haji.  And as I've just indicated, I have some questions

13  for you this afternoon.

14  A.  Yes, ma'am.

15  Q.  You indicated when you started your testimony that you were

16  familiar with Arabic phrases.  Do you read Arabic?

17  A.  In the Arabic language?

18  Q.  Yes.

19  A.  No.

20  Q.  Do you speak Arabic?

21  A.  I do not.

22  Q.  Do you understand Arabic?

23  A.  Again, certain words, yes.

24  Q.  So if someone were to say an Arabic sentence to you, would

25  you understand it or are you just looking for keywords that you

1    understand?

2    A.   Right.  Again, certain words in the context of the types of

3    investigations I'm assigned to, right.

4    Q.   How many words would that be?

5    A.   I think it would be difficult to estimate, but maybe 50 to

6    a hundred.

7    Q.   And is that based on what someone has told you those words

8    mean?

9    A.   So it's based on experience working with either our

10   language specialists or working this program.

11   Q.   So when Ms. Turek was asking you, for example, about

12   "hijra," that is someone telling you what that means in the

13   context of what you believe to be extremism, correct?

14   A.   Correct.  Or there's publications that ISIS makes like

15   Dabiq.  And in Dabiq they make reference to hijra.  It's

16   literally spelled out in English characters across the face of

17   that publication and essentially explaining what it is for the

18   people that follow ISIS propaganda.

19   Q.   You know "hijra" is a fairly common Arabic word, correct?

20   A.   It is.

21   Q.   That means journey or pilgrimage.  Not just about Muhammad,

22   but it's just a fairly common word.

23   A.   Again, context matters.

24   Q.   You indicated that Mr. Muse's interview was approximately

25   four hours long and it was video and audio recorded?

CROSS-EXAMINATION OF PAUL DUNHAM                96

1    A.   Correct.

2    Q.   And that has been preserved, correct?

3    A.   It has.

4    Q.   Mr. Haji's interview, how long was that?

5    A.   Approximately three hours.

6    Q.   Was that audio and video recorded?

7    A.   It was.

8    Q.   That has been preserved?

9    A.   It has.

10   Q.   Who was in that interview?

11   A.   I was with another special agent from the FBI office in

12   Grand Rapids.

13   Q.   Was Mr. Haji read his Miranda rights?

14   A.   He was.

15   Q.   Did he make a written statement?

16   A.   No, he did not.

17   Q.   As it relates to Mr. Muse's statement, the slightly over

18   one-page statement that he gives, Exhibit 2, did he dictate

19   those words and then someone wrote them down?

20   A.   Again, I have not seen the video, so I don't know how it

21   transpired.

22   Q.   So you don't know if these are his words or someone else

23   stating those in the interrogation, correct?

24   A.   I don't know.

25   Q.   UCE-1, 2 and 3, are they all FBI full-time employees?

1  *A.*  Yes.

2  *Q.*  UCE-1 posed as an ISIS recruiter?

3  *A.*  Correct.

4  *Q.*  UCE-2 posed as an ISIS fighter?

5  *A.*  Correct.

6  *Q.*  And UCE-3 posed as an individual who converted to Muslim?

7  *A.*  To Islam, correct.

8  *Q.*  To Islam.  Excuse me, to Islam.

9      Now, you had stated that essentially this is a team effort,

10  everyone collaborates in terms of what to do and what the next

11  task would be.  Correct?

12  *A.*  Correct.

13  *Q.*  When we go back to April 2016 when you state that

14  Mr. Muse's Facebook page came to the attention of the FBI, you

15  said that you were doing some analysis and that's how the

16  Facebook page came to your attention.  What analysis were you

17  doing?

18  *A.*  So it was not me personally.  This would have been in our

19  FBI Miami office, and so the Miami office was conducting their

20  work and came across this Facebook account.  It had material

21  that they were concerned about.  So a grand jury subpoena was

22  issued out of Miami to understand the ISP logins for that

23  Facebook account.  And those ISP logins resolved to Omaha,

24  Nebraska.  So the matter was transferred from FBI Miami to FBI

25  Omaha.  FBI Omaha conducted their work, and as they started to

1  narrow down where they thought those ISP logins were, they

2  identified Mohamud Muse.  And in doing their investigative work

3  they learned that in the fall of 2016 that Mohamud Muse had

4  moved to Michigan.  And so the matter was brought to my

5  attention here in Michigan.

6  Q.  So from April 2016 to June 21st, 2017, is someone

7  monitoring Mr. Muse's Facebook account?

8  A.  Yes.

9  Q.  And on June 21st, 2017, the FBI -- and that would be an

10  undercover agent or undercover employee -- poses as an ISIS

11  recruiter, and that's 14 months later approximately of when the

12  Facebook page comes to the FBI's attention?

13  A.  Yes.  So, again, FBI Miami started its work.  They didn't

14  know who the account belonged to or even where it was.  So by

15  the time it gets to the summer of 2016 we learn of who possibly

16  could be the user of that account.  And as that gets narrowed

17  down, it's determined that Mohamud Muse is likely living in

18  Michigan, so we started our investigative work here in

19  Michigan.

20       From the roughly January time period -- well, a little

21  later than that -- probably in the March time period until June

22  Mohamud Muse is conversing with another person.  Again, this

23  Complaint doesn't include everyone that's in here.  Another

24  individual that Mohamud Muse learns is planning to travel and

25  join ISIS.

