1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF MICHIGAN
2                         SOUTHERN DIVISION

3    _____

4    UNITED STATES OF AMERICA,

5                         Plaintiff,
                                          DOCKET NO. 1:19-mj-24
6    vs.

7
     MUSE ABDIKADIR MUSE,
8    MOHAMED SALAT HAJI, and
     MOHAMUD ABDIKADIR MUSE,
9
                         Defendants.
10   _____/

11


12    TRANSCRIPT OF ARRAIGNMENTS, INITIAL PRETRIAL CONFERENCES, AND

13              CONTINUATION OF DETENTION HEARINGS

14          BEFORE MAGISTRATE JUDGE PHILLIP J. GREEN

15                   GRAND RAPIDS, MICHIGAN

16                     January 31, 2019

17


18   Court Reporter:          Glenda Trexler
                              Official Court Reporter
19                            United States District Court
                              685 Federal Building
20                            110 Michigan Street, N.W.
                              Grand Rapids, Michigan 49503
21

22   Proceedings reported by stenotype, transcript produced by

23   computer-aided transcription.

24

25

1   A P P E A R A N C E S:

2   FOR THE GOVERNMENT:

3        MR. CLAY M. WEST
         UNITED STATES ATTORNEY'S OFFICE
4        330 Ionia Avenue, N.W.
         P.O. Box 208
5        Grand Rapids, Michigan 49501-0208
         Phone:  (616) 456-2404
6        Email: Clay.M.West@usdoj.gov

7        MR. CHRISTOPHER M. O'CONNOR
         UNITED STATES ATTORNEY'S OFFICE
8        330 Ionia Avenue, N.W.
         P.O. Box 208
9        Grand Rapids, Michigan 49501-0208
         Phone:  (616) 456-2404
10       Email:  Christopher.m.o'connor@usdoj.gov

11  FOR THE DEFENDANT MUSE ABDIKADIR MUSE:

12       MS. SHARON A. TUREK
         FEDERAL PUBLIC DEFENDERS OFFICE
13       50 Louis Street, N.W., Suite 300
         Grand Rapids, Michigan 49503-2633
14       Phone:  (616) 742-7420
         Email:  sharon_turek@fd.org

15

16       MR. JAMES S. FISHER
         FEDERAL PUBLIC DEFENDERS OFFICE
17       50 Louis Street, N.W., Suite 300
         Grand Rapids, Michigan 49503-2633
18       Phone:  (616) 742-7420
         Email:  james_fisher@fd.org

19

20  FOR THE DEFENDANT MOHAMED SALAT HAJI:

21       MS. MARY CHARTIER
         CHARTIER & NYAMFUKUDZA, PLC
22       1905 Abbot Road, Suite 1
         East Lansing, Michigan 48823
23       Phone:  (517) 885-3305
         Email: mary@cndefenders.com

24

25

```
1    FOR THE DEFENDANT MOHAMUD ABDIKADIR MUSE:

2         MR. RICHARD E. ZAMBON
          RICHARD E. ZAMBON, PLLC
3         202 Waters Building
          161 Ottawa Avenue, N.W.
4         Grand Rapids, Michigan 49503
          Phone: (616) 456-7831
5         Email: rick@zambonlaw.co

6                        *   *   *   *   *

7                                  Grand Rapids, Michigan

8                                  January 31, 2019

9                                  2:15 p.m.

10              P R O C E E D I N G S

11        THE COURT:  We're here on the matter of United States

12   versus Muse Abdikadir Muse, Mohamed Salat Haji, and

13   Mohamud Abdikadir Muse, case number 19-cr-25.  This is the date

14   and time for a continuation of the detention hearing.  In the

15   interim, since the last hearing, the grand jury returned an

16   Indictment which is filed at docket number 25.  So it's my

17   intention, unless anyone has an objection, to go ahead and do

18   an arraignment on the Indictment and then we will proceed with

19   the continuation of the detention hearing.

20        Is there any objection from the government?

21        MR. O'CONNOR:  No, Your Honor.

22        THE COURT:  Mr. Zambon?

23        MR. ZAMBON:  None, Your Honor.

24        MS. CHARTIER:  No, Your Honor.

25        MS. TUREK:  No, Your Honor.
```

1      *THE COURT:*  All right.  I suppose I should have

2  everyone make their appearance on the record.  Why don't we go

3  ahead and do that as well.

4      *MR. WEST:*  Good afternoon, Your Honor, Clay West and

5  Chris O'Connor for the United States.

6      *THE COURT:*  Good afternoon.

7      *MR. ZAMBON:*  Oh.  Good afternoon, Your Honor.

8  Richard Zambon appearing on behalf of the Defendant

9  Mohamud Muse who is seated to my left.

10      *THE COURT:*  All right.  Good afternoon, Mr. Zambon.

11      *MS. CHARTIER:*  Good afternoon, Your Honor.

12  Mary Chartier on behalf of Mohamed Haji who is seated to my

13  right.

14      *THE COURT:*  All right.  Good afternoon, Ms. Chartier.

15      *MS. TUREK:*  Good afternoon, Your Honor.  Sharon Turek

16  on behalf of Mr. Muse Muse seated at my right.  Also at counsel

17  table is Mr. Fisher from my office who has also filed an

18  Appearance in this case.

19      *THE COURT:*  All right.  Good afternoon to all of you.

20      All right.  Mr. -- let's see here.  I'll get my notes

21  together.

22      Mr. Muse Muse and Mr. Mohamud Muse and

23  Mr. Mohamed Haji, I want to remind each of you that you have a

24  right to remain silent.  That means you have no obligation to

25  say anything to anyone from the government, anyone in law

1   enforcement, or anyone else for that matter.

2           Do you understand that, Mr. Muse Muse?

3           *DEFENDANT MUSE MUSE:*  Yes.

4           *THE COURT:*  Do you understand that, Mr. Mohamed Haji?

5           *DEFENDANT HAJI:*  Yes.

6           *THE COURT:*  Do you understand that, Mr. Mohamud Muse?

7           *DEFENDANT MOHAMUD MUSE:*  Yes.

8           *THE COURT:*  All right.  If you do make a statement,

9   what you say may be used against you in a later court

10  proceeding.

11          Do you understand that, Mr. Muse Muse?

12          *DEFENDANT MUSE MUSE:*  Yes.

13          *THE COURT:*  Mr. Mohamed Haji?

14          *DEFENDANT HAJI:*  Yes.

15          *THE COURT:*  Mr. Mohamud Muse?

16          *DEFENDANT MOHAMUD MUSE:*  Yes.

17          *THE COURT:*  You each have a right to the assistance of

18  an attorney throughout the proceedings in this case.  If you

19  cannot afford an attorney, one will be appointed for you at no

20  cost to you.

21          Do you understand that Mr. Muse Muse?

22          *DEFENDANT MUSE MUSE:*  Yes.

23          *THE COURT:*  Mr. Mohamed Haji?

24          *DEFENDANT HAJI:*  Yes.

25          *THE COURT:*  Mr. Mohamud Muse?

1          *DEFENDANT MOHAMUD MUSE:*  Yes.

2          *THE COURT:*  Each of you has been appointed a

3    court-appointed attorney.  Mr. Muse Muse, Sharon Turek has been

4    appointed to represent you.  She is the Federal Public Defender

5    for the Western District of Michigan.  Mr. James Fisher has

6    also been appointed and is representing you.  He is an

7    Assistant Federal Public Defender.  They are both very

8    experienced and very capable criminal defense attorneys.

9          Are you satisfied with their representation so far?

10         *DEFENDANT MUSE MUSE:*  Yes.

11         *THE COURT:*  They will continue to represent you no

12   matter how you choose to proceed in this case.

13         Do you understand that, sir?

14         *DEFENDANT MUSE MUSE:*  Yes.

15         *THE COURT:*  Mr. Mohamed Haji, Ms. Chartier has been

16   appointed by the court to represent you.  She is a very

17   experienced and a very capable criminal defense attorney.

18         Are you satisfied with her representation so far?

19         *DEFENDANT HAJI:*  Yes.

20         *THE COURT:*  And you understand she will continue to

21   represent you no matter how you choose to proceed in this case?

22         *DEFENDANT HAJI:*  Yes.

23         *THE COURT:*  All right.  Mr. Mohamud Muse, Mr. Zambon

24   has been appointed to represent you.  He is also a very

25   experienced and a very capable criminal defense attorney.

133

1         Are you satisfied with his representation so far?

2         *DEFENDANT MOHAMUD MUSE:*  Yes, sir.

3         *THE COURT:*  He will continue to represent you in this

4  case no matter how you choose to proceed.

5         Do you understand that, sir?

6         *DEFENDANT MOHAMUD MUSE:*  Yes.

7         *THE COURT:*  Mr. Zambon, will your client waive reading

8  of the Indictment if I explain the charges to him?

9         *MR. ZAMBON:*  Yes.  Thank you, Your Honor.

10         *THE COURT:*  All right.  And, Ms. Chartier, will your

11  client also waive reading?

12         *MS. CHARTIER:*  Yes, Your Honor.

13         *THE COURT:*  Ms. Turek?

14         *MS. TUREK:*  Yes, Your Honor.

15         *THE COURT:*  All right.  Very well.  And before I get

16  into it, Mr. West or Mr. O'Connor, I saw in the penalty sheet a

17  reference to a forfeiture allegation, but I don't see it in the

18  Indictment.

19         *MR. WEST:*  That's correct, Your Honor.  There is a

20  statutory authority for forfeiture, but there is no forfeiture

21  allegation in the Indictment, and so the penalty sheet as filed

22  is erroneous.

23         *THE COURT:*  All right.  So I don't need to address

24  that?

25         *MR. WEST:*  Correct.

1           *THE COURT:*  Okay.  Thank you.

2           All right.  Mr. Muse Muse, Mr. Mohamed Haji, and

3    Mr. Mohamud Muse, you are each charged in Count 1 with

4    conspiracy to provide material support to a designated foreign

5    terrorist organization.  The word "conspiracy" is used to refer

6    to a criminal agreement of sorts.  If two or more persons agree

7    to cooperate with each other for the purposes of committing a

8    crime, that's called a conspiracy.

9           To be convicted of a conspiracy, the government would

10   have to prove beyond a reasonable doubt that the individual

11   voluntarily joined the conspiracy knowing the criminal purpose

12   of it.  Here the grand jury is alleging that from January of

13   2017 through January 21st of this year that each of you agreed

14   to cooperate with others in committing the crime of providing

15   material support to a designated terrorist organization.

16          Now, here the government would first of all have to

17   prove that the organization to which you allegedly intended to

18   provide material support was a designated foreign terrorist

19   organization.  And that is, if you read the Indictment, it goes

20   into some detail as to which entities have been designated by

21   the State Department which are collectively referred to as ISIS

22   for purposes of this Indictment.

23          It is further alleged that you agreed to provide

24   material support and resources specifically by way of

25   personnel, which I take to mean providing your services, to

1    ISIS.  This would be a violation of Title 18, United States

2    Code § 2339B.

3              Mr. Muse Muse, do you think you understand what you're

4    being accused of in Count 1?

5              *DEFENDANT MUSE MUSE:*  Yes.

6              *THE COURT:*  Mr. Mohamed Haji, do you think you

7    understand what you're being accused of in Count 1?

8              *DEFENDANT HAJI:*  Yes.

9              *THE COURT:*  And Mr. Mohamud Muse, do you think you

10   understand what you're being accused of in Count 1?

11             *DEFENDANT MOHAMUD MUSE:*  Yes.

12             *THE COURT:*  I'm going to go on and talk about Count 2,

13   and then we'll talk about penalties as they are the same.

14             Count 2 charges each of you with attempting to provide

15   material support to a designated foreign terrorist

16   organization.  Here it's alleged essentially that on

17   January 21st of this year each of you attempted to provide

18   material support to the organizations collectively referred to

19   as ISIS and that you aided and abetted each other in that

20   attempt.

21             Aiding and abetting -- excuse me -- is a separate

22   statutory provision, and that's under Title 18,

23   United States Code § 2.  Aiding and abetting means to provide

24   assistance, to help somebody else in committing a crime knowing

25   that that person is committing a crime.

1        So here it's alleged that either you attempted to

2    provide material support, that is your services, to ISIS, or

3    you aided and abetted somebody else in attempting to provide

4    that material support.  This would also be a violation of

5    Title 18, United States Code § 2339B.

6        Mr. Muse Muse, do you think you understand what you're

7    being accused of in Count 2?

8        *DEFENDANT MUSE MUSE:*  Yes.

9        *THE COURT:*  Mr. Mohamed Haji, do you think you

10   understand what you're being accused of in Count 2?

11       *DEFENDANT HAJI:*  Yes.

12       *THE COURT:*  And Mr. Mohamud Muse, do you think you

13   understand what you're being accused of in Count 2?

14       *DEFENDANT MOHAMUD MUSE:*  Yes.

15       *THE COURT:*  Gentlemen, if you are convicted of either

16   Count 1 or Count 2, you face a maximum penalty of 20 years in

17   prison, a fine of up to $250,000.  You would be subject to a

18   period of supervised release of up to three years.  And you

19   would be required to pay a special assessment of a hundred

20   dollars.

21       Supervised release is a period of time following

22   incarceration in which an individual is subject to certain

23   terms and conditions set by the sentencing judge.  If that

24   individual violates any term or condition, he could be sent

25   back to prison for up to the full term of supervised release.

1    In some instances that could result in an individual spending

2    more time in prison than what was allowed as the maximum

3    penalty for the offense of conviction.

4           Do you have any questions as to the penalties for

5    Count 1 or Count 2, Mr. Muse Muse?

6           *DEFENDANT MUSE MUSE:*  No.

7           *THE COURT:*  Do you have any questions,

8    Mr. Mohamed Haji?

9           *DEFENDANT HAJI:*  No.

10          *THE COURT:*  Do you have any questions,

11   Mr. Mohamud Muse?

12          *DEFENDANT MOHAMUD MUSE:*  No.

13          *THE COURT:*  All right.  Mr. Muse Muse, you are also

14   charged in a third count of making a false statement in a

15   passport application.  The grand jury is alleging that on

16   January 2nd of this year that you made an application for a

17   passport and that in that application you knowingly and

18   intentionally made a false statement of the type that would

19   cause the State Department to issue a passport where it might

20   otherwise not.  It's alleged that you attested, meaning that

21   you stated under oath, on the application that you had

22   accidentally thrown out your prior passport on December 19th,

23   2018.  And it's alleged that you knew at the time that that

24   statement was not true.  This would be a violation of Title 18,

25   United States Code Section 1542.

1          Mr. Muse Muse, do you think you understand what you're

2    being accused of in Count 3?