CROSS-EXAMINATION OF PAUL DUNHAM                    99

1    *Q.*  An FBI individual or another individual?

2    *A.*  No, an FBI individual.

3    *Q.*  So just so I'm clear, Mr. Muse during the period of

4    April 2016 to June 21st, 2017, is communicating with another

5    FBI individual?

6    *A.*  From roughly March of 2017 to June of 2017.

7    *Q.*  And was that a member of your team who reached out to

8    Mr. Muse?

9    *A.*  Yes, it was.

10   *Q.*  How did that occur?  So does someone just send him an IM or

11   post on his public page?

12   *A.*  Right, they become Facebook friends.

13   *Q.*  So just so I'm clear, this is all a public page, correct?

14   Anyone can go on Mr. Muse's page and read what he's writing?

15   *A.*  If he has settings for that, yes.

16   *Q.*  Well, that's how someone would friend him, correct?

17   *A.*  Correct.

18   *Q.*  And then they would read what he wrote?

19   *A.*  Sure.

20   *Q.*  So this is a fourth undercover FBI employee who is

21   communicating with Mr. Muse?

22   *A.*  Correct.

23   *Q.*  And then ultimately a recruiter comes into the picture, an

24   alleged recruiter, in June of 2017?

25   *A.*  Yes.

*CROSS-EXAMINATION OF PAUL DUNHAM*                      100

1    *Q.*  So when you received your search warrant materials from

2    Facebook, do they predate April 2016?

3    *A.*  Yes, they go back to the origins of the Facebook accounts.

4    *Q.*  All the Facebook accounts?

5    *A.*  Correct.

6    *Q.*  Before the FBI gets involved do any of these three

7    gentlemen reach out to an ISIS recruiter?

8    *A.*  Not to my knowledge, no.

9    *Q.*  A real ISIS recruiter.

10   *A.*  Not to my knowledge, no.

11   *Q.*  So it's just when the FBI gets involved as an ISIS

12   recruiter that there's an exchange about joining ISIS, correct?

13   *A.*  Right.  Again, when we see the pro-ISIS, pro-Jihad,

14   pro-martyrdom, pro-violence, then that's part of our mandate to

15   understand what that's about.

16   *Q.*  But that's not illegal, correct?  People can have those

17   viewpoints, correct?

18   *A.*  Correct.

19   *Q.*  And they can post them on Facebook, correct?

20   *A.*  They can.

21   *Q.*  Does the FBI target anyone who has those views, or do you

22   have criteria as to who you will target?

23   *A.*  Again, because this started in another place, by the time

24   it got to me a lot of information had been gathered.  A lot of

25   things that were pro-ISIS, pro-Jihad, pro-violence,

1   pro-martyrdom.  So those are criteria for us.

2   *Q.*  So anyone with those four criteria who is posting those

3   things on Facebook, the FBI would target those individuals?

4   *A.*  I'm not talking about -- all I'm saying, in this case that

5   was the material that was there, yes.

6   *Q.*  But what I'm asking is the broader standard.  So do you

7   understand my question?

8           *MR. O'CONNOR:*  Objection, relevance.

9           *MS. CHARTIER:*  It's extremely relevant.  For the

10  detention hearing this Court is going to have to look at what

11  the allegations are in terms of violence, and one of the

12  factors in the presentence report is the extreme nature of what

13  this crime allegedly entailed.  How these gentlemen are

14  targeted and what their activities are before the FBI gets

15  involved is extremely relevant.  We just heard the agent say

16  they are not -- you can have pro-ISIS views.  That's not a

17  crime.  They never reach out to ISIS.  They never seek to take

18  any step to join until the FBI puts an ISIS recruiter at their

19  doorstep and then begins initiating this process.

20          *THE WITNESS:*  But, again, like I said, there's

21  pro-violence and pro-martyrdom.

22          *THE COURT:*  Special Agent, I have something that has

23  to be said first.  It is absolutely relevant to the issue of

24  detention to the extent any agent of the government has

25  encouraged any of the defendants to make a statement indicating

1   violence or to engage in violence, but you're going beyond that

2   into what the FBI's policy is, how they start these cases.

3   That's too far.  The objection is sustained.

4           *MS. CHARTIER:*  I'll narrow down.

5   *Q.   (BY MS. CHARTIER)*  So the FBI has a recruiter, an alleged

6   ISIS recruiter who comes in on June 21st, 2017, correct?

7   *A.*  Correct.

8   *Q.*  How long had that individual been working at the FBI?

9   *A.*  I don't know.

10  *Q.*  What about any of the undercover employees, how long had

11  they been working at the FBI?

12  *A.*  A number of years, but I couldn't tell you when their, you

13  know, service periods began.

14  *Q.*  How did that first communication in June 21st or on

15  June 21st of 2017 occur?  So was it a public post or an IM, an

16  instant message?

17          *MS. CHARTIER:*  That's private, Your Honor, between two

18  individuals.

19          *THE COURT:*  Thank you.

20          *MS. CHARTIER:*  I am a Facebook expert.  I'm on all the

21  time.