3          *DEFENDANT MUSE MUSE:*  Yeah.

4          *THE COURT:*  If convicted of Count 3, you face a

5    maximum penalty of 10 years in prison, a fine of up to

6    $250,000.  You'd be subject to a period of supervised release

7    of up to three years.  And would be required to pay a special

8    assessment of a hundred dollars.

9          Mr. Muse Muse, do you have any questions or concerns

10   about those penalties?

11         *DEFENDANT MUSE MUSE:*  No.

12         *THE COURT:*  All right.  Gentlemen, there are four ways

13   that you could respond to the charges against you.  You could

14   plead not guilty.  You could plead guilty.  You could plead

15   what's known as no contest, which requires the permission of

16   the district court judge, in this case Judge Gordon Quist.  Or

17   you could stay silent, say nothing, in which case the Court

18   would automatically enter a not-guilty plea on your behalf.

19         I'm now going to ask each of you to enter a plea to

20   the charges against you through your attorney.

21         Ms. Turek, how does Mr. Muse Muse plead?

22         *MS. TUREK:*  Your Honor, not guilty as to all three

23   counts.

24         *THE COURT:*  Very well.  A not-guilty plea will be

25   entered on behalf of Mr. Muse Muse as to each count, 1, 2, and

139

1  3 of the Indictment.

2          Ms. Chartier, how does Mr. Haji plead?

3          *MS. CHARTIER:*  Mr. Haji pleads not guilty, Your Honor.

4          *THE COURT:*  Very well.  A not-guilty plea will be

5  entered on behalf of Mr. Haji as to each count 1 and Count 2.

6          Mr. Zambon?

7          *MR. ZAMBON:*  Not guilty as to all counts, Your Honor.

8          *THE COURT:*  Very well.  A not-guilty plea will be

9  entered on behalf of Mr. Mohamud Muse as to each, Count 1 and

10 Count 2 in the Indictment.

11         Gentlemen, the next thing we're going to take up is

12 the initial pretrial conference.  This is an opportunity for

13 you and your attorney to learn more about the government's case

14 against you.  The prosecutors have filed an Initial Pretrial

15 Conference Summary Statement.  This lists and identifies those

16 matters the government is required to disclose to you at this

17 time.

18         Mr. West, are there any corrections, additions, or

19 comments that you wish to make?

20         *MR. WEST:*  No, Your Honor.  I'll note that I've

21 discussed separately with each defense counsel that we intend

22 to transfer discovery to the final upload system early next

23 week.

24         *THE COURT:*  This is going to the cloud?

25         *MR. WEST:*  Yes, Your Honor.

1         *THE COURT:*  Okay.

2         *MR. WEST:*  Securely.

3         *THE COURT:*  All right.  I don't know anything about

4   the cloud, so that's fine.  Mr. -- as long as the defense

5   attorneys do, that's all that matters.

6         Mr. Zambon, any questions or concerns?

7         *MR. ZAMBON:*  I do, Your Honor.  At the detention

8   hearing last week Agent Dunham testified that my client made no

9   statement when he was arrested, and I see that under I(A) that

10  "Post-arrest interviews of all three defendants."  I don't

11  understand the difference.

12        *THE COURT:*  Mr. West.

13        *MR. WEST:*  May I clarify, Your Honor?

14        *THE COURT:*  Yes, please.

15        *MR. WEST:*  I believe there was no substantive

16  statement given by Mr. Mohamud Muse.  I think to the degree

17  that a report was written to that effect, I constituted it in

18  that category.

19        *THE COURT:*  All right.  So are you saying that an

20  interview was attempted but he declined to answer questions?

21        *MR. WEST:*  That's my understanding, Your Honor.

22        *THE COURT:*  Does that help you, Mr. Zambon?

23        *MR. ZAMBON:*  That does.  Thank you, Your Honor.

24        *THE COURT:*  Anything else, Mr. Zambon?

25        *MR. ZAMBON:*  No, thank you, Your Honor.

141

1           THE COURT:  All right.  Ms. Chartier?

2           MS. CHARTIER:  The only issue is I filed an Initial

3   Pretrial Conference Statement last week under the MJ.  Would

4   the Court like me to refile one under the new docket, or does

5   it all get transferred over?

6           THE COURT:  I think it gets transferred.  I'm going to

7   say that with conviction.

8           MS. CHARTIER:  Great.

9           THE COURT:  Okay.  The MJ case does get transferred

10  in.  I think if you went on the CM/ECF under 19-cr-25 right

11  now, you would see everything from the MJ case.

12          MS. CHARTIER:  Perfect.

13          THE COURT:  So I don't see that there's any need for

14  you to file another one.

15          MS. CHARTIER:  Thank you.  Then I have no issues with

16  the statement filed by the government.

17          THE COURT:  All right.  Thank you.

18          Ms. Turek?

19          MS. TUREK:  No issues, Your Honor.

20          THE COURT:  All right.  Very well.

21          Mr. Zambon, how much time would you like to file your

22  initial statement?

23          MR. ZAMBON:  I filed my Initial Pretrial Statement.

24          THE COURT:  Oh, you did.

25          And did you, Ms. Turek?

1        MS. TUREK:  I did, Your Honor.  It was also under the

2   MJ.

3        THE COURT:  Excellent.  Then we're all covered.  Thank

4   you.

5        Is there anything else we need to take up before we

6   resume the detention hearing, Mr. West?

7        MR. WEST:  No, Your Honor.

8        THE COURT:  All right.  Mr. Zambon?

9        MR. ZAMBON:  No, thank you, Your Honor.

10       THE COURT:  All right.  Ms. Chartier?

11       MS. CHARTIER:  No, Your Honor.  Thank you.

12       THE COURT:  And Ms. Turek?

13       MS. TUREK:  No, Your Honor.

14       THE COURT:  All right.  As I understand it, Counsel,

15   when we were last here I advised everyone that I did not

16   believe the Court could entertain a statutory rebuttable

17   presumption in favor of detention unless it ran a preliminary

18   hearing and made such a finding of probable cause at the

19   conclusion of that hearing.  The government didn't agree with

20   me on that, but that was the approach I took.

21       Intervening circumstances have occurred in that the

22   grand jury has returned an Indictment.  There is no question at

23   this point that the statutory rebuttable presumption now

24   applies.  The Sixth Circuit in United States versus Stone,

25   608 F.3d. 939 at 945, a 2010 case, ruled that the presentment

*CROSS-EXAMINATION OF PAUL DUNHAM* 143

1  of an Indictment satisfies the prerequisite for the statutory

2  rebuttable presumption.  So it does now apply.

3        All right.  Mr. Zambon, I believe you were about to

4  cross-examine Special Agent Dunham.  Please proceed.

5        MR. ZAMBON:  Thank you, Your Honor.

6                      CROSS-EXAMINATION

7  BY MR. ZAMBON:

8  Q.  Good afternoon, Agent Dunham.

9  A.  Good afternoon, sir.

10 Q.  As you know, sir, I represent Mohamud Muse.  And I'm going

11 to ask you questions concerning him but also possibly touch on

12 some of the testimony from last week.

13     When I ask you a question, I'll refer to "you," and I mean

14 that in the larger sense.  You, the FBI, all these other

15 government agencies that you spoke about last week, state and

16 federal agencies and everybody else.

17     Do you understand that?

18 A.  I do.

19 Q.  Okay.  So at some point Mr. Muse, my client -- we'll refer

20 to -- I'll refer to him as Mr. Muse -- came to the attention of

21 the government, correct?

22 A.  That's correct.

23 Q.  And it was through a Facebook posting?

24 A.  Through a Facebook profile, that's correct.

25 Q.  A Facebook profile.  What is that?

*CROSS-EXAMINATION OF PAUL DUNHAM*                    144

1   A.   A Facebook profile is going to be a page that's on the

2   Internet that may contain pictures, statements, commentary,

3   likes, things of that sort.

4   Q.   And I truly don't have a Facebook account and I'm not very

5   knowledgeable, but I have a rudimentary knowledge of it.   I

6   understand that there's a private and a public page, correct?

7   A.   There are user settings.   So a user decides what they want

8   people to be able to see or not see.

9   Q.   And Mr. Mohamud Muse had a public page, is that correct, or

10  posting or whatever it's called?

11  A.   He had material that was available to other Facebook users,

12  yes.

13  Q.   Now, how did that get brought to the attention of the

14  government?

15  A.   So as I shared last week, there were analyses that were

16  being conducted by the FBI for other Facebook accounts that had

17  material that suggested extremist views, and so Mohamud Muse's

18  was one of the accounts that came up during that analysis.

19  Q.   How do they do this analysis?   Does the FBI just look at

20  everybody's Facebook account?

21  A.   No.   So in conjunction with other accounts that

22  demonstrated extremist material, the Facebook account

23  Mohamud A. Muse with an "A" displayed other pro-ISIS,

24  pro-Jihad, pro-violence, and pro-martyrdom type material.

25  Q.   And who are these other accounts that are associated with

*CROSS-EXAMINATION OF PAUL DUNHAM*                                     145

1   Mr. Mohamud Muse?

2   *A.*   I think I would have to be careful in answering some of

3   those questions.

4              *THE COURT:*  Do the best you can.

5              *THE WITNESS:*  I couldn't tell you the specific names

6   of those accounts, but some came on for reasons that were

7   unclassified.  Some came on for reasons that were classified.

8   *Q.*   (BY MR. ZAMBON)  So what were the -- I assume you don't

9   want to talk about the classified reasons or you can't.

10  *A.*   I'm not able to, sir, that's correct.

11  *Q.*   What about the unclassified reasons?

12  *A.*   So these are accounts that demonstrated pro-ISIS,

13  pro-violence, pro-Jihad, pro-martyrdom exchanges of material.

14  So there's linkage amongst the accounts.

15  *Q.*   So it would not initially -- Mr. Muse, he was connected

16  with some other account?

17  *A.*   That's correct.

18  *Q.*   Okay.  Now -- and when did that occur?

19  *A.*   This was in the spring of 2016.

20  *Q.*   2016?

21  *A.*   That's correct.

22  *Q.*   And you mentioned something last week about a grand jury in

23  Miami.  Is that correct?

24  *A.*   So the matter started with not knowing if that Facebook

25  account was used by a person inside the United States or

1    outside the United States.

2              *THE COURT:*  Let me interject here.  I have concerns

3    about Rule 6(e) here.  We're not invading that rule, are we?

4              *THE WITNESS:*  I guess I'm doing my very best here to

5    answer the questions.

6              *THE COURT:*  All right.

7              *THE WITNESS:*  So we can say that process was served in

8    order to determine where the IP logins were, the Internet

9    protocol logins were for that account.  So in the beginning it

10   wasn't clear if the account user was in the United States or

11   not in the United States.  So the IP logins revealed logins

12   from internet service providers in Omaha, Nebraska.

13   *Q.*    *(BY MR. ZAMBON)*  All right.  And how does that connect

14   with Miami?

15   *A.*   So, again, Miami had subjects and individuals they were

16   investigating.  The Facebook account Mohamud A. Muse came about

17   during their investigation.  As the investigation of that

18   began, it revealed that the user was likely in Omaha, Nebraska,

19   based on the internet protocol logins.

20   *Q.*   There wasn't any large like NSA looking at all of these

21   accounts that I might read about in some mystery or something

22   like that?

23   *A.*   There was not.

24   *Q.*   Okay.  Thank you.  I assume, then, that when Mr. Muse came

25   to the attention of the FBI you did a background search on him;

1   is that correct?

2   A.  Eventually, once we identified who we believed the user of

3   the account was, that's correct.

4   Q.  Once you identified him.  And you identified him about when

5   then?

6   A.  It would have been in the fall of 2016.

7   Q.  All right.  And to start off in the spring of 2016 I think

8   you said?

9   A.  That's when some of the initial work was conducted.  You

10  know, it basically brought the account to the FBI's attention

11  and then subsequent investigation occurred.

12  Q.  And was the purpose of the investigation into the

13  background of Mr. Muse to conduct a risk assessment of him?

14  A.  No.  No.  Just trying to determine who the user of that

15  account was.

16  Q.  All right.  At some point did you do a risk assessment of

17  Mr. Muse?

18  A.  Can you define "risk assessment" for me?

19  Q.  I think it's probably self-evident.  You decided whether or

20  not he was a credible threat, an imminent threat?

21  A.  I mean, I guess, just by way of background, so I'm a

22  certified public accountant, and risk assessment means

23  something very different to me in the context of financial

24  reporting, compliance, operations.  So I guess I'm just trying

25  to understand when you say risk assessment, that's not a word

1   we use in the FBI.  How about that?

2   *Q.*  But you're also a special agent.  You've gone beyond just

3   financial accounting, correct?

4   *A.*  That's correct.

5   *Q.*  Okay.  And so you understand by that I mean about an

6   imminent threat to the safety and welfare of the United States.

7   *A.*  So we're trying to assess intentions and capabilities, if

8   that's what you're asking.

9   *Q.*  And that started in the fall of 2016, two and a half years

10  ago?

11  *A.*  That's fair, yes.

12  *Q.*  Okay.  Did you determine where Mr. Muse was born?

13  *A.*  Yes, eventually.

14  *Q.*  And where was that?

15  *A.*  My understanding from his alien file from the United States

16  Citizenship and Immigration Service, it was in a refugee camp

17  in Dadaab, Kenya.

18  *Q.*  When did he come to the United States?

19  *A.*  Um, I want to say around 2003.  That's my best

20  recollection.

21  *Q.*  All right.  And he is about 23 years old I think you

22  testified?

23  *A.*  That's correct.

24  *Q.*  Did you check out his educational background?

25  *A.*  Limited, yes.

1   Q.  His educational background is limited or you did a limited

2   search?

3   A.  We did a limited search.

4   Q.  What did you discover?

5   A.  It's my understanding that he graduated from high school

6   and might have started some college.

7   Q.  In Nebraska?

8   A.  The only piece I'm aware of for college is -- no, I take

9   that back.  Yes, in Nebraska, yes.

10  Q.  At some point he came to Michigan?

11  A.  Yes.

12  Q.  Did he obtain a driver's license?

13  A.  In the state of Michigan?

14  Q.  In the state of Michigan.

15  A.  Yes, he did.

16  Q.  All right.  And did you seize that driver's license?  Is it

17  in your possession?