22          *THE COURT:*  I know IM because we have that here at

23  court.  So that part I understand.

24          *MS. CHARTIER:*  Great.  You're one step away from

25  Facebook.

1  *Q.   (BY MS. CHARTIER)*  So was it a public post or was it a

2  private IM?

3  *A.*  It was basically a friendship request that Mohamud Muse

4  accepted, and over roughly a three-month period Mohamud Muse

5  got to know the first undercover FBI employee.  Again, not to

6  be confused with UCE-1.  And as those two got to know each

7  other in early June of 2017, Mohamud Muse said something to the

8  effect of "Now that I've gotten to know you, I need to know how

9  you feel about dawla.  I need to know how you feel about ISIS."

10  And that person who happened to be an undercover FBI person he

11  was conversing with said something to the effect of "If ISIS

12  hadn't done what they did in Iraq, the whole place would have

13  been overrun by Shia."  And you have to understand a fair bit

14  about the relationships between Sunni muslims and Shia muslims

15  to know why that was important.

16  *Q.*  I do, so . . .

17  *A.*  Okay.  So in this initial undercover employee explaining

18  that to Mohamud Muse, he attached to that right away.  And that

19  undercover employee explained that they were making

20  preparations to travel, and they stopped and Mohamud Muse said,

21  "I'm interested.  How does that work?"  And so this person

22  said, "Well, I have somebody who is helping me get over there."

23  Stopped.  And Mohamud Muse said, "I would like to know who that

24  person is."  And the undercover employee said, "I have someone

25  that I'm working with."  And Mohamud Muse said, "Can you please

1   send me the Facebook profile of that person?"  So this initial

2   undercover employee provided that basically linkage and

3   Mohamud Muse friended UCE-1.

4   Q.  Are all those communications preserved?

5   A.  They are.

6   Q.  In their original format?  Not in the format that we were

7   discussing here with 17, 18, 19.  Are they preserved in their

8   original format?

9   A.  Correct.  And the records that Facebook produced pursuant

10  to search warrants, yes.

11  Q.  Did anyone ever speak to this individual over the

12  telephone?

13  A.  So let's make sure we're delineating our focus to -- do we

14  want to say pre UCE-1?

15  Q.  Pre UCE-1, yes.

16  A.  No.

17  Q.  Was there ever a face-to-face communication?

18  A.  There was not.

19  Q.  There was only the exchanges via Facebook?

20  A.  What I just described, yes.

21  Q.  No text messages, anything like that?  Emails?

22  A.  Text message, you're saying like telephone-based?

23  Q.  Yes.

24  A.  No.

25  Q.  Who mentioned Syria in those conversations?

*CROSS-EXAMINATION OF PAUL DUNHAM*                                    105

1   *A.*   So when the pre UCE-1 -- we're coming up with our own

2   nomenclature here, I guess -- in pre UCE-1 Mohamud Muse asked

3   where they were going to, and so that person explained they

4   were going to Iraq.

5   *Q.*   Now, when we look at the Complaint, it goes from June 2017

6   in paragraph 10 to August 2017 in paragraph 11.   Are there

7   communications going back and forth during that time, so July

8   until we get to August?

9   *A.*   Written communications, yes.

10  *Q.*   Via Facebook?

11  *A.*   Correct.

12  *Q.*   Did the FBI ever notify Facebook to suspend the accounts?

13  *A.*   We did not.

14  *Q.*   I'd like to take you to some of the exhibits that you

15  discussed, and I'd like to take you to Exhibit 4.   If we go to

16  page 431 -- who decided to highlight certain aspects of this

17  exhibit?   Was that you?

18  *A.*   I did, correct.

19  *Q.*   So if we go about halfway down the page you say "This is a

20  call for hijra."   You have that highlighted.   That is supposed

21  to be from Mr. Haji, correct?

22  *A.*   Correct.

23  *Q.*   And then you didn't highlight where he indicated less than

24  a minute later "This place is dangerous, bro."   Right?

25  *A.*   Correct.

*CROSS-EXAMINATION OF PAUL DUNHAM*                                    106

1   *Q.*  And then you didn't highlight where he says a little later

2   than that, "You can't live among people who always lie and are

3   always threatening."  Correct?

4   *A.*  Correct.

5   *Q.*  Mr. Haji had a car, right?

6   *A.*  He did.

7   *Q.*  Who made the decision to send money to all four individuals

8   and not just to Mr. Muse who is planning on traveling to

9   Somalia?

10  *A.*  When you say "who made the decision," what do you mean?

11  *Q.*  Sure.  So one individual is traveling to Somalia, correct?

12  And you have to say yes or no just for the record.  You're just

13  nodding your head.

14      So one individual was planning on going to Somalia,

15  correct?

16  *A.*  I'm sorry, I thought your question was continuing.  I was

17  trying to give you nonverbal cues.

18  *Q.*  Oh, sure.  Okay.  So the third time is the charm.

19  *A.*  One individual, yes.

20  *Q.*  One individual was traveling to Somalia, correct?

21  *A.*  Yes.

22  *Q.*  That individual was requesting funds, correct?

23  *A.*  Correct.

24  *Q.*  Who made the decision to not send all the funds to that

25  individual but loop in other people?