18  A.  I'm not aware if his driver's license was seized or not.

19  Q.  He was arrested at the airport, correct?

20  A.  He was, that's correct.

21  Q.  And he's been locked up since then?

22  A.  Yes, he's been in the custody of the Marshal Service,

23  that's correct.

24  Q.  And the usual course of procedure is that defendants are --

25  all their property is taken from them, including driver's

1   licenses, et cetera, correct?

2   *A.*   Yes.   Again, because they were arrested on a holiday,

3   though, they started in the custody of the Kent County

4   Sheriff's Office, so I personally wasn't involved in that

5   process, so I'm not sure what property went to what agency.

6   *Q.*   Did you ever verify that he lived in Lansing?

7   *A.*   When you say verify, what do you mean?

8   *Q.*   Well, that you know that he was -- moved to Lansing,

9   correct?

10  *A.*   So like there are driver's license records that reflect --

11  *Q.*   Right.

12  *A.*   -- an address of record in the state of Michigan in the

13  Lansing area, yes.

14  *Q.*   And he put a driver's -- excuse me -- put an address on his

15  driver's license, correct?

16  *A.*   He did.

17  *Q.*   Did you ever verify that the address on his driver's

18  license was in fact where he lived?

19  *A.*   Um, so he moved multiple times.   Is there a particular

20  point in time you're referencing?

21  *Q.*   The last year.

22  *A.*   Um, I'm going to estimate I think he moved three to four

23  times within the last year.

24  *Q.*   Did he change his driver's license --

25  *A.*   He did not.

*CROSS-EXAMINATION OF PAUL DUNHAM* 151

1   Q.  -- to reflect that?

2   A.  He did not.

3   Q.  Okay.  Did you check to see if he had a passport?

4   A.  Yes, I did.

5   Q.  And did that reveal any travels --

6   A.  Um, so I could --

7   Q.  -- outside of the United States?

8   A.  So I think your question was two parts.  Yes, I did check

9   to see if he had a passport, and then based on the limited

10  records I saw, no, I'm not aware of any international travel.

11  Q.  What about his employment?  Do you know if he was employed?

12  A.  I do.

13  Q.  And where was he employed?

14  A.  Most recently at WalMart.

15  Q.  And before that?

16  A.  Um, he's been at WalMart for a while.  I'd have to go back

17  into records.

18  Q.  Perhaps Home Depot or someplace like that?

19  A.  He was at Home Depot, that's correct.

20  Q.  Did it appear to you that he's been employed since he's

21  moved to the Lansing area?

22  A.  Continuously?

23  Q.  Sure.

24  A.  I think there's periods of time that he was not.

25  Q.  For how long of periods of time?

*CROSS-EXAMINATION OF PAUL DUNHAM*                          152

1    A.  I don't recall right now.  Again, I would have to go back.

2    They are detailed records.

3    Q.  But he's had several jobs in the Lansing area since he

4    moved here to Lansing; is that correct?

5    A.  That's correct.

6    Q.  When did you say he moved to Lansing?

7    A.  I think it was around the fall of 2016.  Either late summer

8    or early fall.

9    Q.  Now, did you ever know him to use an alias to obtain

10   fraudulent identification?

11   A.  Not that I'm aware of, no.

12   Q.  Okay.  Did you check to see whether or not he had any bank

13   accounts?

14   A.  I did.

15   Q.  And does he have any bank accounts?

16   A.  Yes.

17   Q.  And where are his bank accounts located?  The bank.

18   A.  You're asking the name of the financial institution?

19   Q.  The name of the bank, correct.

20   A.  Is it problematic to reveal?

21          *THE COURT:*  No, not that I know of.

22          *THE WITNESS:*  Okay.  Fifth Third Bank.

23   Q.  *(BY MR. ZAMBON)*  All right.  In Lansing?  A particular

24   branch in Lansing?  Do you know?  Or just generally

25   Fifth Third Bank?

1   A.  Yeah.  I mean, I don't know that financial institutions

2   necessarily work that way.  I think you can show up at whatever

3   branch you want.

4   Q.  Okay.  What were the accounts?  Checking?  Savings?  That

5   kind of accounts?

6   A.  I'd have to go back to the detail, but, yeah, those types

7   of accounts, yes.

8   Q.  What about a credit card?  Did he obtain any credit card?

9   A.  I don't recall off the top of my head.  There was a debit

10  card, but I don't recall if there was a credit card or not.  A

11  debit card that was linked to a checking account.

12  Q.  Now, having been an accountant, still being an accountant,

13  did you do an analysis of his checking/savings accounts?

14  A.  His financial records were reviewed, yes.

15  Q.  Okay.  Did that reveal any transactions where he sent money

16  to a foreign country?

17         MR. O'CONNOR:  Your Honor, I would just object.  To

18  the extent that Mr. Zambon is calling for information derived

19  through the grand jury, we need to be careful about Rule 6(e)

20  disclosures of information that this agent -- to the extent

21  this agent only knows certain information through the

22  grand jury, I'm not sure that that's something --

23         THE COURT:  Well, it would certainly be problematic if

24  the agent was disclosing the source of the information.  I

25  suppose any piece of information that was obtained solely

*CROSS-EXAMINATION OF PAUL DUNHAM*                    154

1   through a grand jury subpoena would be considered a matter

2   occurring before the grand jury and would be considered 6(e).

3   So I recognize that the agent cannot under law disclose matters

4   if they were only obtained through a grand jury subpoena.

5   Q.    *(BY MR. ZAMBON)*  Was that information only obtained with a

6   grand jury subpoena?

7   A.    Yes.  I would have no other basis to speak to that.

8   Q.    Okay.  Now, Mr. Muse had this Facebook account and then

9   your ECU I believe it is Number 1 made contact with him; is

10  that correct?

11  A.    I'm sorry, ECU?  Are you saying undercover employee, UCE?

12  Q.    Correct.

13  A.    Yes, that's correct.

14  Q.    What did I say?  And what's the right term?

15  A.    I think the letters were transposed when you said it, but

16  the substance of what you were explaining made sense.

17  Q.    UCE?

18  A.    UCE.  Undercover employee, UCE.

19  Q.    Undercover employee.  Okay.  I'll get it right.  Okay.

20  It's UCE-1, okay.  And I assume that was the first undercover

21  agent to make contact with Mr. Muse, that's why he's designated

22  Number 1?

23  A.    So as I summarized last Friday in my testimony, there was

24  an undercover employee prior to Undercover Employee 1 in the

25  Criminal Complaint.

*CROSS-EXAMINATION OF PAUL DUNHAM*                    155

1   *Q.*  And I know you answered a lot of questions about these

2   undercover agents, and we went through this, whether or not

3   they are employees of the FBI.  Are they special agents or

4   agents?

5   *A.*  Um, most of the people are in what we call a category of

6   professional support employees, so they are not special agents.

7   But they are other direct employees of the FBI.

8   *Q.*  Is there some kind of background that you have to have in

9   order to be an undercover?

10  *A.*  Um, so there's specialized training that occurs.  There's a

11  process associated with that.

12  *Q.*  Is there some protocol for that, some document which I

13  could look at to see if I would be qualified?

14  *A.*  I don't know the answer to that question.

15  *Q.*  Do you know if there's any written protocol or anything

16  like that?

17  *A.*  I'm saying I don't know.  There could be, but I don't know.

18  *Q.*  Okay.  There was also testimony, I think, that the

19  government has in its possession contacts between my client and

20  UCEs that are text messages, correct?

21  *A.*  You're saying written exchanges?

22  *Q.*  Correct.

23  *A.*  Typed exchanges.  Yes, that's written material.

24  *Q.*  Any other kind of material, like a recorded phone call or

25  something like that?

*CROSS-EXAMINATION OF PAUL DUNHAM*                                    156

1    *A.*  So through Facebook there's voice communication capability,

2    and so there are recorded audio communications as well.

3    *Q.*  Is that only through Facebook or were there any phone

4    calls?

5    *A.*  No, there were no phone calls.

6    *Q.*  I did not know that you could make an audio contact through

7    Facebook.

8    *A.*  You can do it through WhatsApp as well, which is the same

9    here.

10   *Q.*  WhatsApp, is that the application for Facebook?

11   *A.*  No.  So WhatsApp is a completely separate communication.

12   So it's its own application that allows for voice

13   communications and/or written communications between parties.

14        *THE COURT:*  How do you spell that?

15        *THE WITNESS:*  W-A -- W-H-A-T-S-A-P-P.  WhatsApp.

16        *THE COURT:*  Thank you.

17        *THE WITNESS:*  So there are WhatsApp communications

18   between undercover employees and Mohamud Muse.

19   *Q.*  *(BY MR. ZAMBON)*  And I understand, then, that those are

20   all preserved?

21   *A.*  They are.

22   *Q.*  Okay.  You also said last week that Mr. Muse had been in

23   contact with people in other countries?

24   *A.*  He had.

25   *Q.*  And what kind of contact was that?

*CROSS-EXAMINATION OF PAUL DUNHAM*                                157

1   A.   Facebook.

2   Q.   The written or the WhatsApp?

3   A.   Um, so I can speak to the written.   Based on your question

4   we would tread into other material if we answered the rest

5   of --

6   Q.   Fair enough.   Understood.   So it's the Facebook, the

7   written parts?

8   A.   Correct.

9   Q.   All right.   And what other countries are those?

10  A.   Specifically Ghana and Nigeria.

11  Q.   And is the person or -- how many people in each country?

12  A.   One person in each.

13  Q.   Have you determined whether or not that person is an ISIS

14  or an ISIL member, or are we treading --

15  A.   I don't think I can speak to that.

16  Q.   Now, I understand Mr. Muse's brother engaged in a financial

17  transaction with the FBI to get money to buy an airplane

18  ticket, correct?

19  A.   Again, I guess I struggle with that characterization only

20  because Muse Muse was communicating with the person he

21  understood to be an ISIS fighter in Somalia.

22  Q.   Right, but we know the truth.

23  A.   I don't know how I'd rewind that and reconcile that with

24  the events of the time versus what people are aware of now.

25  Q.   Okay.   Do you know if my client received any money in order

*CROSS-EXAMINATION OF PAUL DUNHAM*                                    158

1   to purchase an airplane ticket?

2   A.   I know that $300 was transmitted in your client's name to

3   pick up money in furtherance of Muse Muse's request for money

4   to purchase an airplane ticket, yes.

5   Q.   And how was that transferred?  Was that in a money order?

6   A.   So it was through the service MoneyGram.

7   Q.   All right.  And that's some kind of online money-transfer

8   organization?

9   A.   So MoneyGram is a money service business.  They have a lot

10  of locations in WalMarts.  WalMart stores.  So you can send

11  money from one location to another.

12  Q.   You can also buy money orders and that kind of thing there?

13  Is that kind of the same idea?

14  A.   I don't know if that technically belongs to MoneyGram's

15  service.  That could be WalMart or another provider.  I don't

16  know if MoneyGram issues money orders or not.  But it's

17  basically an ability to transfer cash from one place to

18  another.

19  Q.   Did Mr. Muse purchase any money orders at any of these

20  locations, WalMart or anyplace else?

21  A.   Did he purchase money orders?

22  Q.   Correct.

23  A.   Not that I'm aware of, no.

24  Q.   The ticket that was purchased for his brother, was that a

25  one-way ticket?

1   A.  No, that was not.

2   Q.  It was a roundtrip ticket?

3   A.  It was.

4   Q.  Was there a return date on that?

5   A.  There was.

6   Q.  What date was he supposed to return?

7   A.  I don't remember the exact date, but it was in early

8   February.  Like around a handful of days from now.

9   Q.  So he would have been gone around two months, then; is that

10  correct?

11  A.  No, about two weeks or even less than.  Maybe 10 days-ish.

12  Q.  So he's supposed to fly to Somalia, be there 10 days, and

13  then come back?

14  A.  The ticket date was a departure of January 21st and a

15  return date in early February.  I don't remember exactly.

16  Q.  All right.  And it's to your knowledge that Facebook closed

17  down Mr. Muse's account; is that right?

18  A.  So Mohamud Muse had a total of four Facebook accounts.

19  Q.  Correct.  And I was going to talk about the first one.

20  A.  Okay.  And I'm sorry, your question is what regarding the

21  first account?

22  Q.  Facebook closed down the account; is that right?

23  A.  Facebook disabled it, that's correct.

24  Q.  Now, they did that independent of the government, right?

25  A.  That's correct.

*CROSS-EXAMINATION OF PAUL DUNHAM*                    160

1    Q.  They just have their own people who review postings and

2    look to see if somebody appears to be dangerous or a threat; is

3    that right?

4    A.  That's my understanding as well, yes.

5    Q.  I assume you never worked with Facebook or --

6    A.  I have not.

7    Q.  But you -- okay.  What does it take to obtain a Facebook

8    account?  I assume not a whole lot, right?  I can go on there

9    if I wanted to and enter some information?

10   A.  That's correct.

11   Q.  Even after my account was closed by Facebook?

12   A.  That's correct.

13   Q.  What information is required to open a Facebook account?

14   A.  I think it's very minimal.  Basically a name.

15   Q.  Do you have a Facebook account?

16   A.  I do not.

17   Q.  Okay.

18        THE COURT:  I don't either, Mr. Zambon, if that helps

19   you.

20        MR. ZAMBON:  There's three of us.  Three of us in

21   West Michigan all in one room.

22   Q.  (BY MR. ZAMBON)  All right.  So it's minimal information.

23   And then there were four Facebook accounts opened by Mr. Muse?

24   A.  That's my understanding of how many are attributed to him,

25   yes.

1  *Q.*  Do you know if the same information was used to open each

2  account?

3  *A.*  You're saying like the listed name --

4  *Q.*  Correct.

5  *A.*  -- of the user?  No, it was not the same on any of them.

6  *Q.*  What names were used?

7  *A.*  So the first one was Mohamud A. Muse ending with an A.

8  *Q.*  The second one, do you know?

9  *A.*  Yes, Abu Usama.  So A-B-U  U-S-A-M-A.

10  *Q.*  And the third?

11  *A.*  The third was Abu Osama with an O.  So O-S-A-M-A.

12     And then the fourth I don't remember the name off the top

13  of my head.

14  *Q.*  All right.  Now, were these the names of the -- you used

15  some term last week like an ISIS fighter name or something like

16  that.

17  *A.*  The latter two were made, and then ISIS we talked about

18  kunya, K-U-N-Y-A.