*CROSS-EXAMINATION OF PAUL DUNHAM*                                        107

1   *A.*  So Muse Muse explained how much he needed and discussed

2   with the ISIS fighter basically the best way to get the money

3   to him.  Like how they were going to go about doing that.

4   *Q.*  Did he suggest sending $300 to four people?

5   *A.*  What they talked about was his request was for $1,200 and

6   what would be the best way to send that money.  And as

7   Muse Muse talked to Undercover Employee 2, they decided because

8   there were other ikhwa, other bay'a-sworn, pledge allegiance,

9   ISIS-sworn brothers, that maybe one of the best ways to do that

10  was to break the money up.

11  *Q.*  Who suggested that?  So -- because this seems very unusual

12  to me.  Who suggested breaking it up?  Was that the FBI

13  undercover employee or was that Mr. Muse?

14  *A.*  So the undercover employee is saying -- you know, he's

15  talking to the -- basically the ISIS leadership, and they are

16  saying to him "We need to find a way to get this money to you.

17  Is it possible to send it to you and possible to send it to

18  other people?  And if so, then we need to talk about who those

19  people could be."

20  *Q.*  So it was the FBI who suggested sending it to other people

21  and not just Mr. Muse?

22  *A.*  Explained to him, yeah, that there needed to be a method to

23  get it to him, which could include others, yes.

24  *Q.*  Sure.  But it also could have included just sending it to

25  him, correct?

1  A.  Correct.  But as the two talked, they were talking about

2  the best way to go about doing that.

3  Q.  Well, wouldn't the best way to get one person $1,200 would

4  be to send one person $1,200 and not send four people $300

5  apiece?

6  A.  Right.  And what they were talking about was having some

7  type of operation security.  Some way to make it appear as

8  though the money wasn't concentrated to one individual, to one

9  party.

10  Q.  Who was talking about that, though?  It was your FBI

11  employee, correct?  You're not saying that Mr. Muse, who is

12  barely 20 years old, is talking about operation security?

13  A.  No, what I'm saying is the two of them were talking about

14  that.  So the online covert employee says -- the undercover

15  employee says to them a way to do that could be this, but there

16  have to be trusted parties if you're going to be doing that.

17  Q.  Sure.  So it's the FBI employee saying a way to do this is

18  to loop in four people, one being Mr. Muse and then the other

19  three, correct?

20  A.  Right.  But -- I'm sorry.

21  Q.  And what -- I think I know the answer to this, but why

22  don't you tell me.  What's the reason for that?  Why did the

23  FBI want to suggest that?

24  A.  I'm sorry, I'm not following you.

25  Q.  Sure.  Why did the FBI suggest sending money to additional

1    people and not all to Mr. Muse?

2    *A.*   Right.   Again, so the undercover employee is saying that a

3    way to get this money to you without it being alarming could be

4    to separate it into smaller amounts not going to the same

5    concentrated party.   Meaning not $1,200 going to Muse Muse.

6    *Q.*   Alarming to who?

7    *A.*   To whoever is monitoring those types of -- again, you have

8    to go back to the mind-set of the people that are involved.   So

9    Muse Muse thinks that he's talking to an ISIS fighter in

10   Somalia, and so they are talking about the best method to get

11   the money to him so that it isn't detected by basically, you

12   know, the money service business, isn't reported to the

13   U.S. government.

14   *Q.*   But you are the U.S. government.   Isn't the reason that you

15   suggested or had an FBI undercover agent employee suggest three

16   other people is so then there would be a step taken by Mr. Haji

17   and Mr. Muse where they give money to Mr. Muse who is traveling

18   to Somalia?   Isn't that the reason why it was suggested?

19   *A.*   It was suggested so that there was the appearance of

20   legitimacy, right?   The idea that $1,200 would look

21   problematic.   So basically --

22   *Q.*   Did he -- excuse me -- did he say --

23           *THE COURT:*   The point has been made.   Let's move on.

24           *MS. CHARTIER:*   Okay.

25   *Q.*   *(BY MS. CHARTIER)*   I'd like to turn to Exhibit 12.   A

1   portion that you did not highlight is five down.

2   A.   Five including the highlighted or not?

3   Q.   Five including the highlighted.  So who is on this?  This

4   is UCE-2?

5   A.   That's correct.

6   Q.   It says "You are to follow everything the Amir orders to

7   avoid the eyes of the munafiqun."  What is meant by that

8   statement?

9   A.   So it's basically the idea -- and again we're going back to

10  appearances here.  So if you make a pledge of allegiance to

11  ISIS, you are swearing your unwavering basically allegiance to

12  the Amir, whoever the leader is of that ISIS group.  And so

13  it's basically a reminder to him that whatever you're

14  instructed to do you need to follow.

15  Q.   So just so I'm clear, this is an undercover FBI employee

16  saying whatever you are told to do, you need to do it, correct?

17  A.   Correct.  And, again, it's to create the appearance of

18  you're working with real ISIS.  This is what real ISIS says.

19  Q.   But this is also what the FBI is doing, correct?

20  A.   Correct.  And we have to balance appearance here.

21  Q.   But it's also in your mind-set that you want him to take

22  some sort of action.  Because you've been investigating them

23  for years, correct?

24          *THE COURT:*  Ms. Chartier, I have a great love for

25  horses, so I don't like to see dead ones beaten.