19  *Q.*  Kunya.  That's the term.  What is that term again?  What

20  does that mean?  Is that a fighter name for --

21  *A.*  It's your ISIS fighter name.

22  *Q.*  Who gives you that?  Or do you just pick out one?

23  *A.*  You select it yourself.  You decide what your fighter name

24  is going to be.

25  *Q.*  The first Facebook account was closed when?

*CROSS-EXAMINATION OF PAUL DUNHAM*                    162

1    A.   It was closed around July of 2017.

2    Q.   And when was it -- the second one opened?

3    A.   Right around July of 2017.

4    Q.   Do you know when that second one was closed?

5    A.   To the best of my recollection maybe like Octoberish of

6    2017.   It wasn't open for very long.   A couple of months.

7    Q.   Did Facebook close that one down also?

8    A.   It did.

9    Q.   All right.   And the third one was opened?

10   A.   The third one was opened in November of 2018.

11   Q.   Closed down by Facebook when, do you know?

12   A.   It has not been closed down.

13   Q.   What about the fourth one?

14   A.   What --

15   Q.   You said the fourth account.

16   A.   Yes.   I'm sorry.

17   Q.   When was that opened?

18   A.   You're correct.   The third account was closed.   The fourth

19   account was opened in December of 2018.   So Facebook closed all

20   three accounts that preceded the fourth one.

21   Q.   Were there any contacts with your UCEs on every account,

22   every of the four accounts?

23   A.   There was.   There was contact between UCEs on all four of

24   those Facebook accounts, yes.

25   Q.   Was it just UCE-1 or had UCE-2, 3, 4, and 5, et cetera,

*CROSS-EXAMINATION OF PAUL DUNHAM*                                    163

1    jumped in?

2    A.  Again, to the best of my recollection, because there was a

3    lot of communication, UCE-1 would have probably been exclusive

4    to just the first two accounts, and then UCE-2 for the second

5    two accounts.

6    Q.  When an account was closed, let's say account number 1 was

7    closed, did UCE-1 then try -- or did UCE-1 initiate contact

8    to -- with Mr. Muse in account number 2?

9    A.  Yes.  Yes.

10   Q.  What about when account 2 was closed and account 3 was

11   opened, did a UCE initiate contact then?

12   A.  So that would have been the reverse.  That would have been

13   contact being initiated by the Abu Osama account to UCE-2.

14   Q.  All right.  And then what about when that third one was

15   closed and the fourth one was opened, who initiated the

16   contact?

17   A.  That would have been the fourth account initiating contact

18   with Undercover Employee 2.

19   Q.  You obtained a number of search warrants out of this case;

20   is that correct?

21   A.  When you say a number, like just give me a sense of what

22   you mean.

23   Q.  Well, a dozen or so.  Twelve or so.

24   A.  All the way through the events of January 21st of this

25   year, that's correct.

*CROSS-EXAMINATION OF PAUL DUNHAM*                164

1    *Q.*   Correct.  Were all of these search warrants obtained
2    through the Western District of Michigan?
3    *A.*   Yes, they were.
4    *Q.*   Nothing in Omaha, Nebraska, or Miami?
5    *A.*   No.  None.
6    *Q.*   Let's go to some of the exhibits here.  Do you have your
7    exhibit book up there?
8    *A.*   I do, sir.
9    *Q.*   There's mention of the word "kuffar" through several of the
10   exhibits, K-U-F-F-A-R.
11   *A.*   That's correct.
12   *Q.*   And I know you explained that before.  What is that
13   exactly?
14   *A.*   Again, in my understanding, that's the Arabic word for
15   nonbeliever or disbeliever.  Someone who does not believe in
16   Islam.
17   *Q.*   Does that refer to the universal nonbeliever like in any
18   country in the world or just in particular areas?
19   *A.*   It's my understanding it's universal.  Anyone that's not --
20   that basically is not a follower of Islam.
21   *Q.*   A typical exchange here -- or maybe that's a bad way of
22   saying it.  Go to Exhibit 15, if you would, please.  The way I
23   understand it, the first page I've got, which is page 110, you
24   start at the bottom and you work your way up to the top and
25   then you flip the page over and 109, is that how it works?  Or

1    do I have it backwards?

2    A.   No, you have it correct.  So Facebook produces the records

3    from the most recent to the oldest.  But the page order, in

4    order to follow along, would require what you just described.

5    Q.   Okay.  And that's what it appears to me.  Just looking at

6    the times that are listed, the oldest time, 17:03:02, and you

7    get to the top it's about five minutes later.  You go to the

8    bottom of 109 at 17:07:36 and you work your way up.  That's

9    right?

10   A.   That's correct.

11   Q.   I do have that right.  Good.

12        Is this a complete record of all of the transactions or

13   texts or whatever they are, or did you just cherry pick these

14   out between Mr. Muse and your undercover people?

15   A.   When you say cherry pick, what do you mean?

16   Q.   Well, at one point in here it says "Well, what do you mean?

17   I got a little busy, akhi."  And there's, you know, a little

18   bit of a time break there.  So were there other texts in

19   between those two?

20   A.   For this particular exchange?

21   Q.   Yeah.  Well, is this particular exchange -- were other

22   people texting, or whatever you want to call it, with Mr. Muse

23   there in this time frame that are not listed here on this

24   exhibit?

25   A.   Again, there are literally hundreds of thousands of pages,

*CROSS-EXAMINATION OF PAUL DUNHAM*                    166

1    so I don't know off the top of my head if there are other

2    things -- you're saying are there other things happening

3    simultaneously?

4    Q.  Right.

5    A.  I would have to reference that material.  I don't know.

6    Q.  Okay.  It's a little confusing because, you know, there's a

7    time gap there of, you know, seven minutes.  He said, "What you

8    mean?  Sorry, got a little busy, akhi."

9        Do you see that on page 109 about the third one down?

10   A.  I do, from the top.

11   Q.  Right.

12   A.  I do.

13   Q.  Okay.  Now --

14        MS. CHARTIER:  Your Honor, I apologize for

15   interrupting.  Would it be possible -- is there a sweatshirt or

16   something for Mr. Haji?  He's been shivering because he's cold.

17   I don't know if there's anything that we could put over him.

18   No?  Okay.

19        THE COURT:  I think I have something.  All right?

20   Hang on.

21        MS. CHARTIER:  Thank you, Your Honor.

22        Sorry, Mr. Zambon.

23        THE COURT:  I don't think he wants to wear a black

24   robe.

25        MR. ZAMBON:  I'm almost done.  I don't anticipate

 1  being much longer either, so . . .

 2          THE COURT:  Mr. Zambon, you're not in any hurry.

 3  Nobody is going to rush you here.  There are important issues

 4  at stake here.  Please take your time.

 5          MR. ZAMBON:  No, that's -- it's more for the

 6  defendant's sake.

 7          THE COURT:  It is a little chilly in here.

 8          You may proceed, Mr. Zambon.

 9          MR. ZAMBON:  Thank you.

10  Q.   (BY MR. ZAMBON)  Now, the reason I'm bringing that up is

11  because there was, I think it was paragraph 31 of the

12  Complaint, a passage about my client having just been married.

13  Are you familiar with that passage?

14  A.   Yes.  I'm flipping to it right now, but I am aware that he

15  was recently married.

16  Q.   And that's a correct statement, right?  He was just

17  recently married?

18  A.   Yes.  I don't see that reflected in paragraph 31, but if

19  you're asking, yes, it's my understanding he was married in the

20  summer of 2018.

21  Q.   And do you know if his now wife is pregnant?

22  A.   That's my understanding, yes.

23  Q.   And he wrote that he would travel to Somalia to join ISIS

24  soon after the birth of his child.

25          Was there, to your knowledge, an exchange about, well, why

1   did he have to wait until after the birth of your child?  Why

2   don't you come on now?

3   A.  Was there an exchange between whom?

4   Q.  Well, between whoever is -- UCE-2 I suppose it is and

5   Mr. Muse.

6   A.  And I'm sorry, so your question is what then?

7   Q.  Okay.  Well, do you know if -- it appears to be some kind

8   of reluctance to travel to Somalia by Mr. Muse at the present

9   time on December 17th.  Correct?  Because he's not -- he's

10  going to wait until after his child is born.

11  A.  Right.  That's what Mr. -- that's what Mohamud Muse is

12  citing to UCE-2, yes.

13  Q.  Did UCE respond to that?

14  A.  There was a lot of discussion between UCE-2 and

15  Mohamud Muse about that topic.

16  Q.  Well, about -- right about December 17th, you know, I know

17  there's a lot of conversations, but about that particular

18  exchange, like waiting until the child is born.

19  A.  That was part of what was discussed, yes.

20  Q.  Okay.  And what was discussed?  What did UCE-2 say?

21  A.  Um . . .

22  Q.  Are we again --

23  A.  No.  I don't want the material to get too embarrassing.

24  But if you're fine, I can share it.  But there are definitely

25  people in the courtroom that it could be embarrassing for.

1   *Q.*  Okay.  Fair enough.  I appreciate that.

2       A couple more questions.  Do you have any knowledge of my

3   client trying to recruit people to join ISIS other than his

4   codefendants?

5   *A.*  I do.

6   *Q.*  In the United States?

7   *A.*  Um -- yes.

8   *Q.*  And when was that?

9   *A.*  Again we're going to get into --

10  *Q.*  Okay.

11  *A.*  We're going to get into that material.

12  *Q.*  And can you -- was it an extensive effort?  Without parsing

13  what "extensive" means.

14      *THE COURT:*  The Court won't consider this.  In terms

15  of today's purpose in determining whether the government has

16  sustained its burden for pretrial detention, I'm not going to

17  consider that evidence.

18      *MR. ZAMBON:*  Okay.

19      *THE COURT:*  Any evidence that cannot be explored

20  because it is classified will remain unspoken, but the Court is

21  not going to rely upon it.  At the end of the day the Court has

22  to be satisfied that the defendants' due process rights have

23  been preserved.

24      Go ahead, Mr. Zambon.

25  *Q.*  *(BY MR. ZAMBON)*  The Secretary of State has listed an FTO,

1  correct?  And it's the Islamic State, ISIL, ISIS, et cetera.

2  Are they all one in the same?

3  *A.*  So there are various names by which ISIS is known, yes.  So

4  those are all like synonyms.

5  *Q.*  So ISIS is like the umbrella, the group, and then other

6  people -- and they call themselves other names?

7  *A.*  So it would start with the Islamic State of Iraq and the

8  Levant or the Islamic State of Iraq and Al-Sham.  That's how

9  you get to ISIL and ISIS respectively.  And then it starts to

10 tread into some of the Arabic words like Daesh, dawla,

11 et cetera.  Other names that they are known by in other

12 languages.

13 *Q.*  Is there a relationship to Somalia in all of this?

14 *A.*  So ISIS declared a caliphate, another welayah -- I

15 shouldn't say caliphate -- a welayah, another province in

16 Somalia, so ISIS al Somal, is the Somali province of ISIS.

17         *MR. ZAMBON:*  If I may have just a minute, Your Honor.

18         *THE COURT:*  Certainly.

19         *MR. ZAMBON:*  Thank you, Your Honor.  I think that

20 wraps it up.

21         *THE COURT:*  I have a couple of questions I want to

22 ask, Mr. Zambon, and I'll give you an opportunity to follow up.

23         *MR. ZAMBON:*  Okay.

24         *THE COURT:*  Special Agent Dunham, I believe you

25 previously testified that undercover cooperating employee 1

*CROSS-EXAMINATION OF PAUL DUNHAM*                    171

1    became involved June 21st of 2017.

2            THE WITNESS:  Yes.

3            THE COURT:  Was introduced, I should say, more

4    precisely.

5            THE WITNESS:  That's correct.

6            THE COURT:  And you've testified here that there was

7    an undercover cooperating employee before UCE-1.  Was that --

8    was that undercover cooperating employee actively in

9    communication with any of the defendants?

10           THE WITNESS:  The first party?  I think we started to

11   come up with our own nomenclature, I think it was something

12   like the preundercover employee 1, was not in contact with the

13   other two, no.

14           THE COURT:  What I want to clear up is at what point

15   was there active FBI involvement and communications with any of

16   the defendants?

17           THE WITNESS:  With any of them?  It started in --

18   around March of 20 -- March of 2017.

19           THE COURT:  All right.  Now, the other question I have

20   relates to something that Mr. Zambon was asking about.  These

21   Facebook records that are exhibits, for example, Exhibit 15, it

22   lists a number of entries with dates and times.  Do these

23   records, to the extent we have them, reflect all the

24   communications during that date and time?  In other words, if

25   there was somebody else that was -- I don't know if texting is

1    the right word -- communicating on Facebook with Mr. Muse Muse,

2    for example, would that be on this page or this only contains

3    communications between these individuals?

4            *THE WITNESS:*  So Exhibit 15, as an example, is solely

5    communications between the profile Abu Osama and

6    Ebrahim Salmujahid al muhajir.

7            *THE COURT:*  Understood.  Thank you.

8            Anything further, Mr. Zambon?

9    *Q.   (BY MR. ZAMBON)*  And is it the complete communication or

10   were some not inserted here because you did not think they were

11   important for the purpose of today?

12   *A.*  You're saying is this a complete communication?  Like is

13   there a reason to think that this doesn't run chronologically?

14   *Q.*  Not chronologically but completely.  In other words, were

15   there any other communications between these two people in this

16   time frame that are not in there because they might be talking

17   about something that you do not think was important to put in

18   here?

19   *A.*  So these excerpts were solely for the purpose of

20   demonstrating either danger to the community or risk of flight.

21   So these were basically passages we were trying to get material

22   that was on point for the purpose of the hearing.

23   *Q.*  Okay.  Just for -- okay.  I think you answered my question.

24           *MR. ZAMBON:*  Thank you, Your Honor.

25           *THE COURT:*  You're welcome, Mr. Zambon.

173

1          Mr. West or Mr. O'Connor, redirect?

2          *MR. O'CONNOR:*  No further questions, Your Honor.

3          *THE COURT:*  All right.   Thank you.

4          May this weapon -- weapon -- this witness be excused?

5     All right, Special Agent, you may step down.

6          Any further proofs or proffer, Mr. O'Connor?

7          *MR. O'CONNOR:*  Yes, Your Honor.   We would like to

8     introduce some evidence through proffer.   We have no other live

9     witnesses today.

10          *THE COURT:*  Okay.

11          *MR. O'CONNOR:*  I'll start by proffering what's been

12    marked as Government Exhibit 20.   May I approach?