1          *MS. CHARTIER:*  Thank you.  I'll move on, Your Honor.

2     *Q.  (BY MS. CHARTIER)*  If we go to Exhibit 14, this is also

3     with UCE-2, right?

4     *A.*  Correct.

5     *Q.*  If we look at the first full statement in here, this is

6     UCE-2 saying "When do you plan the hijra?"  Correct?

7     *A.*  I'm sorry, can you guide me here?

8     *Q.*  Sure.

9     *A.*  At the top?

10    *Q.*  Right at the top.

11    *A.*  Fine.

12    *Q.*  It's the 11-26-2018 at 3:44:40.

13    *A.*  I've gotcha.  Correct.

14    *Q.*  What was the response to that?  This is a communication

15    with Mr. Haji.  What was his response?

16    *A.*  I don't know if it's captured in here.  Eventually what it

17    comes back to is what I testified to earlier, that Mohamed Haji

18    said that he was going to be traveling shortly after Muse Muse

19    with Mohamud Muse.  So they were talking about March or April

20    of this year.

21    *Q.*  Did Mr. Haji have a ticket?

22    *A.*  No, he did not.

23    *Q.*  Did he give you a specific date?

24    *A.*  No, he did not.

25    *Q.*  Did he ask you for funds?

*CROSS-EXAMINATION OF PAUL DUNHAM*

1   *A.*  No, not yet.  He set an expectation he would be asking but

2   nothing specific.

3   *Q.*  Well, you said -- you had an expectation that he would be

4   asking?

5   *A.*  No, he set an expectation.  He said he may need financial

6   help.

7   *Q.*  But he never asked for financial help, correct?

8   *A.*  That's what I'm saying, nothing specific.  Correct.

9   *Q.*  For Exhibit 15 this is also UCE-2, and this is with

10  Mr. Muse?

11  *A.*  It is.  Mohamud Muse.

12  *Q.*  And if we look at page 109, that's UCE-2 asking if Mr. Muse

13  knows anyone else that can support dawla, meaning ISIS,

14  correct?

15  *A.*  That's correct.

16  *Q.*  And then if we go up, "See if you can help him.  Let me

17  know if you are."  Correct?

18  *A.*  So this is separate in that Mohamud Muse was independently

19  of his own volition on Facebook recruiting others to join ISIS.

20  So he was obtaining ISIS pledge of allegiance videos from

21  individuals in places like Ghana and Nigeria to join ISIS.  So

22  these were basically like independent actions he was taking and

23  he's reporting back to UCE-2 about what he's doing.

24  *Q.*  Well --

25         *MR. ZAMBON:*  Your Honor, I would only ask, which

*CROSS-EXAMINATION OF PAUL DUNHAM*

1   Mr. Muse are you talking about?

2           *THE WITNESS:*  To clarify, Mohamud Muse.  Your client,

3   sir.

4   *Q.*  *(BY MS. CHARTIER)*  Well, if we look at this page 109,

5   Mr. Mohamud Muse says "It's only us three," right?

6   *A.*  When he's talking specifically about who are the people in

7   Michigan.

8   *Q.*  And then it's UCE-2 who says "Your situation is holding you

9   back," right?

10  *A.*  So this is a prior conversation where Mohamud Muse explains

11  to the fighter that he's married, his wife is pregnant, due to

12  give birth in March, and that's the timing he's anticipating

13  traveling.  That's the situation as I understand it.

14  *Q.*  Sure.  But then if we look at this, I'm looking at the

15  words here -- see, I don't have the complete context of all the

16  records.  But if we look here, UCE-2, the FBI undercover

17  employee, is saying to Mr. Mohamud Muse, "Your situation is

18  holding you back," correct?

19  *A.*  Correct.

20  *Q.*  Where was the money wired to?

21  *A.*  Just like the physical city or the actual stores?

22  *Q.*  The actual store.

23  *A.*  To WalMart locations in Lansing, Michigan, with the

24  exception of one that went to Chicago.

25  *Q.*  How did UCE-3 make contact?  Was it a friend request again?

*CROSS-EXAMINATION OF PAUL DUNHAM*

1   A.  Yes.

2   Q.  Were all the communications between UCE-1 and Mr. Muse,

3   Mr. Mohamud Muse, and Mr. Haji, those were all via Facebook,

4   correct?

5   A.  UCE-1?

6   Q.  Yes.

7   A.  So UCE-1 interacted with Mohamud Muse.

8   Q.  So I just want to be -- I'm talking only about these three

9   gentlemen.  So any communication between UCE-1 and these three

10  gentlemen was only by Facebook, correct?  And only in writing?

11  A.  But, again, UCE-1 did not have contact with Mohamed Haji or

12  Muse Muse, only with Mohamud Muse.

13  Q.  Right.  And I know that, but I'm just asking about --

14  because these three gentlemen are here, so any communication

15  with these three, even if two of them UCE-1 did not communicate

16  with, it was only in writing, correct?

17  A.  No, in the Criminal Complaint it talks about voice

18  communications.

19  Q.  Were those recorded?

20  A.  Yes.

21  Q.  And you have those recordings preserved?

22  A.  We do.

23  Q.  All communications were either recorded, if they were by

24  voice, or they are preserved in writing?