13          *THE COURT:*  You may.

14          *MR. O'CONNOR:*  Your Honor, Government Exhibit 20 is an

15    excerpt from a 2016 report issued by the U.S. Department of

16    Defense.   The cover page and page 35 of that report.   The

17    government proffers the information that appears on the bottom

18    half of Government Exhibit 20 on that page 35 which indicates

19    that approximately half or 50.8 percent of all active-duty

20    enlisted personnel are 25 years of age or younger in the

21    United States military.   And I would move Government Exhibit 20

22    into evidence.

23          *MR. ZAMBON:*  I'm not sure I see the relevance.

24          *THE COURT:*  Well, I was going to ask that myself.

25          Mr. O'Connor, what is the relevance of this?

1          MR. O'CONNOR:  We heard a lot of questioning,

2    Your Honor, last week from defense counsel concerning the ages

3    of the defendants.  There were references to defendants being

4    teenagers.  This evidence will be used by the government to

5    rebut any argument by defense counsel that these individuals

6    were of a certain age that does not pose any danger to the

7    community by the fact of their tender ages, as seemingly argued

8    through the cross-examination last week.

9          THE COURT:  I'm assuming you're not suggesting

10   enlisted members of our Armed Forces are a danger to the

11   community.  The point is that if they are old enough to join

12   the Army, they are old enough to be dangerous?

13         MR. O'CONNOR:  That's correct, Your Honor.

14         THE COURT:  That's of tenuous relevance, I think.

15   Thank you.

16         Next.

17         MR. O'CONNOR:  I have other information to proffer,

18   Your Honor.  I don't know if the Court wishes for me to do that

19   now separate from argument.  Or I know typically we tend to

20   combine proffered information from the background information

21   compiled by the Probation Office with argument, so I'll defer

22   to the Court's --

23         THE COURT:  I think in this instance it makes sense to

24   separate the proffered information from argument and we'll go

25   from there.

1          This Court has to make an individualized assessment,

2    and I don't want things to get blurred.

3          MR. O'CONNOR:  Certainly, Your Honor.

4          THE COURT:  Go ahead.

5          MR. O'CONNOR:  Thank you.  The government then also

6    proffers information concerning some information provided by

7    the investigation conducted by Pretrial Services.

8          First, with respect to Mr. Haji, he was arrested on

9    December 26th, 2018, for providing false identification to

10   police.  There is a pending criminal matter for his failure to

11   provide his true identity to the police in December of 2018.

12         With respect to family ties, the government proffers

13   that Defendant Muse Muse is single and has no children.

14         Defendant Haji has never been married.  He has one

15   child age 4 who lives with his mother, not with Mr. Haji.  And

16   Mr. Haji sees that child every one to two weeks.

17         And Defendant Mohamud Muse, as the Court just heard,

18   is married, is expecting his first child in March.

19         With respect to information relevant to ties to the

20   community, the government submits that all three defendants

21   were born in Africa.  With respect to Muse Muse, he does not

22   own a residence.  He lives with codefendant Mohamud Muse.  He's

23   lived for approximately only two years in the Western District

24   of Michigan.  He had a valid U.S. passport.  In fact had two

25   passports at the time of the offense.

1          With respect to Mohamud Muse, he was only living in

2     the Western District of Michigan for approximately two years.

3     Also has a valid U.S. passport and has claimed that it was

4     lost.  It was not found, apparently, during any searches in

5     this case.  He also does not own his own home.  He lives in an

6     apartment.

7          With respect to Mr. Haji, he entered the United States

8     from Africa in 2004.  He also does not own a residence.  His

9     history, as the Court just heard through testimony, is very

10    transient.  He periodically stays with a friend Nick whose last

11    name is not known.  He sometimes stays at his parents'

12    residence.  And he does not recall where he lived before moving

13    to Michigan.  And he does also have a U.S. passport.  And,

14    excuse me, I think I may have misspoke.  The testimony earlier

15    was regarding Mohamud Muse and his transient residence.

16         MR. ZAMBON:  Then if you could repeat that, because I

17    was not paying attention because I did not think it applied to

18    my client.

19         THE COURT:  Mr. Zambon is clued in for when he hears

20    his client's name, so would you repeat that, please.

21         MR. O'CONNOR:  I will try to clarify, Your Honor.

22         THE COURT:  All right.

23         MR. O'CONNOR:  With respect to the testimony you just

24    heard regarding Mohamud Muse, he has been very transient.  He

25    has moved residences frequently in the last year.  Not always

 1    updating his residence on his driver's license.

 2              With respect to Mr. Haji, there's also evidence that

 3    he does not own a residence, that he is somewhat transient.   He

 4    periodically stays with a friend by the first name of Nick.   He

 5    did not know or would not provide the last name of this

 6    individual.   That he sometimes stays at his parents' residence.

 7    And could not recall where he lived before moving to Michigan

 8    five to six years ago.   Mr. Haji also has a valid

 9    U.S. passport.

10              With respect to employment, Your Honor, the government

11    proffers that Mohamud Muse was working at WalMart in

12    Grand Ledge before his arrest.   Mr. Haji worked at a Meijer

13    Distribution Center in Lansing.   With respect to Muse Muse he

14    is unemployed.   In fact, it appears he quit his job prior to

15    his departure for what he believed was Somalia.

16              And finally the government proffers evidence

17    concerning the defendants' records of appearance in court

18    proceedings.   With respect to Muse Muse and Mohamud Muse there

19    is no history, so we simply don't know.   There is no history of

20    appearing when required to appear.

21              And with respect to Mr. Haji, there is a record.   We

22    have evidence of a failure to pay fines and costs for failing

23    to display a valid license, and he failed to appear in state

24    court on December 18th, 2018, at which time a show cause order

25    was entered.

1          Thank you, Your Honor.  With that the government rests
2     its case on detention.
3          THE COURT:  All right.  Thank you, Mr. O'Connor.
4          Who would like to go first?  Ms. Turek?
5          MS. TUREK:  Your Honor, it's just proffer material.
6          THE COURT:  Go ahead.
7          MS. TUREK:  Some of which is already in the
8     Pretrial Services Report, but I would like to just expand on
9     some of it.
10         THE COURT:  I'm sorry, Ms. Turek, to interrupt you.
11         Jess, if you hear me, could you bring me my iPad,
12    please.
13         Go ahead, Ms. Turek.
14         MS. TUREK:  Thank you.  My client was born in Kenya.
15    He just turned 20 about a week and a half ago.  He has a high
16    school diploma from Eastern High School in the Lansing area.
17    He took classes for one semester at L tri C, Lansing Community
18    Court -- Lansing Community College.
19         He became a naturalized citizen in this country in
20    either 2013 or '14.  He has a large family.  His parents are
21    here in this country, and he is one of 11 children.  He's not
22    married.  Has -- nor has he any children.  He has no prior
23    criminal history.  He has no substance abuse or alcohol issues.
24    He's in good physical health.  He maintained a checking account
25    as noted in the Pretrial Services Report with modest means.

1    And that would be by way of proffer, Your Honor.

2              THE COURT:  All right.  Thank you, Ms. Turek.

3         MS. TUREK:  Thank you.

4              THE COURT:  Ms. Chartier.

5         MS. CHARTIER:  Thank you, Your Honor.  By way of

6    proffer, some of the information is listed in the Presentence

7    Investigation Report.  Mr. Haji was employed at the Meijer

8    Distribution Center for approximately five years.  He worked an

9    average of between 32 and 40 hours a week.  He has extended

10   family in Michigan, some of whom are in the courtroom today,

11   including his parents.  He was in the process of purchasing a

12   home on Bement Street in Lansing.

13             THE COURT:  When you say he was in the process, what

14   do you mean?

15        MS. CHARTIER:  I believe he had given some money to

16   the individuals, and it seemed like it might have been

17   something along like of a land contract.

18             THE COURT:  I see.  Okay.

19        MS. CHARTIER:  As it relates to the allegations of a

20   criminal history, I would point out that it was a traffic

21   offense in May of 2018, and his failure to appear was actually

22   failure to pay fines and costs.  And then he was arrested on

23   that.

24             The December 2018 for providing false identification

25   to the police, it appears that that was a false name, and it

1   was Mr. Haji's nickname.  So he did use Haji when he provided

2   that information to the police.  We're trying to get those

3   records.  But Mr. Haji was actually the passenger in a vehicle,

4   and we have been unable to ascertain why the vehicle was even

5   stopped by the police.

6           I will point out that on the Register of Actions no

7   attorney was appointed to represent Mr. Haji.  Generally what

8   that means in Ingham County is that the court would not be

9   placing Mr. Haji into custody even if he were to be convicted

10  of the offense.

11          Mr. Haji is a United States citizen.  His passport is,

12  I believe, at a residence.  His residence can be verified by

13  his family, again whom are in the courtroom today.  He does

14  have one child and he's in a committed relationship with the

15  child's mother.  His ties to a foreign country are only that he

16  was born there, but, again, he is a United States citizen.  The

17  pending charge, again, is a misdemeanor for which there would

18  be no jail time allotted.

19          THE COURT:  The pending charge in Ingham County?

20          MS. CHARTIER:  In Ingham County District Court.  It's

21  a misdemeanor.

22          And I have nothing else to proffer.  Thank you,

23  Your Honor.

24          THE COURT:  Thank you, Ms. Chartier.

25          Mr. Zambon.

1      MR. ZAMBON:  Thank you, Your Honor.  My client has no

2    ties to a foreign country.  I have received prior to court,

3    just prior to court this afternoon, his Certificate of

4    Citizenship which shows that he is a citizen of the

5    United States.  I have that in my hand if the Court would like

6    to look at that.

7      THE COURT:  It is not necessary.  It's in the

8    Pretrial Services Report too, Mr. Zambon.

9      MR. ZAMBON:  I believe in the Criminal Complaint it's

10   stated that my client is a derivative citizen of the

11   United States, which means to me that he has obtained

12   citizenship.  Derivative I think would be kind of like a chain

13   migration they might call it, and we all know that the

14   president's inlaws are citizens of the United States and are

15   probably derivative.  So I think that --

16     THE COURT:  As I understand it, Mr. Zambon, a

17   derivative citizenship means he was a minor at the time his

18   parents became a citizen and he obtained the citizenship with

19   their naturalization.

20     MR. ZAMBON:  That's what I understand.

21     THE COURT:  I try to avoid any discussion --

22     MR. ZAMBON:  Okay.

23     THE COURT:  -- that relates to any political topics.

24     MR. ZAMBON:  Okay.  Thank you, Your Honor.

25           And I also have received his passport, which

1    Agent Dunham testified that there was no travel outside the

2    United States.  That's verified by the passport I have in my

3    hand which I'll gladly turn over to pretrial release people to

4    assure that he has does not travel outside the United States.

5    But the passport itself shows no travel outside of the

6    United States.

7            He has a verified address.  I'm not sure why the

8    Pretrial Release Report says unverified address.  The police

9    went there pursuant to a search warrant and searched his house.

10           He has a driver's license.  There is listed on a

11   driver's license, which is in the possession of the police, I

12   understand that not only is the address on the driver's license

13   but there's another address on the back of the license which

14   shows that he does -- when he does move, he does attempt to

15   change his address.  Although I do think that he moved within

16   the last 30 days and had not gotten around to changing his

17   address a final time.  But it's the same address where his

18   wife, pregnant wife lives.

19           So he did not use an alias to -- for false

20   identification.  I'm not sure where that came from.  I asked

21   the agent that.  He did not attempt to use false

22   identification -- or an alias to obtain false identification.

23           He has financial ties to the Western District.  He

24   works.  He has bank accounts.  He has been employed at several

25   places in the Lansing area.  It's the first time I've heard of

1  the lack of a record as being a reason to think he won't

2  appear.  Usually that's a good thing.  But also the fact that

3  he lives in an apartment at age 23, I hate to tell you how old

4  I was before I bought my first home, but it was substantially

5  more than age 23, Your Honor.  So I would -- I believe that's

6  the extent of my proffer.

7            *THE COURT:*  Thank you, Mr. Zambon.

8            Argument, Mr. O'Connor?

9            *MR. O'CONNOR:*  Thank you, Your Honor.

10           In this case there is no condition or combination of

11 conditions that would reasonably assure the appearance of the

12 defendants as required and to ensure the safety of any other

13 person in the community.

14           As Your Honor pointed out this morning, we do have a

15 presumption of detention in this case due to the grand jury

16 finding of probable cause to indict each defendant of a

17 terrorist offense, Title 18 §3142(e)(3)(B) and (C) both give us

18 the presumption of detention in this case.

19           As this Court well knows, that means each defendant

20 has the burden to produce evidence that he is not a flight risk

21 or a danger to the community.  Importantly, however, as the

22 Sixth Circuit has told us in the Stone case that Your Honor

23 cited also at the beginning of today's session, even if the

24 defendants present some evidence to rebut the burden of

25 detention, the presumption does not disappear.  The presumption

1    becomes a factor that this Court should take into

2    consideration.  And that's because Congress has, in Congress's

3    judgment, they decided that a particular class of defendants

4    and types of cases should ordinarily be detained pending trial.

5    So to the extent this Court finds that the rebuttable

6    presumption has been rebutted, it's still a factor that the

7    government requests this Court take into consideration.

8            The evidence that we have provided to the Court

9    through the agent's testimony, the entire Complaint Affidavit

10   which is in evidence, as well as the exhibits that were

11   admitted into evidence at the last session, establishes clear

12   and convincing evidence that the safety of the community cannot

13   be assured and that there's a preponderance of the evidence

14   that the defendants will not appear as required.

15           Simply put, the evidence in this case, Your Honor,

16   shows that the defendants stated in their own words that if

17   they were not able to travel to make hijrah to Somalia to join

18   a fight with ISIS, they had a plan B.  They talked about it.

19   This plan was to attack nonbelievers.  There were references to

20   using vehicles and driving vehicles to attack nonbelievers.  In

21   their own words this Court heard them talk about their plan.

22   So the fact that they were stopped and that Muse Muse was

23   stopped specifically on January 21st from traveling to

24   Mogadishu doesn't mean he's not a danger to the community.

25   He's more of a danger to the United States now that his plan to

1    make hijrah has been thwarted.  And the other defendants, as

2    the evidence shows, joined him in his beliefs.

3            So we look at the factors that the Court should

4    consider in this case.  The nature and circumstances of the

5    offense charged.  We know Section 2339B is a federal crime of

6    terrorism.  And we know that there's a presumption of detention

7    in a case like this.