25  A.  That's correct.

*CROSS-EXAMINATION OF PAUL DUNHAM*

1  Q.  Is that the same for UCE-2, all communications were

2  recorded or preserved in writing?

3  A.  That's correct.

4  Q.  Is that the same for UCE-3, all communications were either

5  recorded or preserved in writing?

6  A.  That's correct.

7  Q.  For UCE-3's trip to WalMart, did you also have visual

8  surveillance when they were in the store?

9  A.  Visual surveillance inside the actual store?

10 Q.  Yes.

11 A.  Not by FBI personnel, by the security system within the

12 store.

13 Q.  Do you have the tape of the three of them in the store?

14 A.  I do.

15 Q.  Were they always together or were they at times separate?

16 A.  At times separate.

17 Q.  At the airport do you have audiotaped surveillance -- or

18 excuse me -- videotaped surveillance of the three of them

19 getting to the airport and going into the airport?

20 A.  Yes.

21 Q.  And has that been preserved?

22 A.  It has.

23 Q.  Did you use any other mechanisms to investigate this case?

24 So did you use -- work with any other agencies?

25 A.  Nobody that was substantive.

*CROSS-EXAMINATION OF PAUL DUNHAM*                    116

1   *Q.*  Well, just tell me if you did or you didn't, and then would

2   you tell me who they are.

3   *A.*  So we have a number of folks that are assigned to the FBI's

4   Joint Terrorism Task Force, so there are a number of other

5   agencies that have personnel assigned to it.  So they are

6   basically deputized deputy U.S. Marshals that have federal

7   investigative authorities.  So we're talking about places like

8   the Michigan State Police in their, you know, federal

9   deputization capacity, Michigan State University Police

10  Department, the Lansing Police Department, and a host of people

11  that are on the FBI's Joint Terrorism Task Force in Detroit.

12  *Q.*  Did those individuals participate in this investigation?

13  *A.*  Some of them did, yes.

14  *Q.*  Ms. Turek asked you about the oath.  Was that communicated

15  in writing or via video as to what the oath would be?

16  *A.*  So the pledge of allegiance was communicated from UCE-2 to

17  Muse Muse in the Arabic language, and he apparently couldn't

18  read it and didn't understand it, so then he sent it to

19  Mohamed Haji asking him for help with it.  Mohamed Haji had

20  another party that he was friends with, separate from what's in

21  the Complaint, who was another undercover FBI employee.  And

22  Mohamed Haji sent that to this person, it was an Arab female,

23  asking "Do you speak, read, and write Arabic?"  To which that

24  person replied "Yes."  Mohamed Haji transmitted the written

25  Arabic language bay'a to this other undercover employee that he

1   had a friendship with, and her persona responded "Oh, my gosh,

2   where did you get this?  You know, this is the official ISIS

3   bay'a pledge of allegiance."  And Mohamed Haji said, "I got it

4   from a mujahid."  He said, "I need a favor from you."  She

5   asked what that was.  And he told her that "I need you to make

6   an audio recording of this bay'a pledge of allegiance and send

7   it to me so I can use it to learn to make bay'a."  And so that

8   individual made an audio file, transmitted it to Mohamed Haji,

9   Mohamed Haji transmitted that to Muse Muse, and then after

10  which time bay'a videos were made by Muse Muse, Mohamud Muse,

11  and Mohamed Haji.  So it started with the Arabic written

12  language pledge that went through a series of transactions that

13  ultimately resulted in bay'a videos.

14  *Q.*  I had asked you the question about before the FBI gets

15  involved if you're aware, for example, if Mr. Haji or Mr. Muse

16  or Mr. Mohamud Muse had met with or communicated at all with an

17  ISIS recruiter.  Do you have any knowledge before the FBI gets

18  involved of any of the three of them actually speaking to a

19  member of ISIS?

20  *A.*  No, I do not.

21  *Q.*  Did Mr. Muse Muse check a bag at the airport?

22  *A.*  Yes, he did.

23  *Q.*  Was that bag seized?

24  *A.*  It was.

25  *Q.*  And has it been searched?

*CROSS-EXAMINATION OF PAUL DUNHAM*                    118

1   A.  Pursuant to a search warrant, yes.

2   Q.  Were any other materials seized from Mr. Haji?  For

3   example, phone, computer, anything like that?

4   A.  Incident to Mohamed Haji's arrest a cell phone that was on

5   his person was seized.

6   Q.  Has that been searched?

7   A.  Pursuant to a search warrant, yes.

8   Q.  Mr. Haji and Mr. Mohamud Muse were parked in short-term

9   parking when they went to the airport, correct?

10  A.  That's my understanding, yes.

11  Q.  And, again, they didn't have tickets, correct?

12  A.  They did not.

13  Q.  The training that the UCEs undergo, you said you were not

14  familiar with that?

15  A.  That's correct.

16  Q.  Who is familiar with that?

17  A.  The people that operate the program.  As you can imagine,

18  the FBI is like a big organization.

19  Q.  So there is some sort of training protocol that does exist?

20  A.  It's formal, yes.

21  Q.  But just you're not familiar with it?

22  A.  I am not, correct.

23  Q.  And you did not go through that training?

24  A.  I did not.

25  Q.  You indicated that you worked with other police agencies

1    during this investigation.  You got search warrants for

2    Facebook.  An arrest warrant for Mr. Haji.  Search warrants for

3    the home?