8            With regard to the nature and seriousness of the

9    danger to the community or any person, if any of these

10   individuals were released, the Court saw through repeated

11   exhibits, through a long period of time, Facebook

12   communications, both between the defendants and in

13   communications with FBI undercover employees, indicating their

14   strong desire to either make hijrah and travel to join ISIS or

15   to kill anyone, the kuffar, anyone who doesn't share their

16   extremist Islam ideology.

17           Exhibits 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, those

18   exhibits are all conversations between the defendants.  Not

19   conversations with undercover FBI employees.  The record is

20   full of examples of these defendants talking on their own about

21   their desire to join ISIS, or if they can't do that, to kill

22   nonbelievers here in the United States.

23           We heard evidence concerning the defendants'

24   naturalized citizenship.  Well, Your Honor, from the

25   government's perspective that doesn't mean very much.  Not when

1    you have evidence that each individual defendant recorded their

2    own bay'a video pledging allegiance not to the United States,

3    not to the country that has conferred citizenship on them, but

4    to ISIS, the terrorist organization that they wanted to join

5    and fight with.  So the fact that these individuals are

6    naturalized citizens really doesn't give this Court much

7    comfort when they have effectively renounced their citizenship

8    by pledging allegiance to an enemy of the United States.

9            I think there are a few exhibits that the Court should

10   pay particular attention to.  Exhibit 3 in June of 2017,

11   Mohamud Muse and Mr. Haji are communicating and they are

12   referring with each other to speaking to a mujahid.  And

13   Mr. Haji says "I pray Allah gives the mujahideen the victory.

14   Insha'Allah, always victory, Allah.  And we are next to step up

15   on the battlefield."  This is back in June of 2017.

16           Before that in January of 2017, as the Court knows

17   through the Complaint Affidavit in paragraph 12, Mr. Haji and

18   Mohamud Muse are talking about how great these ISIS videos are

19   that they are seeing.  That they love it.  They love how ISIS

20   burned people.  Haji wrote to Mohamud Muse:  "He put fuel on

21   that dude while he's burning.  That's funny, dude."  That's the

22   mind-set of these individuals all the way back in January of

23   2017.

24           Mohamud Muse in June of 2017 expressly stated he

25   planned to die with a gun in his hand fighting for ISIS.

1          In November of 2017 Muse Muse sent Mr. Haji a screen

2     capture by Messenger -- again, this is not communications with

3     FBI undercovers, these are communications with each other --

4     where Muse Muse sends a picture of that Tribeca truck attack in

5     New York City on Halloween in 2017.  And then they talk about

6     what's happened the day before.  And they talk about real civil

7     war.  "And if this doesn't wake the people up, nothing will.

8     This is a call for hijrah.  We can't live here.  I'm trying to

9     plan for hijrah now."

10         In March of 2018 in Exhibit 6 we see another

11    conversation between Mr. Haji and Muse Muse.  This is the

12    exhibit that contains the picture of the slaughtered goat.  And

13    the context of delivering that picture was Mr. Haji saying "I

14    want to catch kuffar," nonbelievers, "and do my jihad training

15    on them.  That would be in dawla," or ISIS.

16         In April of 2018 in Exhibit 7 Muse Muse is talking

17    again with Mr. Haji and they are talking about ISIS videos and

18    how hot they are.  And Muse Muse says "You're absolutely right.

19    Seeing those heads getting cut off heals the heart and makes me

20    want to be with them more.  May Allah make us steadfast upon

21    this" -- a word I don't understand -- "until we are in the

22    ranks of the khalifa and until we die."  Again, not

23    conversations with the FBI.

24         There's repeated examples, and I won't burden the

25    Court going through each and every exhibit that the government

1    introduced, where there was conversation along these same

2    lines.   How they want to kill the kuffar.   They want a lot of

3    the kuffar dead.

4          There's conversations about martyrdom operations using

5    a vehicle.   Muse Muse and Mr. Haji in August of 2018 exchanged

6    a series of conversations back and forth about how great it was

7    that Muse Muse could drive now so that he could drive that

8    stashahadi, which is the word for martyrdom, car, right.

9          There is one example the Court should consider in a

10   conversation with an FBI undercover and that occurred in

11   November of 2018.   That's Exhibit 12.   Muse Muse said to the

12   undercover FBI employee "I've come this far.   I'm not letting

13   the kuffar stop me now.   I swear to Allah I'd never go to jail.

14   It's either hijrah or shahad."   Which as you heard from the

15   agent means death of a martyr.

16          He's told this Court in his own words, "If I can't get

17   to Mogadishu, Somalia, and join ISIS, I'm not going to jail.

18   It's either hijrah or martyrdom."   And they talked about the

19   martyrdom that they were contemplating.   There were references

20   to the Paris attacks.   There were references to vehicles.   And

21   that's the plan B that should shake everybody in this

22   courtroom, to hear in their own words what their plans were if

23   they couldn't make it to join ISIS.   Muse Muse explained in

24   December of 2018, "I was the first."   Yet there are a lot of

25   conversations between Muse Muse and Mr. Haji, I concede that

1    there are not quite as many -- because, of course, as the Court

2    knows, Muse Muse and Mohamud Muse lived together -- so I

3    understand some kids sit around the dinner table and text each

4    other at the table, but we're not seeing as many conversations

5    on Facebook Messenger.  Probably because they lived together.

6          *THE COURT:*  Well, that doesn't happen at my house,

7    Mr. O'Connor, and I'm not going to speculate about what happens

8    in someone else's house.

9          *MR. O'CONNOR:*  Well, it doesn't happen in my house,

10   Your Honor, either because I don't have kids.  But the point

11   is, there are lots of conversations between two of the

12   defendants.  But make no mistake, Mohamud Muse makes it very

13   clear what his -- what his interest is with ISIS here.  We saw

14   that all the way back in January of 2017.  In fact, it's his

15   postings and comments in support of ISIS that launched this

16   whole investigation.

17         But jumping forward to December of 2018, Mohamud Muse

18   has a conversation in Exhibit 15 with the FBI undercover

19   employee and he describes his full understanding of dawla.  And

20   he says "I was supporting ISIS in my family before anyone else

21   did.  I just want Islam to win.  I want to kill kuffar."  And

22   that's also in the Indictment -- or in the Complaint Affidavit

23   at paragraph 29.

24         And if we haven't heard enough already, we know in

25   December of 2018 on the 14th Muse Muse and Mr. Haji met with

1    somebody that they thought they were trying to recruit.  So we

2    have another element of danger in the community.  We have

3    evidence that these guys thought that UCE-3, an FBI undercover,

4    was somebody that they could recruit to join them and join ISIS

5    and to travel with them.  In fact, Muse Muse thought he was

6    going to the Gerald Ford Airport on December 21st to meet

7    UCE-3.  And they have a meet-up.  The meet-up was their idea,

8    not the undercover's.  The undercover didn't suggest this.

9    These guys say, "Hey, we want to meet."  So they make

10   arrangements to meet with the undercover officer in

11   Benton Harbor, Michigan, where they helped him make his own

12   pledge of allegiance to ISIS.

13          So we have expressions out of their mouths to each

14   other about what they want to do and what they are going to do

15   if they can't do it.  And now we see them trying to recruit

16   other people to do this.  And what's really frightening about

17   that interaction, Your Honor, is that on December 14th, 2018,

18   Muse Muse says to the undercover FBI if he's not able to make

19   hijrah, he's going to take a car and run down the kuffar.  And

20   he makes a reference to what happened in France.  And Muse Muse

21   and Mr. Haji stated that Allah commanded that martyrdom is the

22   only option.  And that's in paragraph 30 of the

23   Complaint Affidavit.

24          And it doesn't stop there.  This goes on.  There are

25   opportunities left and right from even before January of 2017,

1    but through 2017 and through 2018 and now into 2019 in January

2    multiple opportunities for them to say "Wait a second.  I'm not

3    doing this.  This is crazy.  I don't know what I was thinking.

4    We shouldn't be doing this.  This isn't the right thing to do.

5    We shouldn't be talking about running down nonbelievers.  We

6    shouldn't talk about joining ISIS."

7           But we know what happens in January.  On January 9th,

8    2019, there's a conversation about -- from Mohamud Muse to FBI

9    UCE-2 that he might have to leave his wife behind.  He's at the

10   point he's so dedicated to this, Your Honor -- we've heard this

11   afternoon he's so dedicated to this, every time Facebook shuts

12   down his account, he's opening a new one.  He's not giving up.

13   He's dedicated.  He's determined to do this.  He's following

14   through.  He changes the information.  He changes his alias.

15   They come up with these kunya names.  They open up new Facebook

16   accounts in these kunya names.  This is dedication that these

17   individuals have shown.

18          And on January 15th again Muse Muse and Mr. Haji meet

19   up with the person they think they are recruiting to join

20   Muse Muse to join ISIS in Somalia.  They meet UCE-3 at a

21   WalMart in Lansing to shop for supplies so they'd have in this

22   case boots for the trip.  And what happens again?  Another

23   frightening conversation.  Muse Muse and Mr. Haji tell the FBI

24   undercover that if they failed in their attempt to join ISIS,

25   they would conduct an attack or a martyrdom operation.  And

1    again there's a reference to France, to the terror attack in

2    Paris.  And that appears in paragraph 45 of the Affidavit.

3             Your Honor, these men have demonstrated to you through

4    their own words with each other that they cannot be released.

5    If this Court releases any of these defendants, the next step

6    is grabbing a vehicle and running down kuffar.  And you know

7    that because they told you that that's what they would do.  The

8    government asks for detention pending trial in this matter.

9    Thank you.

10            *THE COURT:*  All right.  Thank you, Mr. O'Connor.

11            Ms. Turek.

12            *MS. TUREK:*  Thank you, Your Honor.  Your Honor, of the

13   factors that you must consider, I'm going to start with the

14   personal history and characteristics of my client.  And I do

15   that for a special reason.  As we heard, he's young.  He just

16   turned 20 about a week and a half ago.  When this -- when the

17   FBI became involved in this case, you know, he was 16, 17 years

18   old.  He graduated from Eastern High School.  Learned the

19   language.  Has a semester -- some classes at a community

20   college.  Has some employment record, although not as much as

21   the others, perhaps because he's younger.  He has a very

22   supportive family.  They were in the courtroom last week at the

23   hearing.  Many are back here today.

24            *THE COURT:*  I remember you pointing them out.

25            *MS. TUREK:*  Yes.  Thank you.  And many are still here

1    today.

2            He comes from a large family, and they are more than

3    willing to have him stay with them should the Court release

4    him.

5            He has no issues with substance abuse or alcohol.  No

6    mental health issues.  And no prior record.  Which I've always

7    argued is a good thing, Your Honor, although today the

8    government is arguing that not having contact is a bad thing.

9    But he does have a very close family.

10           This young man with no criminal history is the man

11   that the FBI, in my opinion, recruited for this conjured-up

12   offense.  And I don't say that lightly.

13           Since 2016 the FBI has been communicating with my

14   client and the others.  Since 2016 they have been putting ideas

15   in the heads of these -- of my client.  Even when -- even when

16   it appeared to my client's father that something was wrong and

17   he took my client's passport, the government still kept -- they

18   were aware of it, but they still kept at my client.  Since

19   2016.  We're now in January of 2019.  And for all that time,

20   even though there were these communications which are not

21   flattering to my client, nevertheless the government saw no --

22   were not concerned enough to make any arrests at that time.

23   Some of these conversations, Facebook posts, are from a number

24   of years back already and yet the government has not seen fit

25   to arrest my client prior to just a few weeks ago.

1    My client has never been accused of having any sort of

2    weapon.  In the four years as -- four years -- almost

3    four years since this case has been going on, my client took

4    none of the steps that may have been the topics in some of the

5    Facebook posts, but yet the FBI is cheerleading these guys on.

6    And I think once we do find and have a chance to read all the

7    Facebook posts, we're going to get a better picture of who was

8    suggesting what to whom.

9    And we know that the government was putting thoughts

10   in the heads of my client and the others because for the

11   longest time there was -- the first Muse Facebook account, that

12   was in existence well beyond April of 2016 -- well, before

13   April of 2016 when it first came to the attention of the FBI.

14   When in two thousand -- in June of 2017, when UCE-1 became

15   involved, within a month that is when the Facebook account was

16   suspended.  So I think that what that demonstrates is that

17   although there may have been some chatter and some

18   conversations going back and forth about ISIS, it was only

19   after the FBI became involved, until they began to focus those

20   conversations and direct and steer those conversations that

21   Facebook saw a reason to suspend the account.  And I think

22   that's very important because I think that demonstrates that

23   the FBI wasn't just a passive listener or a passive reader of

24   Facebook postings.  They were putting ideas and putting things

25   in motion until they had enough to charge my client.

1          It almost seems in just listening to the evidence last

2     Friday, in looking at the limited discovery that we have, which

3     consists right now of the exhibits, it almost seems that last

4     November or December the government decided, hey, we have to

5     ratchet things up.  We have to get these guys to move because

6     we want to make an arrest after three years or three and a

7     half years.  That's really what it seems to me when you look at

8     this.

9          As I said, they were not concerned before that.  There

10    were these Facebook postings going on for years and the

11    government took no action to stop them.  It was only after --

12    they were only arrested after the government made it possible

13    for an offense to be charged.

14         What I mean by that is take the idea of the passport.

15    My client, as we heard the agent testify last week, they could

16    have -- the FBI could have stopped my client from getting the

17    passport.  They didn't.  They wanted him to get a passport.  In

18    fact, after they learned that his first passport was lost and

19    he had applied for a second one, there was another opportunity,

20    and he was issued that passport within two days.

21         Now, I've had the opportunity to apply for passports

22    in my day because I like to travel, and I've also paid extra to

23    have an expedited passport delivered to me at times.  But it's

24    not within two days.

25         The money.  My client had no money to take a trip to

1    the east coast let alone halfway across the world.  He didn't

2    have the funds.  Who supplied the funds?  The government did.

3    So it's the government that every step of the way was getting

4    my client deeper and deeper involved in this and actually

5    taking steps until they felt that they had enough to charge my

6    client.

7              So, Your Honor, I think that's very important when you

8    look at this and when you consider whether he's a danger or

9    whether he will appear in court.  I do believe that there are

10   conditions that would secure his appearance here in court as

11   well as provide the Court with some understanding that he would

12   not be a -- pose a threat or a danger to the community, and I

13   would suggest curfew or tether.  No computer access.  My client

14   would gladly turn over his passport.