4    *A.*  Yes, for the residence of Muse Muse and Mohamud Muse, their

5    apartment, yes.

6    *Q.*  Did you get a search warrant for Mr. Haji's home?

7    *A.*  No, it was a consent search.

8    *Q.*  So who consented to the search of the home?

9    *A.*  I wasn't there, but it was my understanding that his

10   partner, wife, Nerta (sp) Muse.

11   *Q.*  Did you use any other investigatory mechanisms while you

12   were investigating this case?

13   *A.*  We used federal grand jury subpoenas.

14   *Q.*  Did you use a FISA warrant?

15           *MR. O'CONNOR:*  Objection, Your Honor.  I feel like

16   we're -- this is now discovery exploration.

17           *THE COURT:*  We are getting into discovery.  Let's move

18   on.

19   *Q.*  *(BY MS. CHARTIER)*  Mr. Haji voluntarily spoke with you for

20   approximately three hours you said when he was arrested?

21   *A.*  That's correct.

22   *Q.*  And he did so despite being given Miranda warnings,

23   correct?

24   *A.*  Correct.

25           *MS. CHARTIER:*  I have no additional questions.  Thank

1   you.

2           *THE COURT:* Thank you, Ms. Chartier.

3           Mr. Zambon, I surmise that you have some questions.

4           *MR. ZAMBON:* I do, Your Honor.

5           *THE COURT:* Do you know -- and I'm not trying to rush

6   you -- but do you have a sense of how long you might be?

7           *MR. ZAMBON:* I think counsel asked most of the

8   questions, so I do have some, Your Honor. I think it will be

9   probably 15, 20 minutes.

10          *THE COURT:* Okay. Thank you. Here is the issue: I

11   have pretty much a hard break at 5:00. And the reason for that

12   is two-fold. Part of it has to do with the marshals and

13   security of the building, but also I teach a class that begins

14   at 6:00 and I have to drive to that location. Students are

15   traveling from around -- I don't have any way of canceling that

16   class. So I really have to be out in my car on the way by

17   about ten after five. So, unfortunately, we're going to --

18   because I don't want to rush anybody here and I want everybody

19   to have opportunity -- so what I intend to do is to adjourn

20   this hearing to resume on Monday afternoon. My Monday morning

21   is completely booked. It looks like a dentist's calendar. But

22   I do have in the afternoon -- you have a choice. We can -- we

23   can resume at noon on Monday. I have a couple of IAs at 2:00,

24   but that's the only thing. And that can be moved if necessary.

25   At least to later in the day or whatever. So we can resume at

1   noon or we can resume at 2:30.

2          MS. TUREK:  Any time is fine with me.

3          THE COURT:  Mr. West?  Mr. O'Connor?

4          MR. O'CONNOR:  We'll make it work.

5          MR. WEST:  We'll make that time work, Your Honor.

6          THE COURT:  All right.

7          MR. WEST:  2:30?

8          THE COURT:  Yes.  We will adjourn, we will resume the

9   hearing at 2:30 Monday afternoon at -- on -- it's January 28th.

10  Anything else that we need to take up at this time?  Do you

11  want to schedule a date for the prelim, assuming one is

12  necessary?

13         MS. CHARTIER:  I think that would be fantastic.  That

14  way we'd get it on our calendar and your pseudo dentist

15  calendar.

16         THE COURT:  I'll tell you what scares me is I look at

17  my calendar in 2020 and it's filling up pretty fast.

18         MS. CHARTIER:  2020.  Wow.

19         THE COURT:  All right.  So the 14 days runs when?

20  Mr. O'Connor?  Mr. West?  When did we see the defendants first?

21  Was that the day before yesterday?  Tuesday.  So it looks like

22  February 5th would be the 14 days?

23         MR. O'CONNOR:  That was our calculation as well,

24  Your Honor.

25         THE COURT:  So if we do schedule it for -- I could do

1    the 4th.  Or, let's see, the 5th.  The 5th has a number of

2    things.  Assuming that -- yeah, we'll still be good on the 5th;

3    is that right?

4              *MR. O'CONNOR:*  Yes, Your Honor.

5              *THE COURT:*  Okay.

6              *MR. O'CONNOR:*  We're available either day.

7              *THE COURT:*  All right.  The 5th for me looks very

8    full.  The 4th is very open.  So does -- do counsel -- and so

9    I'm apparently able to do it at any time on the 4th.

10             *MS. CHARTIER:*  Me too.

11             *THE COURT:*  Do counsel have a preference?

12             *MR. O'CONNOR:*  4th.

13             *MS. CHARTIER:*  No, that works.  Thank you.

14             *THE COURT:*  Okay.  Do you have a preference as to

15   time?

16             *MS. CHARTIER:*  I would say maybe begin early?  If that

17   works for the Court.

18             *THE COURT:*  You're driving from Lansing.

19             *MS. CHARTIER:*  Right.

20             *THE COURT:*  What if it's snowing?  Shall we say 10:00?

21             *MS. CHARTIER:*  That's great.  Thank you.

22             *THE COURT:*  Okay.