15             And as I've noted, he has a lot of family with whom he

16   could reside during the pendency of this case.  But I believe

17   there are those conditions that the Court could impose.

18   Because as I see it, but for the government's involvement, but

19   for the government's prodding of my client, of the FBI

20   cheerleading him on to become more involved in this matter, he

21   would still be working at Meijer's in all likelihood and

22   perhaps looking to take additional classes at Lansing Community

23   College.  Thank you.

24             *THE COURT:*  Thank you, Ms. Turek.

25             Ms. Chartier.

1          MS. CHARTIER:  Thank you, Your Honor.  Words spoken on

2    a public forum are not a crime, and words spoken to individuals

3    privately are not a crime.  Even when they express beliefs that

4    are anti-American and are pro-ISIS.  The agent when I asked him

5    questions last week said words are not a crime.  If any steps

6    were taken here that the government wants to indicate or craft

7    into a crime, it's because the government urged them to be

8    taken.  Even in the limited context that we have of the

9    exhibits.  In Exhibit 15 it's the government who asks:  "Can

10   you get more people?"  It's the government who says "Your

11   situation is holding you back."  That's not a government agent

12   who is sitting passively by and waiting for individuals to

13   express their willingness to act.  This is the government

14   actively encouraging individuals to participate in what they

15   will later deem to be a crime.

16          In three years there were no steps taken until the

17   government, as Ms. Turek indicates, seems to believe this is

18   taking too long and so instead of just sending money to

19   Mr. Muse, they decide to send a little bit to each individual

20   so that way they can say they put their words and beliefs into

21   action.  All because the government decides to send money to a

22   young man who didn't have it himself.

23          Mr. O'Connor said, "Well, Mr. Haji said 'We're the

24   next to step up' in June of 2017."  And you know what never

25   happens?  Mr. Haji doing anything to step up that's pro-ISIS.

1    He commits no crime at that point.  In a year and a half.  He

2    is a passenger in a car that takes Mr. Muse Muse to the airport

3    and ostensibly he provides the $300 that were sent to him by

4    the government to Mr. Muse Muse for his ticket.  A roundtrip

5    ticket we learned today.  The FBI has provided a limited

6    context for these conversations, but what we do know is that

7    they encouraged these young men to get deeper and deeper.  And

8    then now the government wants to say that they are a threat to

9    the community.  And Mr. O'Connor says "Well, the next step is

10   driving a car into a crowd."  In three years not one of these

11   young men has ever even done anything to indicate that that's

12   what they would actually do.

13          This Court can dislike their words.  This Court can

14   dislike their sentiments.  This Court can dislike their

15   beliefs.  But those are not crimes.  And those are not reasons

16   that these young men, and specifically Mr. Haji, should remain

17   in jail.

18          Mr. Haji had a job for approximately five years

19   working day after day after day at the Meijer warehouse.

20   That's not an individual who is doing anything more than being

21   a productive member of the community.

22          His family was here last week.  His family is here

23   today.  He can stay with his family if this Court releases him.

24   He has a minimal criminal history.  And he has, again, a place

25   to live.  To fault Mr. Haji for not having more money in the

1    bank or more financial or property ties faults poor people for

2    being poor.  You know who has a lot of money in the bank?

3    People who make a lot of money.  That's not someone who is

4    working a minimum-wage job at Meijer.

5              Mr. Haji should not be faulted because he does not

6    have more property and financial ties to the community.  What

7    he should be applauded for is having a job, having a family.

8    And the only reason that he sits here today is because the

9    government got tired of monitoring conversations and wanted to

10   ratchet things up and bring an end to this investigation.

11             I would ask the Court to consider the full picture of

12   what has occurred in this case.  I would ask the Court to not

13   be swayed by sentiments as stated by Mr. O'Connor, that the

14   next step is a vehicle being driven into a crowd, which is

15   purely meant to prey on the emotions of the Court.  There's no

16   indication that Mr. Haji would do anything of the sort.

17   Because, again, words are not a crime.  And I would ask the

18   Court to consider that there are mechanisms that could be

19   placed into effect to ensure that Mr. Haji is where he needs to

20   be.  So, for example, home confinement and a tether that falls

21   short of forcing him to remain in jail until a trial in this

22   case.  Thank you.

23             *THE COURT:*  Thank you, Ms. Chartier.

24             Mr. Zambon.

25             *MR. ZAMBON:*  Thank you, Your Honor.  I adopt the

1    arguments of fellow counsel here.  I'll just add a couple of

2    observations.

3            *THE COURT:*  Uh-huh.

4            *MR. ZAMBON:*  Mr. O'Connor talked about looking at the

5    nature and circumstances of this case.  The nature and the

6    circumstance of the case are set forth in the Indictment where

7    the defendants were supposed to provide material support to a

8    terrorist organization.  That material support appeared to be

9    only them, that they wished to go to Somalia to either live

10   there or to fight.  Was one of the quotes that we heard last

11   week.

12           This is a case of all talk and no action.  If they had

13   been accused or there was some evidence of, you know,

14   purchasing firearms or explosives or even an automobile or a

15   truck to run over people, we might have something there.  But

16   this is talk between the three of them.

17           As Ms. Chartier says, talk is not a crime.  Talk plus

18   something else, perhaps you would have a crime here.  I don't

19   believe that the government should view these gentlemen,

20   Mr. Mohamud Muse especially, as any danger to the community.

21   In fact, just the opposite.  He has no criminal record.  He has

22   no ties to a foreign country.  He's been in the United States

23   for 15 years.  He's been a citizen of the United States.  Was

24   willing to give up the passport.  He has a verified residence,

25   a pregnant wife.  As the Court notes, family in the courtroom

1    last week and then today.

2             He has been employed at a number of jobs, which I

3    think is very admirable.  And as the Pretrial Release Report

4    indicates, it appears that he becomes employed and then changes

5    jobs in order to better himself to get a higher wage.  I

6    believe he was last making about -- well, $11 an hour at

7    WalMart.

8             He has ties to the community.  Financial ties.  The

9    checking account, savings account.  There's no indication

10   whatsoever that he had ever dipped into those accounts to, you

11   know, purchase any kind of physical material in support of

12   ISIS.  These were conversations mainly between three young

13   people.  We didn't hear about any particular conversations with

14   any other known terrorists or anything like that.  No action

15   taken by my client.

16            I think that the Court could safely release

17   Mr. Mohamud Muse back to his family.  He could be monitored

18   electronically.  He could return to his job.  He can be there

19   for the birth of his child here in a month or two.  And that

20   there are a number of combinations that the Court can take into

21   account to ensure the safety as well as the appearance.

22            I don't think there's any doubt that he'll appear in

23   court.  He has no history of not appearing.  In fact, he always

24   appears to go to work.  So he does have a history of appearing.

25   Perhaps not in court, which is a good thing, because he has no

1  record.  So I think that the Court can safely release

2  Mr. Mohamud to the community under some kind of conditions.

3  Reporting, curfew, electronic monitoring.  And perhaps no

4  communication via the internet.  Thank you, Your Honor.

5           THE COURT:  Thank you, Mr. Zambon.

6           This matter is governed by the Bail Reform Act of

7  1984.  Pursuant to that statute I must release a defendant on

8  his personal recognizance unless I find that such release will

9  not reasonably assure the appearance of that person as required

10 or will endanger the safety of any other person in the

11 community.

12          The government has the burdens of proof.  First of

13 all, preponderate evidence that an individual poses a

14 significant risk of flight that is more likely than not.  And

15 by clear and convincing evidence that the individual poses a

16 danger to the safety of other persons in the community.

17          Even if the government meets its burden, that does not

18 result in pretrial detention unless the judicial officer also

19 determines that there is no condition or combination of

20 conditions that will address the issue at hand.  The statute

21 includes 13 specific conditions the Court is to consider as

22 well as any other the Court can fashion.  And in all cases I

23 consider every one of those.

24          In this case, as I've indicated earlier, the

25 government enjoys a rebuttable presumption under the Bail

203

1    Reform Act, specifically Section 3142(e)(3)(C) which references

2    eventually to 18 U.S.C. 2339B, the statute that was allegedly

3    violated here.

4            As I've indicated, in United States versus Stone the

5    Sixth Circuit ruled that the presentment of a grand jury

6    Indictment is sufficient to trigger the rebuttable presumption.

7    There's no need for a separate judicial determination of

8    probable cause.  But the Sixth Circuit in the Stone case also

9    noted that the rebuttable presumption temporarily shifts the

10   burden of production to the defendant, it does not shift the

11   burden of persuasion.  That remains with the government.

12           The Court also held that the burden of production that

13   is shifted to the defendant is not a heavy one, however, the

14   defendant must introduce some evidence to rebut it.  It

15   remains, if rebutted, a factor for the Court to consider.  And

16   the Sixth Circuit noted in the Stone case that their statutory

17   rebuttable presumption reflects Congress's substantive judgment

18   that particular classes of cases of offenders should be

19   detained prior to trial.  And the court also held, and I quote,

20   "To rebut the presumption, therefore, a defendant should

21   present all the special features of his case that take it

22   outside the congressional paradigm."  And that is from

23   9 -- 608 F.3d. at 946.  The Sixth Circuit in turn quoting

24   United States versus Jessup, a First Circuit case.

25           I also note that I must make an individualized

1     assessment of each of the defendants, and I'm going to do that

2     here.

3              First of all, with respect to the statutory rebuttable

4     presumption as to significant risk of flight, I find that --

5     I'm going to deal with Mr. Muse Muse first.  Again keeping in

6     mind the Sixth Circuit's admonition that this burden is not

7     heavy, and in fact I note that that case involved allegations

8     similar to those in this case, and in fact similar to this one

9     the court found that the presumption had been rebutted.  I find

10    that Mr. Muse Muse has rebutted the presumption, keeping in

11    mind that burden is not very heavy, through the information

12    that he is a U.S. citizen, he has extended family and family

13    support here, involvement in employment until very recently.

14    That he's been in school.  And there's also some information in

15    the Pretrial Services Report that supports that.

16             All right.  Now, having made that determination -- and

17    the irony here is that it takes little, relatively, to rebut

18    the presumption, but I still have to determine whether the

19    government has met its burden by a preponderance of the

20    evidence, and the irony is sometimes both apply.  And I find

21    here that while Mr. Muse Muse rebutted the presumption, the

22    government has met its burden by a preponderance of the

23    evidence that Mr. Muse Muse does pose a significant risk of

24    flight.  He has limited property interests and other interests

25    here, although he does have a family that cares about him.

1      And this will apply to all the defendants.  They have

2  demonstrated through the Facebook communications they have a

3  strong interest in leaving this country.  They have a strong

4  interest in not returning.  They have made oaths to a foreign

5  terrorist organization and committed themselves over and over

6  to leave this country to go and fight for that organization.

7  That's pretty strong incentive to flee.  That's certainly

8  preponderance of the evidence.

9      Now let me deal -- turn to Mr. Haji.  I'm going to

10  deal with risk of flight before I deal with danger to the

11  community.

12      Mr. Haji also has rebutted the statutory presumption

13  with respect to significant risk of flight through his

14  employment, his extended family, his attempts to purchase

15  property.  He's a U.S. citizen.  Ms. Chartier has represented

16  to me that his residence has been verified.  And I trust all

17  the counsel here implicitly in terms of the representations

18  that they make.  That's sufficient to rebut the presumption.

19  However, for the same reasons I cited for Mr. Muse Muse, the

20  government has also met its burden of preponderate evidence

21  that he poses a significant risk of flight.

22      Mr. Mohamud Muse has also rebutted the statutory

23  presumption through the fact that he's a citizen, no

24  significant ties to any foreign country.  He is willing to turn

25  his passport over to Pretrial Services.  A verified address.

1    He is married and expecting his first child in March of 2019.

2    For the same reasons I articulated for Mr. Muse Muse, the

3    government has met its burden of a preponderance of the

4    evidence that he poses a significant risk of flight.

5            Now I will turn to the issue of danger to the

6    community.  I find that none of the defendants have rebutted

7    that presumption, even though the burden is not very great.

8    There is little, if any, evidence here that's been offered to

9    the Court that rebuts -- or addresses I should say much less

10   rebuts the issue of danger to the safety of any other person in

11   the community.

12           Moreover, I find that even if the defendants had

13   rebutted that presumption, the government has met its burden by

14   clear and convincing evidence that each of the defendants pose

15   a danger to others in the community.  And I'm going to recount

16   some of the evidence.  I'm not going to do it all.

17           As to Mr. Muse Muse we have a Facebook account.  A

18   search warrant was executed -- obtained I should say on

19   March 22nd of this year.  The result of which showed multiple

20   communications with Mr. Haji expressing a desire to fight for

21   ISIS.  They discuss specific acts of violence.  There's a

22   screen capture of the truck attack in New York City which is

23   also demonstrated in the hearing Exhibit Number 4.  No evidence

24   of FBI involvement in any of these communications.

25           And let me mention, by the way, I understand where

1    defense counsel is coming from.  This is not a criticism in any

2    way, shape, or form.  I've heard -- the elephant in the room

3    here is entrapment, all right?  That's not an issue that's

4    before me.  That's not an issue that I'm supposed to decide nor

5    could I decide it based upon the record that's before me.  I

6    suspect that's going to be an issue Judge Quist is going to

7    decide, and he's going to have a much more complete record upon

8    which to decide it.  So I don't want anybody to take anything

9    I'm saying here today one way or the other about what I think

10   of that issue.  What I'm focused on is it is relevant to my

11   determination whether a government agent is prompting somebody

12   to say something that then in turn is being used as evidence to

13   demonstrate their violent tendencies or their danger.  And so I

14   am focused on that aspect to that extent.

15        With respect to -- back to Mr. Muse Muse.

16   February 1st of this year he and Mr. Haji were exchanging

17   messages discussing hijrah.  And I also note that there's been

18   contentions about the specific meaning of hijrah and the

19   connotations of that term.  I don't think any reasonable

20   impartial person could look at the use of that term in the

21   context of this case and see it as anything other than an

22   interest and intent to fight for ISIS.

23        March 28th, 2018, Mr. Haji sent a dead goat picture to

24   Mr. Muse Muse and he and Mr. Muse Muse discussed jihad with

25   respect to that.  I won't recite all the specific comments.

1          March 29th, 2018, Mr. Muse Muse and Mr. Haji exchanged

2     Facebook communications discussing ISIS videos decapitating

3     victims, noting that they wanted to be with ISIS and to join in

4     getting victory.  This is not about the First Amendment.  This

5     is not about whether words are a crime.  They are not.  This is

6     about whether someone says or does things that would cause this

7     Court to believe they pose a danger to the community.  And over

8     and over again we have a number of comments here.  And counsel

9     wants me to treat them as just talk.  Well, to do that, I have

10    to assume that they were lying, that they were not telling the

11    truth when they made these statements.  I have no evidence to

12    base such a conclusion.

13         July 5th, 2018, Mr. Muse Muse and Mr. Haji were on

14    Facebook sharing a photo of a young martyr and discussing the

15    killing of kuffar, nonbelievers.

16         August 17th, 2018, Mr. Muse Muse and Mr. Haji again on

17    Facebook.  Mr. Muse Muse writes, and I quote, "Hijrah is the

18    only thing," spelling incorrect, "that can save us unless we do

19    istishhadi," martyrdom.

20         August 31st, 2018, Mr. Muse Muse and Mr. Haji on

21    Facebook discussing going to Somalia.  The fact that law

22    enforcement may be reading their Facebook content.  They

23    discussed domestic jihad if placed on the no-fly list.  No

24    evidence the FBI put them up to that.

25         Mr. Muse Muse's Facebook was searched by a warrant

1   that was issued on October 17th, 2018, which showed exchanges

2   between Mr. Muse Muse and Mr. Haji between August of 2018 and

3   October of that year, including using a vehicle for an attack.

4   I heard no evidence to suggest the FBI ever suggested to any of

5   the defendants that they use vehicles to attack people.

6           October 18th, 2018, Mr. Muse Muse told Undercover

7   Employee Number 2, "I plan on doing hijrah to Somalia and

8   joining those who are establishing the Sharia of Allah."

9           Now, this was in response to UCE-2's communication

10  regarding the situation in Somalia.  The evidence doesn't tell

11  me specifically what that communication was, but I haven't

12  heard any evidence to suggest that the FBI specifically asked

13  them to come to Somalia.

14          October 30th, 2018, Mr. Muse Muse communicated with

15  UCE-2.  He wrote he wanted to travel to Somalia to make his

16  bay'a, his oath, allegiance to ISIS, and to fight in the front

17  lines.  Mr. Muse Muse stated he would be able to save enough

18  money to join ISIS in six to eight months.  The UCE-2 then

19  cautioned Mr. Muse Muse about the steps he needed to take.

20  Now, here, arguably, the FBI is providing information, but

21  there's nothing to suggest or to demonstrate that Mr. Muse Muse

22  was only acting at the direction of any FBI agent.

23          Mr. Muse Muse sent a video on November 7th, 2018, to

24  UCE-2 with his oaths -- with an oath to ISIS.  No evidence that

25  the FBI helped to make that video or told him what to say.

1      November 15, 2018, Mr. Muse Muse broached the subject

2   of needing financial support.  Now, pursuant to that request it

3   seems to have prompted the FBI to offer money to help them make

4   the trip.

5      November 17th, 2018, Mr. Muse Muse sent two videos to

6   UCE-2 containing Mohamud Muse and Mr. Haji's oath of allegiance

7   to ISIS with Mohamud Muse and Haji's -- Mr. Haji's, excuse

8   me -- contact information.

9      On December 14th of last year Mr. Muse Muse and

10  Mr. Haji met with UCE-3 in Benton Harbor.  Both Mr. Muse Muse

11  and Mr. Haji coached UCE-3 through the recitation.  Here it

12  looks like Mr. Muse Muse and Mr. Haji are the ones doing the

13  coaching, not the FBI.

14      December 17th, 2018, the State Department received

15  Mr. Muse Muse's passport application.  That could be construed

16  as an action to effect the conspiracy.

17      December 18th of last year Mr. Muse Muse went to

18  UCE-3 -- sent to him I should say, or her, a link to flights

19  from Chicago to Mogadishu.  So apparently the FBI is not the

20  one finding the flights.

21      December 20th through the 21st of last year

22  Mr. Muse Muse advised UCE-3 that if their passports arrived

23  before January 21st they would leave sooner.  That they were

24  booking a flight, that they found a flight at the cost of

25  $1,799.  Mr. Muse Muse stated that the purchase of the tickets

1    will be proof of his sincerity.

2            December 21, 2018, Mr. Muse Muse wrote to UCE-2 and

3    said that he and UCE-3 had found a ticket, gave the dates of

4    travel, and the cost.  At that point Mr. Muse Muse requested

5    $1,200 from who he thought was a representative from ISIS.

6            January 7th of this year Mr. Muse Muse communicated

7    with UCE-2 that he and UCE-3 were planning to buy tickets and

8    would be on a flight.

9            Mr. Muse Muse and Mr. Haji met with UCE-3 at WalMart

10   in Lansing and purchased combat-style boots.  They also told

11   UCE-3 at that time that if they failed to join ISIS, they would

12   conduct an attack or martyrdom operation, referencing the Paris

13   attack.  No evidence the FBI suggested that.

14           January 21st all three drove to Gerald R. Ford

15   Airport.  Mr. Muse Muse obtained a boarding pass and went

16   through TSA before he was arrested.  After his arrest in a

17   Mirandized interview he provided a statement saying that he

18   wanted to join ISIS in Somalia so he wouldn't have to do an

19   attack in the United States.  That is clear and convincing

20   evidence that Mr. Muse Muse poses a danger to the community.

21           With respect to Mr. Mohamed Haji, prior to

22   the June 21st, 2017, introduction of UCE-1 Mr. Haji was

23   communicating on Mr. Mohamud Muse's Facebook indicating support

24   and an interest in fighting for ISIS.

25           June 15th of 2017 Mr. Haji writes, "I pray Allah gives

1    the mujahideen the victory inshallah.  Always victory Ya Allah.

2    And we are next to step up to the battlefield."

3           November 1st, 2017, Mr. Muse Muse sent Mr. Haji a

4    screen shot of the truck attack I referenced earlier, which is

5    Exhibit 4.  Mr. Haji stated, and I quote, "Real civil war."

6    Mr. Muse Muse stated, "If this don't wake up the people,

7    nothing will."  Mr. Haji responded, "Yeah, I'm ready

8    inshallah."  God willing.  Mr. Haji then added, "This is a call

9    for hijrah."  There was no FBI involvement that I could glean

10   from any of that interaction.

11          February 1st, 2018, Mr. Muse Muse and Mr. Haji

12   exchanged messages discussing hijrah and Dawla, which is ISIS.

13          On March 28th, 2018, Mr. Haji sent a dead goat picture

14   as I indicated earlier.  Mr. Muse Muse and Mr. Haji discussed

15   jihad.  Mr. Haji writes -- wrote, and I quote, "Yeah, next time

16   I want to catch kuffar and do my jihad training on them."

17          April 29th, 2018, Mr. Muse Muse and Mr. Haji exchanged

18   communications on Facebook discussing ISIS videos decapitating

19   victims, noting that they wanted to be with ISIS and join in

20   getting the victory.

21          Please note I'm not repeating the comments about

22   whether -- how they felt about that.  Ms. Chartier, I think, is

23   the one who made this point.  She's right.  This Court should

24   not be making decisions of this nature based on any sort of

25   emotion.  It's not.  This is based upon Mr. Haji's and

1    Mr. Muse Muse's statements indicating that they had an interest
2    in being involved in such activity.
3            July 5th, 2018, Mr. Muse Muse and Mr. Haji were on
4    Facebook sharing a photo of a young martyr as I said before,
5    and both of them discussing killing kuffar, nonbelievers.
6            August 31st of last year, Mr. Muse Muse and Mr. Haji
7    were on Facebook discussing going to Somalia.  Again discussing
8    the fact that law enforcement reads Facebook contact -- content
9    and their intention to engage in domestic jihad.
10           And Mr. Haji wrote, and I quote, "I just want to
11   dispatch them to the hellfire."  People can have whatever
12   religious or other beliefs they want, but when they express an
13   interest in killing people, that's an interest to this Court.
14           Mr. Haji's Facebook was searched pursuant to a warrant
15   issued on August 28th of last year.  It showed communications
16   between June and August of 2018, communications with
17   Mr. Muse Muse regarding a desire to fight for ISIS.  Mr. Haji
18   wrote on one occasion, "Kuffar, I want to kill one.  My days
19   are coming.  I want a lot of this kuffar dead."  No FBI
20   involvement in that.
21           October of 2018 UCE-3 introduced to the investigation.
22   Between October 18 and December of 2018 Mr. Haji communicated
23   with UCE-3 about his desire to make hijrah and jihad.
24           On November 15 of last year Mr. Muse Muse sent a video
25   to UCE-3 containing Mr. Haji's oath of allegiance to ISIS.  And

1    sometime between December 6th and 7th of last year Mr. Haji

2    asked UCE-3 for a face-to-face meeting.  Mr. Haji sent UCE-3 a

3    written ISIS oath and audio of his recitation of the ISIS

4    pledge.

5              On December 14th of last year Mr. Haji and

6    Mr. Muse Muse met with UCE-3 in Benton Harbor.  They coached

7    him through the recitation of the oath and Mr. Haji recorded

8    it.

9              December 17th of last year Mr. Haji contacted UCE-2

10   asking for financial assistance to travel.  For Muse Muse to

11   travel.

12             January 7th Mr. Haji communicated with UCE-2 and

13   stated, "I will find it and work hard for it.  Will be coming

14   with Muse at the same time or not too long inshallah."  God

15   willing.

16             January 15th of this year Mr. Haji and Mr. Muse Muse

17   met with UCE-3 at the WalMart, were buying boots and discussing

18   domestic jihad.  And all three of them drove to the

19   Grand Rapids airport on the 21st.  That is clear and convincing

20   evidence that Mr. Haji poses a danger to others in the

21   community.

22             As to Mr. Mohamud Abdikadir Muse -- Muse, excuse me --

23   there's a Facebook account of his from June of 2017 referenced

24   in the Complaint.  Mohamud -- Mr. Mohamud Muse told UCE-1 he

25   wanted to join ISIS in Syria and was saving for a trip to

215

1  Syria.  He had a valid passport.  That he planned to die with a
2  gun in his hand.

3       I reviewed all of these exhibits very carefully again,
4  and I could find nothing to suggest that the interest in going
5  to Syria was prompted by an FBI agent.

6       September 13th, 2017, search warrant of
7  Mr. Mohamud Muse's Facebook, communications between
8  January 2017 and June of that year between Mr. Mohamud Muse and
9  Mr. Haji again expressing support for and interest in fighting
10 for ISIS.  And Mr. Mohamud Muse asked for more ISIS videos.

11      February 8th of 2018, a search warrant obtained on
12 Mr. Mohamud Muse's Facebook account.  A look found messages
13 between August and October of 2017 between Mr. Mohamud Muse and
14 Mr. Muse Muse discussing support for ISIS.

15      Sometime prior to November 17th of last year
16 Mr. Mohamud Muse made a video making an oath of allegiance to
17 ISIS which Mr. Muse Muse sent to UCE-2.

18      On December 11th or 12th of last year Mr. Mohamud Muse
19 communicated with UCE-2 stating, "I was supporting Dawla in my
20 family before anyone did."  He also wrote that he was saving
21 money for hijrah soon.  And he stated, "Brother, I just want
22 Islam to win.  I want to kill kuffar."

23      December 17th, 2018, Mr. Mohamud Muse communicated
24 with UCE-2 that he would travel to Somalia to join ISIS soon
25 after the birth of his child.

216

1          January 7th of this year he advised UCE-2 that -- and
2    I quote -- that "Haji, my brother-in-law, and, yes, we talked,
3    we agree to leave together," and he joined the others in a trip
4    to the Grand Rapids airport resulting in his arrest.  That is
5    clear and convincing evidence that Mr. Mohamud Muse poses a
6    danger to the community.
7          Even crediting the defense argument concerning the FBI
8    role here, it seems to me the defendants needed little
9    encouragement.  They discussed committing domestic terrorism if
10   they were unable to fight for ISIS.  There's no evidence
11   anybody from the FBI suggested that.  And they expressed not
12   only an interest in killing for ISIS but a willingness to die
13   for the cause.  To be martyrs for the cause.
14         Given such extremism, there is no reason to believe
15   that anyone with those opinions and views would be dissuaded by
16   any term or condition of bond that this Court could set.
17   Accordingly, I am issuing an order remanding Mr. Muse Muse,
18   Mr. Mohamud Muse, and Mr. Mohamed Haji to the custody of the
19   United States Marshal pending further proceedings in this case.
20         Mr. O'Connor, is there anything else we need to take
21   up at this time?
22         *MR. O'CONNOR:*  No, Your Honor.  Thank you.
23         *THE COURT:*  All right.  Mr. Zambon?
24         *MR. ZAMBON:*  Only with regard to the passport,
25   Your Honor.  I'll return that to the family.  I don't think

1  there's any need for the pretrial release people to keep that.

2          THE COURT:  I agree with you, and I know of no legal

3  basis by which he's required to surrender it at this time.

4          MR. ZAMBON:  Thank you.

5          THE COURT:  Ms. Chartier.

6          MS. CHARTIER:  Nothing else.  Thank you, Your Honor.

7          THE COURT:  All right.  Ms. Turek.

8          MS. TUREK:  Nothing.  Thank you, Your Honor.

9          THE COURT:  I want to thank all three counsel for

10  their work on this case.  I know if I were charged with a

11  federal crime, I would want somebody just like one of you

12  representing me, and I appreciate your advocacy on the part of

13  your clients.

14          MR. ZAMBON:  Thank you, Your Honor.

15          MS. CHARTIER:  Thank you.

16          MS. TUREK:  Thank you.

17      (Proceeding concluded at 4:31 p.m.)

18                      *   *   *   *   *

19

20

21

22

23

24

25

218

1                       CERTIFICATE

2          I certify that the foregoing is a transcript from the

3    Liberty Court Recording System digital recording of the

4    proceedings in the above-entitled matter, transcribed to the

5    best of my ability.

6          I further certify that the transcript fees and format

7    comply with those prescribed by the court and the Judicial

8    Conference of the United States.

9

10   May 14, 2019

11

12                            /s/ Glenda Trexler
                              _____
13                            Glenda Trexler, CSR-1436, RPR, CRR

14

15

16

17

18

19

20

21

22

23

24

25

219

1

2                          *EXAMINATION INDEX*

3                                                *PAGE*

4        *CROSS-EXAMINATION BY MR. ZAMBON:*          *143*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25