23             *MS. CHARTIER:*  Thank you for being so considerate.

24             *MR. ZAMBON:*  Your Honor?

25             *THE COURT:*  Will that work?

1          MR. O'CONNOR:  Yes, Your Honor.

2          THE COURT:  Yes, Mr. Zambon.

3          MR. ZAMBON:  A little bit after 10?  I have a doctor's

4    appointment at 9.  I don't know how long it will go.

5          THE COURT:  Sure.  Okay.  Do you think 11 is safe?

6          MR. ZAMBON:  Eleven would be great, Your Honor.

7          MS. CHARTIER:  Yes.

8          THE COURT:  Okay.  We'll do it 11:00 on February 4th.

9          Now, when we resume on Monday afternoon, we will be

10   downstairs in the 6th floor courtroom.  Okay?  So I don't want

11   anybody coming up here and wondering why it's locked up.

12         Is there anything else we need to take up now,

13   Mr. West or Mr. O'Connor?

14         MR. O'CONNOR:  No, Your Honor.

15         THE COURT:  Ms. Turek?

16         MS. TUREK:  No, Your Honor.

17         THE COURT:  Ms. Chartier?

18         MS. CHARTIER:  No.  Thank you, Your Honor.

19         THE COURT:  Mr. Zambon?

20         MR. ZAMBON:  I don't believe so.  Thank you,

21   Your Honor.

22         THE COURT:  Thank you all.  Have a good weekend.

23   Please drive safely.

24         Yes, Ms. Turek.

25         MS. TUREK:  Your Honor, one thing.  I'm not sure -- my

1    client's family is all here today, they are in the back of the

2    courtroom.   I'm not sure if they will be here Monday.   But I do

3    want the Court to know that the defendants have plenty of

4    support.

5            *THE COURT:*  Thank you for pointing that out.   And

6    please remind me of that on Monday.

7            *MS. TUREK:*  Thank you.

8            *THE COURT:*  All right.

9            *THE CLERK:*  Court is adjourned.

10       *(Proceeding concluded at 4:57 p.m.)*

11                      *   *   *   *   *

12                       CERTIFICATE

13       I certify that the foregoing is a transcript from the

14   Liberty Court Recording System digital recording of the

15   proceedings in the above-entitled matter, transcribed to the

16   best of my ability.

17       I further certify that the transcript fees and format

18   comply with those prescribed by the court and the Judicial

19   Conference of the United States.

20

21   May 14, 2019

22

23                       /s/ Glenda Trexler
                          Glenda Trexler, CSR-1436, RPR, CRR
24

25

```
 1                        EXAMINATION INDEX

 2                                                   PAGE

 3   PAUL DUNHAM

 4        DIRECT EXAMINATION BY MR. O'CONNOR:          11

 5        CROSS-EXAMINATION BY MS. TUREK:             62

 6        CROSS-EXAMINATION BY MS. CHARTIER:          94

 7                      *    *    *    *    *

 8                        EXHIBIT INDEX

 9   EXHIBIT                              OFFERED  ADMITTED

10   GVT  1   Criminal Complaint and Affidavit  13       13

11   GVT  2   Handwritten statement of          17       18

12            Muse Muse (not written out by

13            Muse Muse)

14   GVT  3   Excerpt from Mohamud Muse         26       27

15            Facebook account in 6/17

16   GVT  4   Excerpt from Muse Muse Facebook   29       30

17            account in 11/17

18   GVT  5   Excerpt from Muse Muse Facebook   33       33

19            account in 02/18

20   GVT  6   Excerpt from Muse Muse Facebook   34       34

21            account in 03/18

22   GVT  7   Excerpt from Muse Muse Facebook   35       36

23            account in 04/18

24   GVT  8   Excerpt from Muse Muse Facebook   37       38

25            account in 05/18
```

| 1 | *GVT* | *9* | *Excerpt from Mohamed Haji* | *39* | *41* |
| 2 | | | *Facebook account in 07/18* | | |
| 3 | *GVT* | *10* | *Excerpt from Mohamed Haji* | *41* | *41* |
| 4 | | | *Facebook account in 08/18* | | |
| 5 | *GVT* | *11* | *Excerpt from Muse Muse Facebook* | *42* | *43* |
| 6 | | | *account in 08/18* | | |
| 7 | *GVT* | *12* | *Excerpt from Muse Muse Facebook* | *45* | *45* |
| 8 | | | *account in 11/18* | | |
| 9 | *GVT* | *13* | *Excerpt from Facebook account in* | *47* | *47* |
| 10 | | | *11/18* | | |
| 11 | *GVT* | *14* | *Excerpt from Mohamed Haji* | *49* | *49* |
| 12 | | | *Facebook account in 11/18* | | |
| 13 | *GVT* | *15* | *Excerpt from Mohamud Muse* | *61* | *62* |
| 14 | | | *Facebook account in 12/18* | | |
| 15 | *GVT* | *16* | *Excerpt from Mohamed Haji* | *55* | *55* |
| 16 | | | *Facebook account in 12/18* | | |
| 17 | *GVT* | *17* | *Screen shot of Facebook exchange* | *57* | |
| 18 | | | *between UCE-2 and Mohamed Haji* | | |
| 19 | | | *in 01/19* | | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |